FRANK L. RODRIGUEZ
NAME

V-63358
PRISON NUMBER

HIGH DESERT STATE Prison
P.O.Box-3030.
CURRENT ADDRESS OR PLACE OF CONFINEMENT

SUSANVILLE, CAL. 96127-3030.
CITY, STATE, ZIP CODE

2254 ✓ 1983
FILING FEE PAID
Yes ___ No ✓
IFP MOTION FILED
Yes ___ No ✓
COPIES SENT TO
Court ✓ ProSe ___

FILED
FEB - 1 2008
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY ___ DEPUTY

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

FRANK L. RODRIGUEZ,
(FULL NAME OF PETITIONER)

PETITIONER

v.

JAMES TILTON, DIRECTOR.,
(NAME OF WARDEN, SUPERINTENDENT, JAILOR, OR AUTHORIZED PERSON HAVING CUSTODY OF PETITIONER [E.G., DIRECTOR OF THE CALIFORNIA DEPARTMENT OF CORRECTIONS])

RESPONDENT

and

EDMUND G. BROWN, JR.,
The Attorney General of the State of California, Additional Respondent.

Civil No. '08 CV 0205 IEG PCL
(TO BE FILLED IN BY CLERK OF U.S. DISTRICT COURT)

## PETITION FOR WRIT OF HABEAS CORPUS

UNDER 28 U.S.C. § 2254
BY A PERSON IN STATE CUSTODY

1. Name and location of the court that entered the judgment of conviction under attack: Superior court of CALIFORNIA, COUNTY OF SAN Diego, NORTH COUNTY JUDICIAL DISTRICT, VISTA CALIF.
2. Date of judgment of conviction: OCT. 7, 2004.
3. Trial court case number of the judgment of conviction being challenged: NO. D045684; SCN-163391
4. Length of sentence: (3) CONSECUTIVE LIFE TERMS PLUS AN Additional Term OF 60 years.

5. Sentence start date and projected release date: OCT. 7.2004. RELEASE DATE "?"

6. Offense(s) for which you were convicted or pleaded guilty (all counts) (3) COUNTS OF ATTEMPTED MURDER (3) COUNTS OF ASSAULTING A PEACE OFFICER, AND EVADING AN OFFICER; ARMED WITH AND FIRED A RIFLE

7. What was your plea? (CHECK ONE)
   - (a) Not guilty ☒
   - (b) Guilty ☐
   - (c) Nolo contendere ☐

8. If you pleaded not guilty, what kind of trial did you have? (CHECK ONE)
   - (a) Jury ☒
   - (b) Judge only ☐

9. Did you testify at the trial?
   ☐ Yes ☒ No

**DIRECT APPEAL**

10. Did you appeal from the judgment of conviction in the **California Court of Appeal**?
    ☒ Yes ☐ No

11. If you appealed in the **California Court of Appeal**, answer the following:
    - (a) Result: DENIED
    - (b) Date of result, case number and citation, if known: NOV 28, 2005
    - (c) Grounds raised on direct appeal: (1). The discharge of Juror NO. 10; (2). INSUFFICIENT EVIDENCE To support the attempted murder convictions; (3). Testimony of CRIMINALIST LANCE MARTINI.

12. If you sought further direct review of the decision on appeal by the **California Supreme Court** (e.g., a Petition for Review), please answer the following:
    - (a) Result: DENIEd.
    - (b) Date of result, case number and citation, if known: JUN 14, 2006
    - (c) Grounds raised: (1). The discharge of Juror NO. 10; (2). INSUFFICIENT EVIDENCE To support the attempted murder convictions; (3). Testimony of CRIMINALIST LANCE MARTINI.

13. If you filed a petition for certiorari in the **United States Supreme Court**, please answer the following with respect to that petition:

(a) Result: DENIED

(b) Date of result, case number and citation, if known: DEC. 19-2007 - S-154403 & S-154398 -

(c) Grounds raised: (1). THE discharge of JUROR NO. 10; (2) INSUFFICIENT EVIDENCE TO SUPPORT THE ATTEMPTED MURDER CONVICTIONS; (3). TESTIMONY OF CRIMINALIST LANCE MARTINI; (4). EIGHTH AMENDMENT FORBIDS EXTREME SENTENCES THAT ARE GROSSLY DISPROPORTIONATE TO THE CRIME; (SUPPLEMENTAL GROUNDS) (5). THE EX-POST-FACTO CLAUSE IN ART. I. 10; (6). PROSECUTION MISTATED EVIDENCE VIOLATED THE TRUTH-IN-EVIDENCE DOCTRINE.

## COLLATERAL REVIEW IN STATE COURT

14. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions (e.g., a Petition for Writ of Habeas Corpus) with respect to this judgment in the **California Superior Court**?
☒ Yes ☐ No

15. If your answer to #14 was "Yes," give the following information:

(a) **California Superior Court** Case Number: NO. D045684; - SCN-163391

(b) Nature of proceeding: COLLATERAL ATTACK ON JUDGEMENT

(c) Grounds raised: (1). THE discharge of JUROR NO. 10; (2). INSUFFICIENT EVIDENCE TO SUPPORT THE ATTEMPTED MURDER CONVICTIONS; (3). TESTIMONY OF CRIMINALIST LANCE MARTINI; (4). EIGHTH AMENDMENT FORBIDS EXTREME SENTENCES THAT ARE GROSSLY DISPROPORTIONATE TO THE CRIME; (SUPPLEMENTAL GROUNDS) (5). THE EX-POST-FACTO CLAUSE IN ART. I. 10; (6). PROSECUTION MISTATED EVIDENCE VIOLATED THE TRUTH-IN-EVIDENCE DOCTRINE.

(d) Did you receive an evidentiary hearing on your petition, application or motion?
☐ Yes ☒ No

(e) Result: N/A

(f) Date of result: N/A

16. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions (e.g., a Petition for Writ of Habeas Corpus) with respect to this judgment in the **California Court of Appeal**?
☒ Yes ☐ No

17. If your answer to #16 was "Yes," give the following information:

(a) **California Court of Appeal** Case Number: NO: D050502; D050739 - BCN: 163391

(b) Nature of proceeding: COLLATEREL ATTACK ON JUDGEMENT.

(c) Grounds raised: (1). THE discharge of Juror NO: 10; (2). INSUFFICIENT EVIDENCE TO SUPPORT THE ATTEMPTED MURDER CONVICTIONS; (3). TESTIMONY OF CRIMINALIST LANCE MARTINI; (4). EIGHTH AMENDMENT; Forbids extreme SENTENCES THAT ARE grossly disproportionate TO THE CRIME; (SUPPLEMENTAL grounds) (5). THE EX-POST-FACTO CLAUSE IN ART. I, 10; (6). PROSECUTION MISTATED EVIDENCE VIOLATED THE TRUTH-IN-EVIDENCE DOCTRINE.

(d) Did you receive an evidentiary hearing on your petition, application or motion?
☐ Yes ☒ No

(e) Result: [redacted] N/A

(f) Date of result: N/A

18. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions (e.g., a Petition for Writ of Habeas Corpus) with respect to this judgment in the **California Supreme Court**?
☒ Yes ☐ No

19. If your answer to #18 was "Yes," give the following information:

(a) **California Supreme Court** Case Number: S-154403 - S-154398

(b) Nature of proceeding: COLLATERAL ATTACK ON JUDGEMENT.

(c) Grounds raised: (1). THE discharge OF JUROR NO. 10; (2). INSUFFICIENT EVIDENCE TO SUPPORT THE ATTEMPTED MURDER CONVICTIONS; (3) TESTIMONY OF CRIMINALIST LANCE MARTINI; (4) EIGHTH AMENDMENT Forbids EXTREME SENTENCES THAT ARE grossly disproportionate TO THE CRIME; (SUPPLEMENTAL grounds) (5). THE EX-POST-FACTO CLAUSE IN ART. I. 10; (6). PROSECUTION MISTATED EVIDENCE VIOLATED THE TRUTH-IN-EVIDENCE DOCTRINE.

(d) Did you receive an evidentiary hearing on your petition, application or motion?

☐ Yes ☒ No

(e) Result: N/A

(f) Date of result: N/A

20. If you did ***not*** file a petition, application or motion (e.g., a Petition for Review or a Petition for Writ of Habeas Corpus) with the **California Supreme Court**, containing the grounds raised in this federal Petition, explain briefly why you did not:

______________________________________________

______________________________________________

______________________________________________

______________________________________________

## COLLATERAL REVIEW IN FEDERAL COURT

21. Is this your **first** federal petition for writ of habeas corpus challenging this conviction?
☒ Yes ☐ No (IF "YES" SKIP TO #22)
   (a) If no, in what federal court was the prior action filed? ______________
      (i) What was the prior case number? ______________
      (ii) Was the prior action (CHECK ONE):
         ☐ Denied on the merits?
         ☐ Dismissed for procedural reasons?
      (iii) Date of decision: ______________
   (b) Were any of the issues in this current petition also raised in the prior federal petition?
      ☐ Yes ☐ No
   (c) If the prior case was denied on the merits, has the Ninth Circuit Court of Appeals given you permission to file this second or successive petition?
      ☐ Yes ☐ No

---

**CAUTION:**

- **Exhaustion of State Court Remedies:** In order to proceed in federal court you must ordinarily first exhaust your state court remedies as to each ground on which you request action by the federal court. This means that even if you have exhausted some grounds by raising them before the California Supreme Court, you must first present ***all*** other grounds to the California Supreme Court before raising them in your federal Petition.
- **Single Petition:** If you fail to set forth all grounds in this Petition challenging a specific judgment, you may be barred from presenting additional grounds challenging the same judgment at a later date.
- **Factual Specificity:** You must state facts, not conclusions, in support of your grounds. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do. A rule of thumb to follow is — state who did exactly what to violate your federal constitutional rights at what time or place.

---

## GROUNDS FOR RELIEF

22. State *concisely* every ground on which you claim that you are being held in violation of the constitution, law or treaties of the United States. Summarize *briefly* the facts supporting each ground. If necessary, you may attach pages stating additional grounds and/or facts supporting each ground.

(a) **GROUND ONE**: The discharge of Juror No. 10.

Supporting FACTS (state *briefly* without citing cases or law) On the second day of trial, Juror No. 10 submitted a note to the judge expressing concerns about "deciding a mans fate". After extensive questioning by the Judge, prosecutor and defense, the court excused Juror No. 10 for cause and replaced her with an alternate. There was no good cause for discharging Juror No. 10. As required by penal code 1089 and it was an abuse of discretion for the court to discharge her.

As a result, Appellate was denied his sixth Amendment right to a trial by a fair and impartial jury.

The trial court stated Juror No. 10 could "not" be fair or impartial. (RT. 152).

However, there is "no" evidence in the record to support this conclusion.

Juror No. 10 acknowledged to the trial court that she understood that the court and not the jury.

(CONT'D)

Did you raise GROUND ONE in the California Supreme Court?

☒ Yes ☐ No.

# SUPPORTING FACTS: A
(A: CONT'd)

would impose punishment and that it was her obligation to listen to the facts. (RT 147-148.) She stated that her concerns about the gravity of the case would not affect her ability to listen to the evidence or determine the facts. She said that she would not be swayed by either side and that she is a very fair person. (RT 149, 151.)

Moreover, there is absolutely no evidence to establish that Juror No. 10 was unwilling or unable to follow the court's instructions or the law. She expressly said that she understood that she would have to follow the court's instructions. (RT 151.)

At most, Juror No. 10 was candid that this was a very serious case and that she was aware that her decision carried enormous gravity with regard to petitioner's future. This issue was correctly resolved by the court clarifying the respective roles of the court and the jury and making it clear that any juror would be weighted by the same burden. (RT 150.)

Juror No. 10 expressd no equivocation about her ability to set aside her discomfort about the gravity of the case and the possible consequences. She repeatedly and unambiguously stated she "could" follow the trial court's instructions and set aside her feelings and emotion to the court, but her statements absolutely no actual bias..

However, the record does not reflect that Juror No. 10 was either biased in favor of the defense or prejudiced against the People. All of her statements stemmed

# SUPPORTING FACTS: A
## (A: CONT'd)

FROM HER EXPRESSED DESIRE TO BE FAIR.

JUROR NO. 10'S STATEMENT TO THE PROSECUTOR THAT SHE COULD NOT RULE OUT THE POSSIBILITY THAT THE GRAVITY OF THE CASE WOULD AFFECT THE WAY SHE VIEWED THE EVIDENCE WAS MERELY AN HONEST ASSESSMENT ABOUT NOT BEING ABSOLUTELY SURE HOW ANYTHING MIGHT AFFECT HER BEFOR SHE HEARD THE CASE. FURTHER, THAT AMBIGUOUS STATEMENT ONLY CAME AFTER THE PROSECUTOR, WHO WAS CLEARLY TRYING TO REMOVE JUROR NO. 10, BERATED HER BY ASKING THE SAME QUESTION THREE TIMES. (RT 150-151.)

GIVEN JUROR NO. 10'S ASSURANCES TO THE COURT THAT SHE COULD PERFORM HER DUTIES AND SET ASIDE HER CONCERNS, THE COURT ABUSED ITS DISCRETION IN DISCHARGING HER.

JUROR NO. 10 HAD NO DUTY TO RESPOND AFFIRMATIVELY TO THESE QUESTIONS BECAUSE THE RECORD REVEALS THAT THERE WERE NO FACTS THAT WOULD PREVENT JUROR NO. 10 FROM BEING FAIR AND IMPARTIAL OR THAT SHE HAD A BELIEF OR MORAL CONVICTION THAT WOULD PREVENT HER FROM PASSING JUDGMENT ON ANOTHER PERSON. PENAL CODE SECTION 1089. JUROR NO. 10 TOLD THE COURT SHE WOULD BE BOUND TO FOLLOW THE COURT'S INSTRUCTIONS REGARLESS OF THE GRAVITY OF THE CASE (RT 151.) SHE TOLD THE COURT SHE WOULD BE ABLE TO DETERMINE THE FACTS WITHOUT CONSIDERING PUNISHMENT AND THAT THE GRAVITY OF THE CASE WOULD NOT AFFECT HER ABILITY TO DELIBERATE. (RT 147-149.) SHE SAID THAT SHE WOULD NOT BE SWAYED BY EITHER SIDE AND THAT SHE IS A VERY FAIR PERSON. (RT 149.)

CONTRARY TO RESPONDENT'S ARGUMENT, JUROR-

SUPPORTING FACTS: A
(A: CONT'd)

NO. 10 EXPRESSLY SAID THAT SHE would BE bound TO FOLLOW THE COURTS jURY INSTRUCTIONS. (RT 151.) THERE ARE SIMPLY NO FACTS TO SUPPORT RESPONDENT'S STATEMENT THAT JUROR NO. 10 WAS UNABLE TO PUT ASIDE HER RESERVATIONS, LISTEN TO THE EVIDENCE, OR FOLLOW THE COURT'S INSTRUCTIONS.

RESPONDENT CITES PEOPLE V. BEELER (1995 9 CAL. 4TH 953, TO CONTEND THAT THE TRIAL COURT HAD INADEQUATE grounds TO RETAIN JUROR NO. 10. BEELER OFFERS "NO" SUPPORT FOR RESPONDENTS CONTENTION AND IN FACT dEMONSTRATES THAT JUROR NO. 10 WAS QUITE ABLE TO SERVE.

HERE, LIKE BEELER, JUROR NO. 10 VOLUNTARILY NOTIFIED THE COURT ABOUT HER CONCERNS ABOUT THE GRAVITY OF THE CASE. FURTHER, JUROR NO. 10 REPEATEDLY AND UNAMBIGUOUSLY STATED SHE COULD FOLLOW THE COURT'S INSTRUCTIONS, WHILE ALSO EXPLAINING WHY SHE FELT THE NEED TO RAISE HER CONCERN WITH THE TRIAL COURT. LIKE THE JUROR IN BEELER, JUROR NO. 10 MADE IT CLEAR THAT SHE COULD BE IMPARTIAL AND ABLE TO SERVE DESPITE HER CONCERNS ABOUT THE SERIOUSNESS OF THE CHARGES.

TO REFUTE THE CONTENTION THAT THE IMPROPER REMOVAL OF JUROR NO. 10 CONSTITUTED A VIOLATION OF PETITIONER'S DUE PROCESS RIGHT TO A TRIAL BY A FAIR AND IMPARTIAL JURY AS REQUIRED BY THE SIXTH AMENDMENT, RESPONDENT CITES PEREZ V. MARSHALL (9TH CIR. 1977) 119 F.3d 1422.

HOWEVER, THIS CASE IS IN NO WAY SIMILAR TO PEREZ. IN PEREZ, THE JURY FOREPERSON WAS FORCED TO DISCONTINUE DELIBERATIONS BECAUSE OF THE JUROR'S EMOTIONAL STATE. THE FOREPERSON EXPLAINED THAT THE JUROR WAS "BASICALLY IN PIECES"

# SUPPORTING FACTS: A
## (A: CONCLUSION:)

And that you just "can't get somebody to be rational when they're in that state." The trial court reported that the juror was an "emotional wreck" and "emotionally out of control."

But in this case, Juror No. 10 was neither "an emotional wreck" nor "completely distraught." She was quite able to rationally evaluate the case. Juror No. 10, merely expressed natural feelings when learning about the seriousness of the case. Perez is just another case demonstrating that there was "no" good cause to remove Juror No. 10 in the instant case.

In sum, since Juror No. 10 was able to set aside her concerns about the gravity of the case and act impartially, Juror No. 10 would have been the juror who believed that petitioner acted without the intent to kill the officers. Because Juror No. 10 was improperly discharged from deliberating, petitioner was denied his right to a fair and impartial verdict by the jury impaneled to decide petitioner's case and the error was perjudicial compelling reversal of petitioners convictions.

END.

(b) **GROUND TWO**: INSUFFICIENT EVIDENCE TO SUPPORT THE ATTEMPTED MURDER CONVICTIONS.

**Supporting FACTS** (state *briefly* without citing cases or law): Here petitioner did not Fire At the officers out of preconcieved plan to injure or Kill them.

Petitioner Fired the gun to scare the officer's so petitioner could escape.

Petitioner stated he never intended to kill the officer's.

Petitioner shot over his shoulder never aiming at or looking at the officer's.

The shots were fired randomly without aim, because of the way petitioner fired.

There was "No" Likelihood that the shots would hit the officer's causing serious injury or death therefore, the evidence cannot support an inference that petitioner intended to kill the officer's.

When petitioner was close to and facing the officer's so that petitioner could have fired at point blank range, petitioner chose.

(CONT'd).

Did you raise GROUND TWO in the California Supreme Court?
☐ Yes ☐ No.

# A: SUPPORTING FACTS (2) (CONT'D)

## GROUNDS(2:)

NOT TO DO SO, WHICH CLEARLY INDICATES PETITIONER HAD "NO" INTENT TO KILL OR SERIOUSLY INJURY THE OFFICERS.

PETITIONER MAY HAVE BEEN GUILTY OF ONE COUNT OF ASSAULT ON A PEACE OFFICER, BUT THERE IS SIMPLY "NO" EVIDENCE THAT PETITIONER INTENDED TO KILL ANY OF THE OFFICERS AND, THUS PETITIONER CANNOT BE GUILTY OF ATTEMPTED MURDER. THE FACTS DO NOT SUPPORT THAT PETITIONER INTENDED TO KILL THE OFFICERS. IF PETITIONER WANTED TO KILL OFFICER STROM, PETITIONER HAD AMPLE OPPORTUNITY WHEN PETITIONER MADE A U-TURN AND HEADED TOWARD STROM AND WAS ONLY 15 FEET FROM OFFICER STROM. PETITIONER AND OFFICER STROM WERE FACE-TO-FACE FOR TWO TO THREE SECONDS AND PETITIONER NEVER FIRED. OFFICER STROM TESTIFIED THAT PETITIONER COULD HAVE FIRED THE GUN "TWO TO THREE" TIMES DURING THAT PERIOD. (RT. 43.). DEPUTY KWIATKOWSKI SAID THAT WHEN PETITIONER WAS FACE-TO-FACE WITH OFFICER STROM, PETITIONER COULD HAVE FIRED (FOUR OR FIVE) SHOTS (RT. 93-96) THERE WAS NOTHING PREVENTING PETITIONER FROM FIRING THE GUN DURING THE U-TURN. (RT. 107.) SIMILARLY, AS DEPUTY VANMIDDLESWORTH PASSED THE BUICK, PETITIONER AND DEPUTY VANMIDDLESWORTH WERE SIDE-BY-SIDE FOR (FOUR SECONDS. (RT. 100, 155.) THEY WERE ONLEY SEPARATED BY FOUR FEET AND PETITIONER COULD HAVE FIRED DIRECTLY AT VANMIDDLESWORTH, BUT DID NOT (RT. 100-101)(155-156).

FURTHER, WHEN KWIATKOWSKI MOVED HIS SUV TO THE DRIVER'S SIDE OF THE BUICK, PETITIONER

# A: SUPPORTING FACTS (2) (CONT'D)
## GROUNDS (2:) (CONCLUSION)

NEVER FIRED. (RT: 96-97). PETITIONER did NOT FIRE AT THE OFFICERS OUT OF ANY PRECONCEIVED PLAN TO INJURE OR KILL THEM, PETITIONER FIRED THE GUN TO SCARE THE OFFICERS SO HE COULD ESCAPE. PETITIONER SAID HE NEVER INTENDED TO KILL THE OFFICERS, PETITIONER SHOT OVER HIS SHOULDER NEVER AIMING AT OR LOOKING AT THE OFFICERS. THE SHOTS WERE RANDOMLY WITHOUT AIM, BECAUSE OF THE WAY PETITIONER FIRED, THERE WAS "NO" LIKELIHOOD THAT THE SHOTS WOULD HIT THE OFFICER'S CAUSING SERIOUS INJURY OR DEATH. THEREFORE, THE EVIDENCE CANNOT SUPPORT AN INFERENCE THAT PETITIONER INTENDED TO KILL THE OFFICER'S - SIMPLY PUT, PETITIONER HAD MANY OPPORTUNITINES TO SHOOT THE OFFICER'S AT POINT BLANK RANGE AND CHOSE NOT TO DO SO, WHICH CLEARLY INDICATES PETITIONER HAD "NO" INTENT TO KILL OR SERIOUSLY INJURE ANY ONE OF THE OFFICER'S.

END.

(c) **GROUND THREE**: TESTIMONY OF CRIMINALIST LANCE MARTINI.

**Supporting FACTS** (state *briefly* without citing cases or law): SAN DIEGO'S COUNTY SHERIFF'S CRIMINALIST LANCE MARTINI, OPINED that, Petitioner WAS A good shot AND intended to strike the S.U.V. (RT.261). SPECIFICALLY, he stated, "so the Ability of the shooter in the Lead vehicle to Fire two shot's, strike the target vehicle twice is very representative of some--- good shooting. Number one, As well as an intent to strike that target vehicle or At Least the target vehicle/driver combination". (RT.261). Here, MARTINI'S testimony concerning petitioner's mental state was inadmissable ultimate fact opinion evidence that should have Never been Admitted.
MARTINI improperly opined that petitioner intended to strike the vehicles AND officer's when he Fired the Rifle, this was improper opinion evidence as to petitioner's Mental state was Nothing more than AN expression of MARTINI'S general belief as to how the case should be decided, that is A directive to decide the case in FAVOR of the prosecution.
The "KILLEBREW" decision SPECIFICALLY Forbids MATINI

(CONT'd)

**Did you raise GROUND THREE in the California Supreme Court?**

☐ Yes ☐ No.

A: SUPPORTING FACTS: (3) CONT'D.)
GROUND (3.)

FROM TESTIFYING ABOUT PETITIONER'S MENTAL STATE AND THE STATEMENT IS CLEARLY 'INADMISSIBLE MOREOVER, THE STATEMENT IS EXTREMELY PREJUDICIAL SINCE IT CARRIED WITH IT THE IMPRIMATUR OF ONE ENTRUSTED WITH THE ENFORCEMENT OF THE LAW AND VERY WELL MAY HAVE SHIFTED RESPONSIBILITY FOR DECIDING PETITIONER'S INTENT FROM THE JURY TO MARTINI. AN EXPERT SHOULD NOT RENDER AN OPINION WHICH AMOUNTS TO NO MORE THAN AN EXPRESSION OF HIS GENERAL BELIEF AS TO HOW THE CASE SHOULD BE DECIDED. SUCH AN OPINION MIGHT TEND TO SUGGEST THAT THE JUDGE AND JURY MAY SHIFT RESPONSIBILITY FOR DECISIONS OF FACT TO THE WITNESS, WHICH IS CLEARLY IMPROPER.

IN SUM, SINCE THIS EVIDENCE WAS INADMISSIBLE, IT MAY NOT BE USED BY THIS COURT IN CONSIDING WHETHER PETITIONER HAD THE SPECIFIC INTENT TO KILL THE OFFICER'S REQUIRED TO UPHOLD HIS CONVICITIONS FOR ATTEMPTED MURDER.

END.

(d) GROUND FOUR: Eigth Amendment, Forbids Extreme Sentences that Are grossly disproportionate to the crime. This violates constitutional Rights to Due process.

Supporting FACTS: ON Dec. 15, 2004. Petitioner WAS sentences to three consecutive Life terms plus an additional term of 60 years for having peronally used A rifle in the commission of the offenses.
Counts I, II and III, also The trial court imposed, but stayed, three concurrent seven-year terms for counts "4" through "6" and A stayed concurrent term of two years for count "7".

(SUPPLEMENTAL GROUNDS)

(e) GROUND FIVE: The EX-POST-FACTO CLAUSE IN Art I, 10. OF the UNited STATES CONSTITUTION prohibits ANY New statute which deprives ONE charged with A crime OF ANY deFENSE AVAILABLE according to LAW At the time the Act WAS committed. Violates constitutional Rights.

Supporting FACTS: ON Approx: OCT. 7. 2004. Petitioner WAS convicted Following Jury trial, For (3) COUNTS OF Attempted Murder ON OFFicer's, ALONG with (3) COUNTS OF ASSAULT ON OFFicers.

Petitioner contends he WAS deprived OF A FAir triAL AND the right to be protected AgAINST UNAuthorized or excessive punishment.

It is the Jury's Duty to see through the diLiberAtions AS WeLL AS the sentencing stages of trial. Here petitioner contends he WAS sentenced UNLAWFULLY AND excessively by the Judge.

(SUPPLEMENTAL GROUNDS)

(F). GROUND SIX: Prosecution misstated evidence and other case factors to cause the indictment and selective prosecution of RODRIGUEZ, which violated the. Truth-in-Evidence doctrine and violated his constitutional rights.

Supporting Facts: Petitioner contends that in view of the evidence indicating that the crime was less than (3) counts of attempted murder on officers. When in fact, petitioner stated that his only intent was to flee/to escape. Shot's were fired randomly not accurately.
Only to buy him time in hopes of escaping, petitioner admits he was under the influence of (CRYSTAL METHAMPHETIMINS) in a paranoia state.
A toxicology test was never submitted.
Paraphanalia was found on petitioner,
But petitioner was never tested.

FRANK L. RODRIGUEZ, V-63358
HIGH DESERT STATE PRISON.
P.O. BOX-3030
SUSANVILLE, CALIF. 96127-3030.

## MEMORANDUM OF POINTS AND AUTHORITIES.

CASE NO.

## I.
## INTRODUCTION.

1. PLAINTIFF WAS charged AND convicted OF Three counts OF Attempted Murder; AND Three COUNTS OF ASSAULTING A peace officer; AND evading AN officer; AND Armed with A Firearm A Rifle. ON OCT. 7, 2004. AND Filed his COA ON JAN-4-2005. Petitioners Judgement WAS AFFirmed by the CALIFORNIA court OF Appeals ON NOV-28-2005 Petitioners petition For review Filed ON JUN-14-06. AND WAS subsequently denied ON DEC-18-06.

2. PLAINTIFF NOW proceedes to "COLLATERALLY ATTACK Judgement" AND cure claims that trial counsel AND Appellate counsel refused to pursue At trial AND ON Appeal before proceeding to Federal court. Accordingly PLAINTIFF contends that his constitutional rights were violated in the Forms OF: The discharge OF Juror NO. 10; INSUFFICIENT evidence to support the Attempted Murder convictions; Testimony OF criminalist LANCE MARTINI; Eighth Amendment, Forbids extreme sentences that Are grossly disproportionate to the crime; (Supplemental-GROUNDS) The ex-post-facto clause in Art I, 10, of the united states constitution prohibits ANY New statute which deprives one charged with A crime OF ANY defense AVAILABLE according to the LAW At the time the Act WAS committed; Prosecution misstated evidence AND other case Factors to cause the indictment AND selective prosecution OF RODRIGUEZ, which violated the truth-in-Evidence doctrine.

3. PLAINTIFF MAINTAINS that such violations cumulatively of his "FIFTH, SIXTH AND FOURTEENTH AMENDMENT rights AND protection under the united states constitution", deprived him OF his protection Against Arbitrary action of government. DENT V. WEST VIRGINIA, 129 U.S. 114, 123, 9 S.CT. 231, 233, 32 L.Ed 623 (1889).

## II.
## Parties.

4. PLAINTIFF FRANK L. RODRIGUEZ, is A prisoner OF the state OF CALIFORNIA, presently incarcerated At High DESERT STATE Prison. (H D S P).

5. Respondent James Tilton, is the director of California department of corrections and is the legal custodian of petitioner.

6. Respondent James Tilton, is the director of California department of corrections and as such is responsible for the lawful operation of all of its institutions, including High Desert State Prison (H D S P).

Points And Authorities.

ARGUMENT POINT I.

"Juror No. 10 was removed without good cause, And it was an Abuse of discretion And denied petitioner, Right under the Sixth Amendment to a Jury trial".

7. The improper removal of a juror under section 1089 violates a petitioners right under the sixth Amendment to a jury trial. The right to trial by an impartial jury guaranteed by the Sixth Amendment of the united states constitution is an integral aspect of due process. In light of the jury's role as "an inestimable safeguard against 'the corrupt or overzealous prosecutor and against the complaint, biased, or eccentric Judge". (*DUNCAN V. LOUISIANA*, (1968) 391 U.S. 145, 156 (20 L.Ed 2d 491, 88 S.CT. 144.)

8. Moreover, such right is "No-Less implicitly guaranteed by the declaration of Article (1) Section 16, of the California constitution that trial by jury is an inviolate right and shall be secured to All". (*RUBIO V. SUPERIOR COURT* (1979) 24. CAL. 3d 93, 101). Because the right to trial by jury is a cornerstone of our system of Jurisprudence, it should be zealously guarded by the courts and they must resolve any doubt in favor of preserving any furthering this fundamental right. (*BLANTON V. WOMANCARE, INC.* (1985) 38. CAL. 3d 396, 411.).

9. Based on the trial courts and Attorney's questioning of Juror No. 10, no impartiality or actual bias, under either the federal or state constitutional standards, existed. Juror No. 10 merely expressed natural feelings when learning about the seriousness of the case. Juror No. 10 "Did Not" Express an unwillingness to be open to defense or prosecution evidence. Instead she agreed to follow the courts instructions, therefore, there were "No" facts to indicate that Juror No. 10 was unable to perform her duties, as required for discharge under section 1089, and her dismissal by the court was error.

POINT II.

"There is insufficient evidence as a matter of law to support the Attempted murder convictions of counts I, II and III, Because there is insuffient evidence to establish specific intent to kill".

10. Here, Petitioner did not fire at the officers out of any preconceived plan to injure or kill them. Petitioner fired the gun to scare the officer's so petitioner could escape.

To prove "Attempted Murder" "There must be sufficient evidence of the intent to commit the murder plus a direct, but ineffectual act toward its commission" (*People v. Chinchilla*, (1997) 52. Cal. App. 4th. 683, 690 ("chinchilla") Because "specific intent is a requisite ellement" of an attempted murder charge, a conviction cannot be based upon a finding of implied malice. Rather "The evidence must demonstrate a deliberate intention unlawfully to kill a fellow human being". (Id).

11. The crime of attempted murder requires a specific intent to kill. (*People v. Murtishaw* (1981) 29 Cal. 3d 733, 764. A conviction violates due process if it is not supported by substantial evidence the proper test to determine a claim of insufficiency of the evidence in a criminal case is whether, on the entire Record, a rational trier of fact could find a defendant guilty beyond a reasonable doubt. (*People v. Johnson*, (1980) 26. Cal. 3d 557, 576, 578; (*Jackson v. Virginia*, (1979) 443 U.S. 307, 318-319 [61 L.ed. 2d 560, 99 S.Ct. 2781].

12. In making this determination, the appellate court must judge whether the evidence for each of the essential elements of the offense of which defendant stands convicted is substantial and of solid value. (*People v. Johnson, supra*; (*People v. Barnes*, (1986) 42 Cal. 3d 284, 303.) The above principles preclude an appellate court from upholding a conviction merely because there is any evidence, "No matter how weak, to support the elements of the prosecution's case. Rather implicit in [the appellate courts] duty to determine the legal sufficiency of evidence to sustain a verdict is [the appellate court's] obligation, in a proper case, to appraise the sufficiency and effect of evidence admitted or otherwise indubitably established as precluding or overcoming, as a matter of law, inconsistent inferences sought to be derived from weak and conclusive sourees". (*People v. Reyes* (1974) 12 Cal. 3d. 486, 499 citations omitted.)

13. There was insufficient evidence to support the conclusion that petitioner intended to kill deputy (Kwiatkowski) because petitioner never saw the officer who was traveling two cars behind petitioner the fact that petitioner might not have been able to see deputy (Kwiatkowski) at the time he fired the shots does not negate a specific intent to kill. (*People v. Vang* (2001) 87 Cal. App. 4th 554, 563, 564.) (opinion p.4.)

14. Specific intent to kill is a necessary element of the crime of attempted murder. (*People v. Mendoza*, (1988). 18 Cal. 4th 1114, 1123; Chinchilla, *supra*, 52 Cal. App. 4th at 690.) And the acts must be directed toward that victim with the intent to kill. (*People v. Czahara*, (1988) 203 Cal. App. 3d 1468, 1474. When a single act is

Alleged as an attempt on two different lives, the intent to kill must be evaluated separately. For each victim in Chinchilla, the defendant fired a single shot at two officer's. *Meisels and Silofau.* While they were crouched on the ground. (Id at p. 687.) But in *Chinchilla*. It is distinguishable from the instant case because unlike the officer's in *Chinchilla*, officers *Kwiatkowski and VanMiddleworth.* were never together or even near eachother at the same time. Before petitioner fired the third and fourth shots, *VanMiddlesworth* was in an "SUV" one or two car lengths behind the petitioner's car and *Kwiatkowski* was in an "SUV" behind *VanMiddleworth's* "SUV" (RT. 128) when *VanMiddlesworth* saw the rifle, he swerved out of the way to the right shoulder of the road. (RT. 152.) As he swerved, he heard two rounds fired from the rifle. (RT. 128) The bullets only hit *Kwiatkowski's* "SUV" because *VanMiddlesworth* had swerved to the shoulder of the road. Since *Kwiatkowski's* "SUV" was behind *VanMiddlesworth* "SUV" not side-by-side, petitioner could not have seen both officer's at the same time and could not have intended to hit or kill both officer's with the shot's.

15. This is especially true since the officer's "SUV" were considerable higher then the Buick and petitioner was firing back-wards over his shoulder while speeding and swerving in and out of traffic. Since both officer's could not possibly have been visible to petitioner at the time he fired his rifle, there was "No" evidence for the jury to draw a reasonable inference that petitioner possessed the concurrent intent to kill both officer's. Accordingly, counts I, II and III. Must be Reversed.

## POINT III.

"When considering whether there was sufficient evidence of petitioner's specific intent to kill the officer's. This court cannot consider the testimony of criminalist *Lance Martini* as to petitioners intent, because it is inadmissible ultimate fact opinion evidence."

16. An expert may properly give an opinion in court even though it "embraces" the ultimate issue to be decided by the trier of fact. (Evid. Code, § 805.) However, an expert is not permitted to express an opinion that "a specific individual had specific knowledge or possessed a specific intent." (*People v. Killebrew*, (2002) 103 Cal. App. 4th 644, 658 ["Killebrew"]. emphasis added.)

17. In *Killebrew, supra*. The court held that a gang expert cannot give an opinion about a gang members subjective mental state. (Id. Ap. 658.) The *Killebrew* court held it was improper for a police officer to testify that when one gang

IN A CAR POSSESSES A GUN, EVERY OTHER GANG MEMBER, IN THE CAR KNOWS OF A GUN AND WILL CONSTRUCTIVELY POSSESS THE GUN. (Id. At.p.652). The court explained that such testimony amounted to testifying About "the subjective knowledge and intent of each occupant in each vehicle," making his testimony "an improper opinion on the ultimate issue," which is improper and should have been excluded. (Id. At p. 658.) Also see, *SUMMERS V. A.L. GILLBERT CO.* (1996) 69 CAL. App. 4th 1155, 1182-1183.)

POINT IV.

"Eighth AMENDMENT, Forbids extreme sentences that are grossly disproportionate to the crime. This violates constitutional rights to due process."

18. U.S. V. BARAJAS-AVALOS-, 359 F3d 1204 (9th cir. 2004). Eigth Amendment Forbids extreme sentences that are grossly disproportionate to the crime. *U.S. V. CONLEY,*- 349 F.3d 837 (5th cir. 2003)

19. Sentence that exceeds statutory maximum is an illegal sentence and therefore constitutes plain error.- *U.S. V. NAPPI,*- 243 F.3d 758 (3rd cir. 2001) AND *U.S. V. ESCHMAN,*- 227 F.3d 886 (7th cir. 2000) Due process requires that defendant be sentenced on basis of accurate information. Also *U.S. V. HARRIS,*- 244 F.3d 828 (11th cir. 2001). Sentencing Guidelines cannot be used to increase penalty imposed beyond statutory maximum. (Also see,) *U.S. V. SANCHEZ;*- 242 F.3d. 1294 (11th cir. 2001)- *U.S. V. FRANK;*- 354 F.3d 910 (8th cir. 2003)- The ex-post-Facto clause is violated if a defendant is sentenced under the sentencing guidelines in effect at the time of sentencing, when those guidelines produce a sentence harsher than one permitted under the guidelines in effect at the time the crime is committed. (Also see-) *BLAKELY V. WASHINGTON;*

20. APPELLATE WAS greatly prejudiced by the courts failure to instruct SUA SPONTE on the Lesser included offense. (*PEOPLE V. MODESTO,*-(1963. 59 CAL. 2d 722, 730, (*PEOPLE V. WICKERSHAM,*-(1982) 32 CAL. 3d. 307, 335.); (*PEOPLE V. WATSON,*- STANDARD of prejudice, (1956) 46. CAL. 2d. 818, 836.)

POINT V.

"The ex post-Facto clause in Art I, 10. of the United states constitution prohibits any new STATUTE which deprives one charged with a crime of any defense available according to law at the time the act was committed. violates constitutional rights."

21. *COLLINS*, Director, Texas Department of Criminal Justice, Institutional Division *v. YOUNGBLOOD*, NO. 89-742, Supreme court of the United States, 497 U.S. 37; 110 S.CT. 2715, 111 L.Ed. 2d 30, 1990 *U.S. LEXIS*. 3294, 58 U.S.L.W. 4855.

CONTINUED ON ATTACHED pages.

# "SUPPORTING CASES"

ON CERTIORARI, THE UNITED STATES SUPREME COURT REVERSED. IN AN OPINION BY REHNQUIST, CH. J., JOINED BY WHITE, BLACKMUN, O'CONNOR, SCALIA, AND KENNEDY, JJ., IT WAS HELD--EXPRESSLY OVERRULING THE COURTS TWO PRIOR EX POST FACTO DECISIONS IN THOMPSON V. UTAH, SUPRA, AND KRING V. MISSOURI (1883) 107 US 221, 27 L ED 506, 2 S CT 443, TO THE EXTENT THAT THE TWO DECISIONS WERE INCONSISTENT WITH THE COURTS HOLDING IN THE CASE AT HAND--THAT THE APPLICATION OF THE NEW TEXAS STATUTE TO THE ACCUSED WAS NOT PROHIBITED BY THE EX-POST FACTO CLAUSE OF ART I, 10, BECAUSE THE TEXAS STATUTE DID NOT (1) PUNISH AS A CRIME AN ACT PREVIOUSLY COMMITTED WHICH WAS INNOCENT WHEN DONE; (2) MAKE MORE BURDENSOME THE PUNISHMENT FOR A CRIME, AFTER ITS COMMISSION; OR (3) DEPRIVE ONE CHARGED WITH A CRIME OF ANY DEFENSE AVAILABLE ACCORDING TO THE LAW AT THE TIME THE ACT WAS COMMITTED.

STEVENS, J., JOINED BY BRENNAN AND MARSHALL, JJ., CONCURRING IN JUDGMENT, EXPRESSED THE VIEW THAT, WHILE THE NEW TEXAS STATUTE DID NOT VIOLATE THE EX-POST FACTO CLAUSE OF ART I, 10, SUCH A CONCLUSION WAS CONSISTENT WITH THE COURTS PRIOR PRECEDENTS, INCLUDING THOMPSON V. UTAH AND KRING V. MISSOURI, BECAUSE (1) UNDER THOSE PRECEDENTS, EX POST FACTO ANALYSIS OUGHT TO FOCUS ON THE IMPACT OF THE PROCEDURAL CHANGE IN TEXAS LAW UPON THE RIGHT BELONGING TO THE ACCUSED WHEN THE OFFENSE WAS COMMITTED; AND (2) IN THE CASE AT HAND, NEITHER THE ACCUSED'S RIGHT TO A FAIR TRIAL NOR THE ACCUSED'S RIGHT TO BE PROTECTED AGAINST UNAUTHORIZED OR EXCESSIVE PUNISHMENT HAD BEEN IMPAIRED "IN THE SLIGHTEST" BY THE NEW TEXAS RULE.

CONSTITUTIONAL LAW § 78

EX POST FACTO LAW--REFORMATION OF IMPROPER JURY SENTENCING VERDICT--MAKING PAST OFFENSE CRIMINAL-- HEADNOTE: [1A] [1B] [1C]

WITH RESPECT TO AN ACCUSED WHO HAS BEEN CONVICTED IN A STATE CRIMINAL TRIAL OF AGGRAVATED SEXUAL ABUSE AND ON WHOM THE JURY HAS IMPOSED A PUNISHMENT OF LIFE IMPRISONMENT PLUS A FINE, THE APPLICATION TO THE ACCUSED OF A NEW STATE STATUTE WHICH WAS PASSED AFTER THE ACCUSED'S CRIME, AND WHICH ALLOWED THE REFORMATION OF THE IMPROPER JURY SENTENCING VERDICT IN THE ACCUSED'S CASE, DOES NOT VIOLATE THE EX POST FACTO CLAUSE OF ART I, 10, OF THE UNITED STATES CONSTITUTION--WHERE THE NEW STATUTE AUTHORIZED A STATE APPELLATE COURT TO REFORM AN IMPROPER VERDICT THAT ASSESSED A PUNISHMENT NOT AUTHORIZED BY LAW, AND WHERE A STATE APPELLATE COURT, RELYING ON THE NEW STATUTE IN STATE HABEAS CORPUS PROCEEDINGS, DENIED THE ACCUSED'S REQUEST FOR A NEW

"SUPPORTING CASES"

TRIAL AND INSTEAD REFORMED THE VERDICT BY ORDERING THE DELETION OF THE FINE-- BECAUSE THE NEW STATE STATUTE DOES NOT(1) PUNISH AS A CRIME AN ACT PREVIOUSLY COMMITTED WHICH WAS INNOCENT WHEN DONE; (2) MAKE MORE BURDENSOME THE PUNISHMENT FOR A CRIME, AFTER ITS COMMISSION; OR (3) DEPRIVE ONE CHARGED WITH A CRIME OF ANY DEFENSE AVAILABLE ACCORDING TO THE LAW AT THE TIME THE ACT WAS COMMITTED. (STEVENS, BRENNAN, AND MARSHALL, JJ., DISSENTED IN PART FROM THIS HOLDING.)

[***LEdHN2] APPEAL §1087.7

HEADNOTE:[2]

ON CERTIORARI TO REVIEW A FEDERAL COURT OF APPEALS' ORDER THAT A WRIT OF HABEAS CORPUS BE GRANTED TO AN ACCUSED WHO HAD BEEN CONVICTED AND SENTENCED IN A STATE COURT, THE UNITED STATES SUPREME COURT, HAVING GRANTED CERTIORARI TO CONSIDER THE MERITS OF THE RESPONDENT ACCUSED'S CLAIM THAT THE APPLICATION OF A NEW STATE STATUTE TO THE ACCUSED VIOLATED THE EX POST FACTO CLAUSE IN ART I, 10 OF THE UNITED STATES CONSTITUTION, WILL PROCEED TO CONSIDER THE MERITS OF THE CLAIM--EVEN THOUGH THE SUPREME COURT, BECAUSE THE ACCUSED IS BEFORE THE COURT ON COLLATERAL REVIEW, IS FACED WITH A THRESHOLD QUESTION WHETHER THE RELIEF SOUGHT BY THE ACCUSED WOULD CONSTITUTE A "NEW RULE" WHICH WOULD NOT APPLY RETROACTIVELY--GIVEN THAT (1) THE STATE DID NOT ADDRESS RETROACTIVITY IN ITS PETITION FOR CERTIORARI OR ITS BRIEFS ON THE MERITS; (2) WHEN COUNSEL WAS ASKED ABOUT THE ISSUE AT ORAL ARGUMENT, COUNSEL ANSWERED THAT THE STATE HAD CHOSEN NOT TO RELY ON THE "NEW RULE" RETROACTIVITY DOCTRINE; AND (3) ALTHOUGH THE "NEW RULE" RETROACTIVITY DOCTRINE IS GROUNDED IN IMPORTANT CONSIDERATIONS OF FEDERAL-STATE RELATIONS, THE DOCTRINE IS NOT "JURISDICTIONAL" IN THE SENSE THAT THE SUPREME COURT, DESPITE A LIMITED A GRANT OF CERTIORARI, MUST RAISE AND DECIDE THE ISSUE ON THE SUPREME COURT'S OWN MOTION.

[***LEdHN3]

COURTS §777.5

HABEAS CORPUS §41

NEW RULE--RETROACTIVE APPLICATION--

HEADNOTE:[3]

FOR PURPOSES OF DETERMINING WHETHER THE FEDERAL HABEAS CORPUS RELIEF

"Supporting Cases"

sought by an accused who has been convicted and sentenced in a state criminal trial would constitute a "new rule" which would not be applied retroactively, retroactivity, generally speaking, is properly treated as a threshold question, for, once a new rule is applied to the accused in the case announcing the new rule, evenhanded justice requires that the new rule be applied retroactively to all who are similarly situated.

[***LedHN4]

Constitutional Law § 74

Ex post facto clause -- penal statutes --

Headnote: [4A] [4B]

The prohibition on ex post facto laws in Art I, 10 of the United States Constitution applies to only penal statutes.

[***LedHN5]

Constitutional Law § 17

Ex post facto clause -- history -- changing situation of accused -- making past offenses criminal -- procedure -- punishment --

Headnote: [5A] [5B] [5C] [5D] [5E] [5F] [5G]

Although the Latin phrase "ex post facto" literally encompasses any law passed "after the fact", the federal constitutional prohibition on ex-post facto laws applies to only penal statutes which disadvantage the offender affected by them, in the following four categories -- (1) every law that makes an action done before the passing of the law, and which was innocent when done, criminal, and that punishes such action, (2) every law that aggravates a crime, or makes it greater than it was committed, (3) every law that changes the punishment and inflicts a greater punishment than the law annexed to the crime when committed, and (4) every law that alters the legal rules of evidence, and receives less, or different, testimony than the law required at the time of the commission of the offense, in order to convict the offender; the "evidence" category, however, is not intended to prohibit the application of new evidentiary rules in trials for crimes committed before the changes; the ex post facto clause in Art I, 10 of the United States Constitution prohibits any statute which (1) punishes as a crime an act previously committed

which was innocent when done, (2) makes more burdensome the punishment for a crime, after its commission, or (3) deprives one charged with a crime of any defense available according to law at the time the act was committed; such a formulation is faithful to the best knowledge of the original understanding of the ex post facto clause at the time the Constitution was adopted -- that legislatures may not retroactively alter the definitions of crimes or increase the punishment for criminal acts; a legislature, by simply labeling a law "procedural", does not thereby immunize the law from scrutiny under the ex post facto clause, because subtle ex post facto violations are no more permissible than overt ones; the ex post facto prohibition which may not be evaded, however, is the prohibition defined by the four categories, and references in prior United States Supreme Court decisions to "substantial protections" and "personal rights" should not be read to adopt without explanation an undefined enlargement of the ex post facto clause; the ex post facto clause cannot be read to include, in addition to the four defined categories, any change which alters the situation of a party to the party's disadvantage. (Stevens, Brennan, and Marshall, JJ., dissented in part from this holding.)

[***LEdHN6]

CONSTITUTIONAL LAW § 78

Ex post facto clause -- making past offenses criminal -- punishment --

Headnote: [6A] [6B] [6C]

Although the ex post facto clause in Art I, 10 of the United States Constitution prohibits any new statute which deprives one charged with a crime of any defense available according to law at the time the act was committed, the term "defense" is linked to the prohibition on alterations in the legal definition of the offense or the nature or amount of the punishment imposed for the offense's commission; a law that abolishes an affirmative defense of justification or excuse contravenes Art. I, 10, because such a law expands the scope of a criminal prohibition after the act is done; a reference, however, in the "defense" context, to laws relating to the offense or its consequences is simply

SUPPORTING CASES

Shorthand for legal changes altering the definition of an offense or increasing a punishment. (Stevens, Brennan, and Marshall, JJ., dissented in part from this holding

[*** LedHN7]

CONSTITUTIONAL LAW §82

JURY §2

Ex post Facto Clause -- right to jury trial --

The ex post facto clause in Art I, 10 of the United States Constitution does not prevent a state from taking away a criminal defendant's right to jury trial under the United States Constitution Sixth Amendment, because, although the right to jury trial provided by the Sixth Amendment is a "substantial" one, it is not a right that has anything to do with thh definition of crimes, defenses, or punishments, [redacted] which is thh concern of the ex post facto clause. (Stevens, Brennan, and Marshall, JJ., dissented from this holding.)

1. Although the rule of Teague v. Lane, 489 U.S. 288, 103 L. Ed. 2d 334, 109 S. Ct. 1060 -- which prohibits the retroactive application of new rule to cases on collateral review -- is grounded in important considerations of federal-state relations, it is not jurisdictional in the sense that this Court, despite a limited grant of certiorari, must raise and decide the issue sua sponte. Since Texas has chosen not to rely on Teague, the merits of respondents claim will be considered. Pp. 40-41.

2. The application of the Texas statute to respondent is not prohibited by the ex post facto clause. Pp. 41-52.

(A) The definition of an ex post facto law as one that (1) punishes as a crime an act previously committed which was innocent when don, (2) makes more burdensome the punishment for a crime, after its commission, or (3) deprives one charged with a crime of any defense available according to law at the time when the act was committed, Beazell v. Ohio, 269 U.S. 167, 70 L. Ed. 216, 46 S. Ct. 68, is faithful to this Court's best knowledge of the original understanding of the Clause: Legislatures may not retroactively alter the definition of crimes or increase the punishment for criminal acts. Respondent concedes

# Supporting Cases

that Texas' statute does not fall within the Beazell categories, since it is a procedural change in the law. However, he errs in arguing that this Court's decisions have not limited the Clause's scope to those categories, but have stated more broadly that retroactive legislation contravenes the Clause if it deprives an accused of a "substantial" protection" under law existing at the time of the crime, and that the new trial guaranteed by Texas law is such a protection. When cases have described as "procedural" those changes that do not violate the Clause even though they work to the accused's disadvantage, see, e.g., Beazell, supra, at 171, it is logical to presume that "procedural" refers to changes in the procedures by which a criminal case is adjudicated as opposed to substantive changes in the law. The "substantial - protection" discussion in Beazell, Duncan v. Missouri, 152 U.S. 377, 382-383, 38 L.Ed. 485, 14 S. Ct. 570, and Malloy v. South Carolina, 237 U.S. 180, 183, 59 L.Ed. 905, 35 S.Ct. 507 has imported confusion into the Clause's interpretation and should be read to mean that a legislature does not immunize a law from scrutiny under the Clause simply by labeling the law "procedural". It should not be read to adopt without explanation an undefined enlargement of the Clause. Pp. 41-46.

(B) Kring v. Missouri, 107 U.S. 221, 27 L. Ed. 506, 2 S.Ct. 443, and Thompson v. Utah, supra, are inconsistent with the understanding of the term "ex post facto law" at the time the Constitution was adopted, rely on reasoning that this Court has not followed since Thompson was decided, and have caused confusion in state and lower federal courts about the Clause's scope. Kring and Thompson are therefore overruled. Pp. 47-52.

Opinion By: Rehnquist

Opinion: [*39] [***36] [**2717] Chief Justice Rehnquist delivered the opinion of the Court.

[***LEdHR1A] [1A] The question presented in this case is whether the application of a Texas statute, which was passed after respondent's crime and which allowed the reformation of an improper [***37] jury verdict in respondent's case, violates the Ex Post Facto Clause of Art. I, § 10. We hold that it does not.

# "Supporting Cases"

Respondent Carroll Youngblood was convicted in a Texas court of aggravated sexual abuse. The jury imposed punishment of life imprisonment and a fine of $10,000. After his conviction and sentence were affirmed by the Texas Court of Criminal Appeals, Youngblood applied for a writ of habeas corpus in the State District Court. He argued that the Texas Code of Criminal Procedure did not authorize a fine in addition to a term of imprisonment for his offense, and, thus, under the decision of the Court of Criminal Appeals in Bogany v. State, 661 S.W. 2d 957 (1983), the judgment and sentence were void, and he was entitled to a new trial. N1 In April 1985, the District Court, feeling bound by Bogany, recommended that the writ be granted.

---Footnotes---

N1 In Bogany, the Texas Court of Criminal Appeals held that a jury verdict which included a punishment unauthorized by law was void at its inception and had to be set aside. It concluded that Texas law at that time did not give appellate courts authority to reform such verdicts.

---End Footnotes---

N1 In VB [**2718] Before the habeas application was considered by they Texas Court of Criminal Appeals, which has the exclusive power under Texas law to grant writs of habeas corpus, see Tex. Code Crim. Proc. Ann., Art. 11.07 (Vernon 1977 and Supp. 1990), a new Texas statute designed to modify the Bogany [*40] decision became effective. Article 37.10(b), as of June 11, 1985, allows an appellated court to reform an improper verdict that assesses a punishment not authorized by law. Tex. Code Crim. Proc. Ann., Art. 37.10(b) (Vernon Supp. 1990); see Ex parte Johnson, 697 S.W. 2d 605 (Tex. Crim. App. 1985). Relying on that statute, the Court of Criminal Appeals reformed the verdict in Youngblood's case by ordering deletion of the $10,000 fine and denied his request for a new trial.

Youngblood then sought a writ of habeas corpus from the United States District Court for the Eastern District of Texas, arguing that the retroactive application of Art. 37.10(b) violated the

"SUPPORTING CASES"

EX POST FACTO CLAUSE OF ART. I, § 10, OF THE FEDERAL CONSTITUTION. THE DISTRICT COURT CONCLUDED THAT SINCE YOUNGBLOOD'S "PUNISHMENT" . . . WAS NOT INCREASED (BUT ACTUALLY DECREASED), AND THE ELEMENTS OF THE OFFENSE OR THE ULTIMATE FACTS NECESSARY TO ESTABLISH GUILT WERE NOT CHANGED," THERE WAS NO EX POST FACTO VIOLATION. APP. TO PET. FOR CERT. C-6.

THE COURT OF APPEALS REVERSED. YOUNGBLOOD V. LYNAUGH, 882 F.2d 956 (CA5 1989). IT RELIED ON THE STATEMENT IN THIS COURTS' DECISION IN THOMPSON V. UTAH, 170 U.S. 343, 42 L.Ed. 1061, 18 S.CT. 620 (1898), THAT RETROACTIVE PROCEDURAL STATUTES VIOLATE THE EX POST FACTO CLAUSE UNLESS THEY "LEAVE UNTOUCHED ALL THE SUBSTANTIAL PROTECTIONS WITH WHICH EXISTING LAW SURROUNDS THE PERSON ACCUSED OF CRIME," LYNAUGH, SUPRA AT 959 (QUOTING 170 U.S. AT 352). IT HELD THAT YOUNGBLOOD'S RIGHT TO A NEW TRIAL UNDER THE BOGANY DECISION WAS SUCH A "SUBSTANTIAL PROTECTION," AND THEREFORE ORDERED THAT A WRIT OF HABEAS CORPUS BE ISSUED. WE GRANTED CERTIORARI, 493 U.S. 1001 (1989).

[***38] [***LEdHR2] [2] [***LEdHR3] [3] BECAUSE RESPONDENT IS BEFORE US ON COLLATERAL REVIEW, WE ARE FACED WITH A THRESHOLD QUESTION WHETHER THE RELIEF SOUGHT BY YOUNGBLOOD WOULD CONSTITUTE A "NEW RULE," WHICH WOULD NOT APPLY RETROACTIVELY UNDER OUR DECISIONS IN TEAGUE V. LANE, 489 U.S. 288, 103 L.Ed. 2d 334, 109 S.CT. 1060 (1989), AND BUTLER V. MCKELLAR, 494 U.S. 407, 108 L.Ed. 2d 347, 110 S.CT. 1212 (1990). GENERALLY SPEAKING, "RETROACTIVITY IS [*41] PROPERLY TREATED AS A THRESHOLD QUESTION, FOR, ONCE A NEW RULE IS APPLIED TO THE DEFENDANT IN THE CASE ANNOUNCING THE RULE, EVEN-HANDED JUSTICE REQUIRES THAT IT BE APPLIED RETROACTIVELY TO ALL WHO ARE SIMILARLY SITUATED." TEAGUE, SUPRA, AT 300. THE STATE OF TEXAS, HOWEVER, DID NOT ADDRESS RETROACTIVITY IN ITS PETITION FOR CERTIORARI OR ITS BRIEFS ON THE MERITS, AND WHEN ASKED ABOUT THE ISSUE AT ORAL ARGUMENT, COUNSEL ANSWERED THAT THE STATE HAD CHOSEN NOT TO RELY ON TEAGUE. TR. OF ORAL ARG. 4-5. ALTHOUGH THE TEAGUE RULE IS GROUNDED IN IMPORTANT CONSIDERATIONS OF FEDERAL-STATE RELATIONS, WE THINK IT IS NOT "JURISDICTIONAL" IN THE SENSE THAT THIS COURT, DESPITE A LIMITED GRANT OF CERTIORARI, MUST RAISE AND DECIDE THE ISSUE SUA SPONTE. CF. PATSY V. BOARD OF REGENTS OF FLA., 457 U.S. 496, 515, N. 19, 73 L.Ed. 2d 172, 102 S. CT. 2557 (1982) (ELEVENTH AMENDMENT DEFENSE

need not be raised and decided by the court on its own motion). We granted certiorari to consider the merits of respondents' ex post facto claim, and we proceed to do so.

[***LEdHR4A] [4A] [***LEdHR5A] [5A] Although the Latin phrase "ex post facto" literally encompasses any law passed "after the fact," it has long ben recognized by this Court that the constitutional prohibition on ex post facto laws applies only to penal statutes which disadvantage the offender affected by them. Calder v. Bull, 3 U.S. (3 Dall.) 386, 390-392, 1L. Ed. 648 (1798) (opinion of Chase, J.); id., at 396 (opinion of Paterson, J.); id., at 400 (opinion of Iredell, J.) See Miller v. Florida, 482 U.S. 423, 430, 96 L. Ed. 2d 351, 107 S. Ct. 2446 [**2719] (1987). N2 As early opinions in this Court explained, "ex post facto law" was a term of art with an established meaning at the time of the framing of the Constitution. Calder, 3 Dall., at 391 (opinion of Chase, J.); 3 U.S. at 396 (opinion of Paterson, J.). Justice Chase's now familiar opinion in Calder expounded those legislative [*42] acts which in his view implicated the core concern of the ex post facto clause:

"1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2d. Every law that aggravates a crime, or makes it greater than it was, when committed. 3d. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the [***39] offence, in order, to convict the offender." Id., at 390 (emphasis in original).

[***HR4B] [4B]

N2 Although there has been some debate within the Court about the accuracy of the historical discussion in Calder v. Bull, see Satterlee v. Matthewson, 2 Peters 380, 381 (1829) (note by Johnson, J.), the Court has consistently adhered to view expressed by Justices Chase, Paterson, and Iredell in Calder that the ex post facto clause applies only to penal statutes.

[***LEdHR5B] [5B] [***LEdHR6A] [6A] Early opinions of the Court portrayed this as an exclusive definition of ex post facto laws. Fletcher v. Peck, 10 U.S. (6 Cranch) 87, 138, 3L. Ed. 162 (1810); Cummings v. Missouri,

SUPPORTING CASES

71 U.S. (4 WALL.) 277, 325-326, 18 L. Ed. 356 (1867); 71 U.S. AT 391 (MILLER, J., dissenting) ("THIS EXPOSITION OF THE NATURE OF EX POST FACTO LAWS HAS NEVER BEEN DENIED, NOR HAS ANY COURT OR ANY COMMENTOR ON THE CONSTITUTION ADDED TO THE CLASSES OF LAWS HERE SET FORTH, AS COMING WITHIN THAT CLAUSE"); GUT V. STATE, 76 U.S. (9 WALL) 35, 38, 19 L. Ed. 573 (1870). SO WELL ACCEPTED WERE THESE principles THAT THE COURT IN BEAZELL V. Ohio, 269 U.S. 167, 70 L. Ed. 216, 46 S. CT. 68 (1925), WAS Able TO CONFIDENTLY SUMMARIZE THE MEANING OF THE CLAUSE AS FOLLOWS:

"IT IS SETTLED, by DECISIONS OF THIS COURT SO WELL KNOWN THAT THEIR CITATION MAY BE dispensed with, THAT ANY STATUTE which punishes AS A CRIME AN ACT PREVIOUSLY COMMITTED, which WAS INNOCENT when done; which MAKES MORE burdensome THE punishment FOR A CRIME, AFTER ITS COMMISSION, OR which deprives ONE charged WITH CRIME OF ANY DEFENSE AVAILABLE According TO LAW AT THE TIME WHEN THE ACT WAS COMMITTED, IS prohibited AS EX POST FACTO." Id., AT 169-170.

[*43] SEE ALSO DOBBERT V. FLORIDA, 432 U.S. 282, 292, 53 L. Ed. 2d 344, 97 S. CT. 2290 (1977). N3

[**44] ANOTHER historical REFERENCE, BLACKSTONE'S COMMENTARIES, which WAS discussed by THE FRAMERS during debates ON THE EX POST FACTO CLAUSE, SEE 2 M. FARRAND, RECORDS OF THE FEDERAL CONVENTION OF 1787, pp. 448-449 (1911), And deemed AN AUTHORITATIVE SOURCE OF THE TECHNICAL MEANING OF THE TERM IN CALDER, SEE 3 DALL., AT 391 (OPINION OF CHASE, J.); id., AT 396 (OPINION OF PATERSON, J.), BUTTRESSES THIS understanding. According TO BLACKSTONE, A LAW is EX POST FACTO "WHEN AFTER AN ACTION (INDIFFERENT IN ITSELF) IS COMMITTED, THE legislator THEN FOR THE FIRST TIME declares IT TO HAVE BEEN A CRIME, AND INFLICTS A PUNISHMENT UPON THE PERSON who HAS COMMITTED IT." 1 W. BLACKSTONE, COMMENTARIES *46. Although increased punishments "upon THE person who has committed" ARE NOT MENTIONED explicitly IN THE historical SOURCES, THE COURT HAS NEVER questioned THEIR prohibition, Apparently ON THE THEORY THAT "THE ENHANCEMENT OF A CRIME, OR PENALTY, SEEMS TO COME within THE SAME MISCHIEF AS THE CREATION OF A CRIME OR PENALTY." CALDER, SUPRA, AT 397 (OPINION OF PATERSON, J.). THE BEAZELL DEFINITION, THEN, IS FAITHFUL TO THE USE OF THE TERM "EX POST FACTO LAW" AT THE TIME THE CONSTITUTION WAS ADOPTED.

# Supporting Cases

[***LEdHR1C] [1C] The Texas statute allowing reformation of improper verdicts does not punish as a crime an act previously committed, which was innocent when done; nor make more burdensome the punishment for a crime, after its commission; nor deprive one charged with crime of any defense available according to law at the time when the act was committed. Its application to respondent therefore is not prohibited by the Ex Post Facto Clause of Art. I, § 10.

The judgment of the Court of Appeals is

Reversed.

CONCUR BY: STEVENS

CONCUR: Justice Stevens, with whom Justice Brennan and Justice Marshall join, concurring in the judgment.

The "Ex Post Facto" Clause of the Constitution N1 has been construed to embrace any law that deprives a person accused of crime of a "substantial protection" that the law afforded at the time of the alleged offense. Thus, the clause prohibits not only the retroactive creation of new criminal offenses and more harsh penalties, but also substantial changes in procedure that are designed to protect the defendant from a wrongful conviction. The question in this case is whether a law that changed a postconviction remedy for an erroneous sentence -- by conforming it to the law in effect at the time of the offense instead of affording the defendant a new trial on all issues -- effected a "substantial" deprivation within the meaning of our cases. I agree with the Court's conclusion [*53] that the new law did not violate the Ex Post Facto Clause, but I believe that conclusion is entirely consistent with our precedents.

N1 Art. I, § 10, of the Constitution provides in part:

[***46] I Respondent committed a crime that was punishable by a maximum sentence of life [**2725] imprisonment and was convicted on March 17, 1982. Under Texas law, it was the jury's task to impose sentence as well as to determine guilt or innocence. By consequence of a faulty instruction, respondent was improperly sentenced to life imprisonment and a fine of $10,000. The following year, in Bogany v. State, 661 S.W.2d 957 (1983), the Texas Court of Criminal Appeals held in a somewhat similar case that the fine was not authorized by law, and that no reviewing court had authority to correct such an erroneous sentence. Instead

("Supporting Cases")

THE ENTIRE judgMENT WAS deemed "void" AND THE defendant WAS ENTITLED TO A NEW TRIAL. N2 UNDERSTANDABLY, THE TEXAS LEGISLATURE RECOGNIZED THAT CORRECTIVE LEGISLATION WAS IN ORDER, FOR IT IS DIFFICULT TO UNDERSTAND WHY AN ERROR IN SENTENCING SHOULD NECESSITATE A SECOND TRIAL ON THE ISSUE OF GUILT OR INNOCENCE.

Supporting Cases

(1)

By placing sentence-elevating factfinding within the judges province, violates a defendants right to trial by jury safeguarded by the sixth and fourteenth Amendments, pg. 8-22.

(A) In Apprendi v. NewJersey, this court held that, under the Sixth Amendment, any fact (other than a prior conviction) that exposes a defendant to a sentence in excess of the relevant statutory maximum must be found by a jury, not a judge, and established beyond a reasonable doubt, not merely by a preponderance of the evidence. [*3] See 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435. The court has applied the rule of Apprendi to facts subjecting a defendant to the death penalty, Ring v. Arizona, 536 U.S. 584, 602, 609, 122 S. Ct. 2428, 153 L. Ed. 2d 556, facts permitting a sentence in excess of the "standard range" under Washingtons Sentencing Reform Act (Reform Act), Blakely v. Washington, 542 U.S. 296, 304-305, 124 S. Ct. 2531, 159 L. Ed. 2d 403, and facts triggering a sentence range elevation under the then-mandatory Federal Sentencing Guidelines, United States v. Booker, 543 U.S. 220, 243-244, 125 S. Ct. 738, 160 L. Ed. 2d 621. Blakely and Booker bear most closely on the question presented here.

The maximum penalty for Blakely's offense, under Washington's Reform Act, was ten years imprisonment, but if no facts beyond those reflected in the jury's verdict were found by the trial judge, Blakely could not receive a sentence above a standard range of 49 to 53 months. Blakely was sentenced to 90 months, more than three years above the standard range, based on the judges finding of deliberate cruelty. Applying Apprendi; this court held the sentence unconstitutional. The State in Blakely endeavored to distinguish Apprendi, contending that [*4] Blakely's sentence was within the judges discretion based solely on the guilty verdict. The court dismissed that argument. Blakely could not have been sentenced above the standard range absent and additional fact. Consequently, that fact was subject to the Sixth Amendments jury-trial guarantee. It did not matter that Blakely's sentence, though outside the standard range, was within the 10-year maximum. Because the judge could not have imposed a sentence outside the standard range without finding an additional fact, the top of that range -- 53 months, not 10 years -- was the relevant statutory maximum. The court also rejected the state's arguments that Apprendi was satisfied because the Reform Act did not specify an exclusive catalog of facts on which a judge might base a departure from the standard range,

(2) SUPPORTING CASES

AND BECAUSE IT ULTIMATELY LEFT THE decision whether or NOT to depart TO THE judges discretion.

Booker was sentenced under THE FEDERAL SENTENCING Guidelines. THE FACTS Found by THE jury yielded A BASE Guidelines range of 210 TO 262 MONTHS imprisonment, A range THE judge could NOT EXCEED without undertaking Additional FACTFINDING. THE judge did so, making A Finding THAT [*5] boosted Booker into A higher Guidelines range. This COURT held Bookers SENTENCE impermissible under THE Sixth AMENDMENT. THERE was "no distinction of CONSTITUTIONAL Significance between THE Federal Sentencing Guidelines AND THE Washington procedures AT issue IN [Blakely]." 543 U.S., AT 233, 125 S. CT. 738, 160 L. Ed. 2d 621. Both were "mandatory AND imposed binding requirements ON ALL SENTENCING judges". Ibid. All Members OF THE COURT agreed, however, THAT THE Guidelines would NOT implicate THE Sixth AMENDMENT IF THEY were Advisory. Ibid. Facing THE remedial question, THE COURT concluded THAT rendering THE Guidelines Advisory CAME closest TO what Congress would have intended had it known THAT THE Guidelines were vulnerable TO A SIXTH AMENDMENT challenge. Under THE Advisory Guidelines SYSTEM described IN Booker, judges would NO longer be confined TO THE SENTENCING range dictated by THE Guidelines, but would be obliged TO "TAKE ACCOUNT" OF THAT range along with THE SENTENCING goals ENUMERATED IN THE SENTENCING REFORM ACT (SRA). Id., AT 259, 264, 125 S. CT. 738, 160 L. Ed. 2d 621. IN place of THE SRA provision governing Appellate review of SENTENCES under THE MANDATORY Guidelines scheme, THE COURT installed [*6] A "reasonableness" standard OF review. Id., AT 261, 125 S. CT. 738, 160 L. Ed. 2d 621. Pg. 8-15.

(B) IN ALL MATERIAL respects, California's DSL resembles THE SENTENCING SYSTEMS invalidated IN Blakely AND Booker. Following THE reasoning IN THOSE CASES, THE Middle TERM prescribed under California Law, NOT THE upper TERM, IS THE relevant STATUTORY MAXIMUM. BECAUSE Aggravating FACTS THAT AUTHORIZE THE upper TERM ARE Found by THE judge, AND NEED only be ESTABLISHED by A preponderance OF THE EVIDENCE, THE DSL violates THE rule OF Apprendi.

while "that should be the end of the matter," Blakely, 542 U.S., at 313, 124 S. Ct. 2531, 159 L. Ed. 2d 403 in People v. Black, the California Supreme Court insisted that the DSL survives inspection under our precedents. The Black court reasoned that, given the ample discretion afforded trial judges ot identify aggravating facts warranting and upper term sentence, the DSL did "not represent a legislative effort to shift the proof of particular facts from elements of a crime (to be proved to a jury) to sentencing factors (to be decided by a judge)," 35 Cal. 4th, at, 1255-1256, 113 P.3d, at 543-544. This Court cautioned in Blakely, however, [*7] that broad discretion to decide what facts may support an enhanced sentence, or to determine whether an enhanced sentence is warranted in a particular case, does not shield a sentencing system from the force of this Courts decisions. The Black court also urged that the DSL is not cause for concern because it reduced the penalties for most crimes over the prior indeterminate sentencing scheme; because the system is fair to defendants; and because the DSL requires statutory sentence enhancements (as distinguished from aggravators) to be charged in the indictment and proved to a jury beyond a reasonable doubt. The Black courts examination, in short, satisfied it that California's sentencing system does not implicate significantly the concerns underlying the Sixth Amendments jury-trial guarantee. This Courts decisions, however, leave no room for such an examination. Asking whether a defendant's basic jury-trial right is preserved, though some facts essential to punishment are reserved for determination by the judge, is the very inquiry Apprendi's bright-line rule was designed to exclude.

Ultimately, the Black court relied on an equation of California's DSL to the [*8] post-Booker federal system. That attempted comparison is unavailing. The Booker court held the federal Guidelines incompatible with the Sixth Amendment because they were "mandatory and imposed binding requirements on all sentencing judges"; 543 U.S., at 233, 125 S. Ct. 738, 160 L. Ed. 2d 621. To remedy the constitutional infirmity, the court excised provisions that rendered the system mandatory, leaving the Guidelines in place.

as advisory only. The DSL, however, does not resemble the advisory system the Court in Booker had in view. Under California's system, judges are not free to exercise their "discretion to select a specific sentence within a defined range." Ibid. California's Legislature has adopted sentencing triads, three fixed sentences with no ranges between them. Cunningham's sentencing judge had no discretion to select a sentence within a range of 6 to 16 years, but had to impose 12 years, nothing less and nothing more, unless the judge found facts allowing a sentence of 6 to 16 years. Factfinding to elevate a sentence from 12 to 16 years, this Court's decisions make plain, falls within the province of the jury employing a beyond-a-reasonable-doubt standard, not the bailiwick of [*9] a judge determining where the preponderance of the evidence lies.

The Black court attempted to rescue the DSL's judicial factfinding authority by it a reasonableness constraint, equivalent to the constraint operative in the post-Booker federal system. Reasonableness, however, is not the touchstone of Sixth Amendment analysis. The reasonableness requirement Booker anticipated for the federal system operates within the constitutional constraints delineated in this Court's precedent, not as a substitute for those constraints. Because the DSL allocates to judges sole authority to find facts permitting the imposition of an upper term sentence, the system violates the Sixth Amendment. Booker's remedy for the federal Guidelines, in short, is not a recipe for rendering this Court's Sixth Amendment cases law toothless. Further elaboration here on the federal reasonableness standard is neither necessary nor proper. The Court has granted review in two cases -- to be argued and decided later this -- term -- raising questions trained on that matter. Claiborne v. United States, 127 S. Ct. 551, 166 L. Ed. 2d 406; Rita v. United States, 127 S. Ct. 551, 166 L. Ed. 2d 406. Pp. 15-21.

(c) As to [*10] the adjustment of California's sentencing system in light of the courts ruling, "the ball .... lies in [California's] court." Booker, 543 U.S., at 265, 125 S. Ct. 738, 160 L. Ed. 2d 621. Several states

(5) SUPPORTING CASES

have modified their systems in the wake of Apprendi and Blakely to retain determinate sentencing, by calling upon the jury to find any fact necessary to the imposition of an elevated sentence. Other States have chosen to permit judges genuinely "to exercise broad discretion.... within a statutory range," which, "everyone agrees," encounters no Sixth Amendment shoal. Id., at 233, 125 S. Ct. 738, 160 L. Ed. 2d 621. California may follow the paths taken by its sister States or otherwise alter its system, so long as it observes Sixth Amendment limitations declared in this Court's decisions. Pp. 21-22

REVERSED in part and remanded.

Judges: Ginsburg, J., delivered the opinion of the Court, in wich Roberts, C.J., and Stevens, Scalia, Souter, and Thomas, JJ., joined. Kennedy, J., filed a dissenting opinion, in which Breyer, J., joined. Alito, J., filed a dissenting opinion, in which Kennedy and Breyer, JJ., joined.

Opinion By: Ginsburg

Opinion: Justice Ginsburg delivered the opinion of the Court.

California's determinate [*1] sentencing law (DSL) assigns to the trial judge, not to the jury, authority to find the facts that expose a defendant to an elevated "upper term" sentence. The facts so found are neither inherent in the jury's verdict nor embraced by the defendant's plea, and they need only be established by a preponderance of the evidence, not beyond a reasonable doubt. The question presented is whether the DSL, by placing sentence-elevating factfinding within the judge's province, violates a defendant's right to trial by jury safeguarded by the Sixth and Fourteenth Amendments. We hold that it does.

As this Court's decisions instruct, the Federal Constitution's jury-trial guarantee proscribes a sentencing scheme that allows a judge to

impose a sentence above the statutory maximum based on a fact, other than a prior conviction, not found by a jury or admitted by the defendant. Apprendi v. New Jersey 530 U.S. 466, 120 S.CT. 2348, 144 L. Ed. 2d 435 (2000); Ring v. Arizona, 536 U.S. 584, 122 S.CT. 2428, 153 L. Ed. 2d 556 (2002); Blakely v. Washington, 542 U.S. 296, 124 S. CT. 2531, 159 L. Ed. 2d 403 (2004); United States v. Booker, 543 U.S. 220, 125 S. CT. 738, 160 L. Ed. 2d 621 (2005). "The relevant 'statutory maximum,'" this court has clarified, "is not [*12] the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings." Blakely, 542 U.S., at 303-304, 124 S. CT. 2531, 159 L. Ed. 2d 403 (emphasis in original). In petitioner's case, the jury's verdict alone limited the permissible sentence to 12 years. Additional factfinding by the trial judge, however, yielded an upper term sentence of 16 years. The California Court of Appeal affirmed the harsher sentence. We reverse that disposition because the four-year elevation based on judicial factfinding denied petitioner his right to a jury trial.

Petitioner John Cunningham was tried and convicted of continuous sexual abuse of a child under the age of 14. Under the DSL, that offense is punishable by imprisonment for a lower term sentence of 6 years, a middle term sentence of 12 years, or an upper sentence of 16 years. Cal. Penal Code Ann. § 288.5 (A) (West) 1999) (hereinafter Penal code). As further explained below, see infra, at 4-7, the DSL obliged the trial judge to sentence Cunningham to the 12-year middle term unless the judge found one or more additional facts in aggravation. Based on a post-trial sentencing hearing, the [*13] trial judge found by a preponderance of the evidence six aggravating circumstances, among them, the particular vulnerability of Cunningham's victim, and Cunningham's violent conduct, which indicated a serious danger to the community. Tr. of Sentencing (Aug. 1, 2003), App. 22. N1 In mitigation, the judge found one fact: Cunningham had no record of prior criminal conduct. Ibid. Concluding that the aggravators outweighed the sole mitigator, the judge sentenced Cunningham to the upper term of 16 years. Id., at 23.

For most offenses, including Cunningham's the DSL regime is implemented in the following manner. The statute defining the offense prescribes

SUPPORTING CASES

THREE PRECISE TERMS OF IMPRISONMENT -- A LOWER, MIDDLE, AND UPPER TERM SENTENCE. E.g., PENAL CODE § 288.5 (A) (WEST 1999) (A PERSON CONVICTED OF CONTINUOUS SEXUAL ABUSE OF A CHILD "SHALL BE PUNISHED BY IMPRISONMENT IN THE STATE PRISON FOR A TERM OF 6, 12, OR 16 YEARS"). SEE ALSO BLACK, 35 CAL. 4TH, AT 1247, 113 P. 3d, AT 538. PENAL CODE § 1170 (b)(WEST SUPP. 2006) CONTROLS THE TRIAL JUDGE'S CHOICE; IT PROVIDES THAT "THE COURT SHALL ORDER IMPOSITION OF THE MIDDLE TERM, UNLESS THERE ARE CIRCUMSTANCES IN AGGRAVATION OR MITIGATION OF THE CRIME." "CIRCUMSTANCES IN AGGRAVATION OR MITIGATION" ARE TO BE DETERMINED BY THE COURT AFTER CONSIDERATION OF SEVERAL ITEMS: THE TRIAL RECORD; THE PROBATION OFFICER'S REPORT; STATEMENTS IN AGGRAVATION OR MITIGATION SUBMITTED BY THE PARTIES, THE VICTIM, OR THE VICTIM'S FAMILY; "AND ANY FURTHER EVIDENCE INTRODUCED AT THE SENTENCING HEARING." Ibid.

THE DSL DIRECTED THE STATE'S JUDICIAL COUNCIL N4 TO ADOPT RULES GUIDING THE SENTENCING JUDGE'S DECISION WHETHER TO "IMPOSE THE LOWER OR UPPER [*17] PRISON TERM." PENAL CODE § 1170.3(A)(2) (WEST 2004). N5 RESTATING § 1170(b), THE COUNCIL'S RULES PROVIDE THAT "THE MIDDLE TERM SHALL BE SELECTED UNLESS IMPOSITION OF THE UPPER OR LOWER TERM IS JUSTIFIED BY CIRCUMSTANCES IN AGGRAVATION OR MITIGATION." RULE 4.420 (A). "CIRCUMSTANCES IN AGGRAVATION," AS CRISPLY DEFINED BY THE JUDICIAL COUNCIL, MEANS "FACTS WHICH JUSTIFY THE IMPOSITION OF THE UPPER PRISON TERM." RULE 4.405 (d) (EMPHASIS ADDED). FACTS AGGRAVATING AN OFFENSE, THE RULES INSTRUCT, "SHALL BE ESTABLISHED BY A PREPONDERANCE OF THE EVIDENCE," RULE 4.420 (b), N6 AND MUST BE STATED ORALLY ON THE RECORD." RULE 4.420 (E)

THE RULES PROVIDE A NONEXHAUSTIVE LIST OF AGGRAVATING CIRCUMSTANCES, INCLUDING "FACTS RELATING TO THE CRIME," RULE 4.421 (A), N7 "FACTS RELATING TO THE DEFENDANT," RULE 4.421 (b) "ANY OTHER FACTS STATUTORILY DECLARED TO BE CIRCUMSTANCES IN AGGRAVATION," RULE 4.421 (C). BEYOND THE ENUMERATED CIRCUMSTANCES, "THE JUDGE IS FREE TO CONSIDER ANY ADDITIONAL CRITERIA REASONABLY RELATED TO THE DECISION BEING MADE." BLACK, 35 CAL. 4TH, AT 1247, 113 P. 3d. AT 538 (QUOTING RULE 4.408 (A)). "A FACT THAT IS AN ELEMENT OF THE CRIME," HOWEVER, "SHALL NOT BE USED TO IMPOSE THE UPPER TERM." RULE 4.420(d). IN SUM, CALIFORNIA'S DSL, AND THE RULES GOVERNING ITS APPLICATION, DIRECT THE SENTENCING COURT TO START WITH THE MIDDLE TERM, AND TO MOVE FROM THAT TERM ONLY WHEN THE COURT ITSELF FINDS AND PLACES ON THE RECORD FACTS -- WHETHER RELATED TO THE OFFENSE OR THE OFFENDER -- BEYOND THE ELEMENTS OF THE CHARGED OFFENSE.

Justice Alito - maintains, however, that a circumstance in aggravation need not be a fact at all. In his view a policy judgment, or even a judge's "subjective belief" regarding the appropriate sentence, qualifies as an aggravating circumstance. Post, at 11-12 (dissenting opinion). California's Rules, however, constantly refer to "facts." As just noted, the Rules define "circumstances in aggravation" as "facts which justify the imposition of the upper prison term." Rule 4.405(d) (emphasis added). N9 And "circumstances in aggravation," the Rules unambiguously declare, "shall be established by a preponderance of the evidence," Rule 4.420(b), a clear factfinding directive to which there is no exception. See People v. Hall, 8 Cal. 4th 950, 957, 35 Cal. Rptr. 2d 432, 883 P.2d 974, 978 (1994) ("Selection of the upper term is justified only if circumstances in aggravation are established by a preponderance of evidence ...." (Emphasis added)).

N9 See also, e.g., Rule 4.420(b) ("Selection of the upper term is justified only if, after a consideration of all the relevant facts, the circumstances in aggravation outweigh the circumstances in mitigation." (Emphasis added)); Rule 4.420(e) (court must provide "a concise statement of the ultimate facts that the court deemed to constitute circumstances in aggravation or mitigation" (emphasis added)). [*20]

Notably, the Penal Code permits elevation of a sentence above the upper term based on specified statutory enhancements relating to the defendant's criminal history or circumstance of the crime. See, e.g., Penal Code § 667 et seq. (West Supp. 2006); § 12022 et seq. See also Black, 35 Cal. 4th, at 1257, 113 P. 3d, at 545. Unlike aggravating circumstances, statutory enhancements must be charged in the indictment, and the underlying facts must be proved to the jury beyond a reasonable doubt. Penal Code § 1170.1(e); Black, 35 Cal. 4th, at 1257, 113 P. 3d, at 545. A fact underlying an enhancement cannot do double duty; it cannot be used to impose an upper term sentence and, on top of that, an enhanced term. Penal Code § 1170(b). Where permitted by statute, [*22] however, a judge may use a fact qualifying as an enhancer to impose an upper term rather than an enhanced sentence. Ibid.; Rule 4.420(c).

II

This Court has repeatedly held that, under the Sixth Amendment, any fact that exposes a defendant to a greater potential sentence must be found by a jury, not a judge, and established beyond a reasonable doubt, not merely by a preponderance of the evidence. While this rule is

SUPPORTING CASES

rooted in longstanding common-law practice, its explicit statement in our decisions is recent. In Jones v. United States, 526 U.S. 227, 119 S. Ct. 1215, 143 L. Ed. 2d 311 (1999), we examined the Sixth Amendment's historical and doctrinal foundations, and recognized that judicial factfinding operating to increase a defendant's otherwise maximum punishment posed a grave constitutional question. Id., at 239-252, 119 S. Ct. 1215, 143 L. Ed. 2d 311. While the Court construed the statute at issue to avoid the question, the Jones opinion presaged our decision, some 15 months later, in Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000).

Charles Apprendi was convicted of possession of a firearm for an unlawful purpose, a second-degree offense under New Jersey law punishable by five to [*23] ten years' imprisonment. Id., at 468, 120 S. Ct. 2348, 147 L. Ed. 2d 435. A separate "hate crime" statute authorized an "extended term" of imprisonment: ten to twenty years could be imposed if the trial judge, by a preponderance of the evidence, found that "'the defendant in committing the crime acted with a purpose to intimidate an individual or group of individuals because of race, color, gender, handicap, religion, sexual orientation or ethnicity.'" Id., at 468-469, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (quoting N.J. Stat. Ann. § 2C:44-3(e) (West Supp. 1999-2000)). The judge in Apprendi's case so found, and therefore sentenced the defendant to 12 years' imprisonment. This Court held that the Sixth Amendment proscribed the enhanced sentence. 530 U.S., at 471, 120 S. Ct. 2348, 147 L. Ed. 2d 435. Other than a prior conviction, see Almendarez-Torres v. United States, 523 U.S. 224, 239-247, 118 S. Ct. 1219, 140 L. Ed. 2d 350 (1998), we held in Apprendi, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S., at 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435. See also Harris v. United States, 536 U.S. 545, 557-566, 122 S. Ct. 2406, 153 L. Ed. 2d 524 (2002) (plurality opinion) (Apprendi [*24] said that any fact extending the defendant's sentence beyond the maximum authorized by the jury's verdict would have been considered an element of an aggravated crime -- and thus the domain of the jury -- by those who framed the Bill of Rights.").

We have since reaffirmed the rule of Apprendi, applying it to facts subjecting a defendant to the death penalty, Ring v. Arizona, 536 U.S.

SUPPORTING CASES

584, 602, 609, 122 S. CT. 2428, 153 L. Ed. 2d 556 (2002), FACTS PERMITTING A SENTENCE IN EXCESS OF THE "STANDARD RANGE" UNDER WASHINGTON'S SENTENCING REFORM ACT, BLAKELY V. WASHINGTON, 542 U.S. 296, 304-305, 124 S. CT. 2531, 159 L. Ed. 2d 403 (2004), AND FACTS TRIGGERING A SENTENCE RANGE ELEVATION UNDER THE THEN-MANDATORY FEDERAL SENTENCING GUIDELINES, UNITED STATES V. BOOKER, 543 U.S. 220, 243-244, 125 S. CT. 738, 160 L. Ed. 2d 621 (2005). BLAKELY AND BOOKER BEAR MOST CLOSELY ON THE QUESTION PRESENTED IN THIS CASE.

Ralph Howard Blakely was convicted of second-degree kidnapping with A FIREARM, A CLASS B FELONY UNDER WASHINGTON LAW. BLAKELY, 542 U.S., AT 298-299 S. CT. 2531, 159 L. Ed. 2d 403. While THE OVERALL STATUTORY MAXIMUM FOR A CLASS B FELONY WAS TEN YEARS, THE STATE'S SENTENCING REFORM ACT (REFORM ACT) Added AN IMPORTANT QUALIFICATION: IF [*25] NO FACTS BEYOND THOSE REFLECTED IN THE jury's VERDICT WERE FOUND BY THE TRIAL JUDGE, A DEFENDANT could NOT RECEIVE A SENTENCE ABOVE A "STANDARD RANGE" OF 49 TO 53 MONTHS. Id., AT 299-300, 124 S. CT. 2531, 159 L. Ed. 2d 403. THE REFORM ACT PERMITTED but did NOT REQUIRE A JUDGE TO EXCEED THAT SENTENCE STANDARD RANGE IF SHE FOUND "'''SUBSTANTIAL AND COMPELLING REASONS JUSTIFYING AN EXCEPTIONAL SENTENCE.'''" Ibid. (QUOTING WASH. REV. CODE ANN § 9.94A.120(2) (2000)). THE REFORM ACT SET OUT A NONEXHAUSTIVE list OF AGGRAVATING FACTS ON which such A SENTENCE ELEVATION Could BE BASED. IT Also clarified THAT A FACT TAKEN INTO ACCOUNT IN FIXING THE STANDARD RANGE -- i.e., ANY FACT Found by THE jury -- could under NO CIRCUMSTANCES COUNT IN THE DETERMINATION whether TO IMPOSE AN EXCEPTIONAL SENTENCE. 542 U.S., AT 299-300, 124 S. CT. 2531, 159 L. Ed. 2d 403. BLAKELY WAS SENTENCED TO 90 MONTHS' IMPRISONMENT, MORE THAN THREE YEARS ABOVE THE STANDARD RANGE, BASED ON THE TRIAL judge's Finding THAT he had ACTED WITH deliberate CRUELTY. Id., AT 300, 124 S. CT. 2531, 159 L. Ed. 2d 403.

Applying THE rule OF Apprendi, THIS COURT held Blakely's SENTENCE UNCONSTITUTIONAL. THE STATE IN Blakely had Endeavored TO distinguish Apprendi ON THE grounds THAT "UNDER [*26] THE Washington guidelines, AN EXCEPTIONAL SENTENCE IS WITHIN THE COURT'S discretion AS A RESULT OF A guilty verdict." BRIEF FOR RESPONDENT IN Blakely V. Washington, OT. 2003, NO. 02-1632, p. 15. WE REJECTED THAT ARGUMENT. THE judge could NOT have SENTENCED BLAKELY ABOVE THE STANDARD RANGE WITHOUT Finding THE additional FACT OF deliberate CRUELTY. CONSEQUENTLY, THAT

## SUPPORTING CASES

FACT WAS SUBJECT TO THE SIXTH AMENDMENT'S JURY-TRIAL GUARANTEE. 542 U.S., AT 304-314, 124 S. CT. 2531, 159 L. Ed. 2d 403. IT did NOT MATTER, WE EXPLAINED, THAT BLAKELY'S SENTENCE, THOUGH OUTSIDE THE STANDARD RANGE, WAS WITHIN THE 10-YEAR MAXIMUM FOR CLASS B FELONIES:

"OUR PRECEDENTS MAKE CLEAR ... THAT THE 'STATUTORY MAXIMUM' FOR APPRENDI PURPOSES IS THE MAXIMUM SENTENCE A JUDGE MAY IMPOSE SOLELY ON THE BASIS OF THE FACTS REFLECTED IN THE JURY VERDICT OR ADMITTED BY THE DEFENDANT ... IN OTHER WORDS, THE RELEVANT 'STATUTORY MAXIMUM' IS NOT THE MAXIMUM SENTENCE A JUDGE MAY IMPOSE AFTER FINDING ADDITIONAL FACTS, BUT THE MAXIMUM HE MAY IMPOSE WITHOUT ANY ADDITIONAL FINDINGS. WHEN A JUDGE INFLICTS PUNISHMENT THAT THE JURY'S VERDICT ALONE DOES NOT ALLOW, THE JURY HAS NOT FOUND ALL THE FACTS 'WHICH THE LAW MAKES ESSENTIAL [*27] TO THE PUNISHMENT,' ... AND THE JUDGE EXCEEDS HIS PROPER AUTHORITY". Id., AT 303, 124 S. CT. 2531, 159 L. Ed. 2d 403 (EMPHASIS IN ORIGINAL) (QUOTING 1 J. BISHOP, CRIMINAL PROCEDURE § 87, p. 55 (2d Ed. 1872)).

BECAUSE THE JUDGE IN BLAKELY'S CASE COULD NOT HAVE IMPOSED A SENTENCE OUTSIDE THE STANDARD RANGE WITHOUT FINDING AN ADDITIONAL FACT, THE TOP OF THAT RANGE -- 53 MONTHS, AND NOT 10 YEARS -- WAS THE RELEVANT STATUTORY MAXIMUM. 542 U.S., AT 304, 124 S. CT. 2531, 159 L. Ed. 2d 403.

THE STATE HAD ADDITIONALLY ARGUED IN BLAKELY THAT APPRENDI'S RULE WAS SATISFIED BECAUSE WASHINGTON'S REFORM ACT DID NOT SPECIFY AN EXCLUSIVE CATALOG OF POTENTIAL FACTS ON WHICH A JUDGE MIGHT BASE A DEPARTURE FROM THE STANDARD RANGE. THIS COURT REJECTED THAT ARGUMENT AS WELL. "WHETHER THE JUDGE'S AUTHORITY TO IMPOSE AN ENHANCED SENTENCE DEPENDS ON FINDING A SPECIFIED FACT ... ONE OF SEVERAL SPECIFIED FACTS ... OR ANY AGGRAVATING FACT (AS HERE)," WE OBSERVED, "IT REMAINS THE CASE THAT THE JURY'S VERDICT ALONE DOES NOT AUTHORIZE THE SENTENCE." 542 U.S., AT 305, 124 S.CT. 2531, 159 L. Ed. 2d 403 (EMPHASIS IN ORIGINAL). FURTHER, WE HAD HELD IT IRRELEVANT THAT THE REFORM ACT ULTIMATELY LEFT THE DECISION WHETHER OR NOT TO DEPART TO THE JUDGE'S DISCRETION: [*28] "WHETHER THE JUDICIALLY DETERMINED FACTS REQUIRE A SENTENCE ENHANCEMENT OR MERELY ALLOW IT," WE NOTED, "THE VERDICT ALONE DOES NOT AUTHORIZE THE SENTENCE." Ibid., n. 8 (EMPHASIS IN ORIGINAL).

# SUPPORTING CASES

"IF THE GUIDELINES AS CURRENTLY WRITTEN COULD BE READ AS MERELY ADVISORY PROVISIONS THAT RECOMMENDED, RATHER THAN REQUIRED, THE SELECTION OF PARTICULAR SENTENCES IN RESPONSE TO DIFFERING SETS OF FACTS, THEIR USE WOULD NOT IMPLICATE THE SIXTH AMENDMENT. WE HAVE NEVER DOUBTED THE AUTHORITY OF A JUDGE TO EXERCISE BROAD DISCRETION IN IMPOSING A SENTENCE WITHIN A STATUTORY RANGE. INDEED, EVERYONE AGREES THAT THE CONSTITUTIONAL ISSUES PRESENTED BY [THIS CASE] WOULD HAVE BEEN AVOIDED ENTIRELY IF CONGRESS HAD OMITTED FROM THE [FEDERAL SENTENCING REFORM ACT] THE PROVISIONS THAT MAKE THE GUIDELINES BINDING ON DISTRICT JUDGES .... FOR WHEN A TRIAL JUDGE EXERCISES HIS DISCRETION TO SELECT A SPECIFIC SENTENCE WITHIN A DEFINED RANGE, THE DEFENDANT HAS NO RIGHT TO A JURY DETERMINATION [*30] OF THE FACTS THAT THE JUDGE DEEMS RELEVANT. "THE GUIDELINES AS WRITTEN, HOWEVER, ARE NOT ADVISORY; THEY ARE MANDATORY AND BINDING ON ALL JUDGES". IBID. (CITATIONS OMITTED).

N10 CALIFORNIA'S DSL, WE NOTE IN THIS CONTEXT, RESEMBLES PRE-BOOKER FEDERAL SENTENCING IN THE SAME WAYS WASHINGTON'S SENTENCING SYSTEM DID: THE KEY CALIFORNIA PENAL CODE PROVISION STATES THAT THE SENTENCING COURT "SHALL ORDER IMPOSITION OF THE MIDDLE TERM" ABSENT "CIRCUMSTANCES IN AGGRAVATION OR MITIGATION OF THE CRIME"; § 1170(b) (EMPHASIS ADDED), AND ANY MOVE TO THE UPPER OR LOWER TERM MUST BE JUSTIFIED BY "A CONCISE STATEMENT OF THE ULTIMATE FACTS" ON WHICH THE DEPARTURE RESTS, RULE 4.420(E) (EMPHASIS ADDED). BUT SEE POST, AT 7 (ALITO, J., DISSENTING) (CHARACTERIZING CALIFORNIA'S DSL AS INDISTINGUISHABLE FROM POST-BOOKER SENTENCING).

N.11 TITLE 18 U.S.C. § 3553(b)(1) MANDATED THE IMPOSITION OF A GUIDELINES SENTENCE UNLESS THE DISTRICT COURT FOUND "AN AGGRAVATING OR MITIGATING CIRCUMSTANCE OF A KIND, OR TO A DEGREE, NOT ADEQUATELY TAKEN INTO CONSIDERATION BY THE SENTENCING COMMISSION IN FORMULATING THE GUIDELINES." SECTION 3742(E)(2), AND, IF THE SENTENCE IMPOSED FELL OUTSIDE THE APPLICABLE GUIDELINES RANGE, WHETHER THE SENTENCING JUDGE HAD PROVIDED A WRITTEN STATEMENT OF REASONS, WHETHER § 3553(b) AND THE FACTS OF THE CASE WARRANTED THE DEPARTURE, AND WHETHER THE DEGREE OF DEPARTURE WAS REASONABLE, § 3742(E)(3).

UNDER THE SYSTEM DESCRIBED IN JUSTICE BREYER'S OPINION FOR THE COURT IN BOOKER, JUDGES WOULD NO LONGER BE TIED TO THE SENTENCING RANGE INDICATED IN THE GUIDELINES, BUT THEY WOULD BE OBLIGED TO "TAKE

# SUPPORTING CASES

ACCOUNT OF "THAT RANGE ALONG WITH THE SENTENCING GOALS ~~CONGRESS~~ ENUMERATED IN THE SRA AT 18 U.S.C. § 3553 (A). 543 U.S., AT 259, 264, 125 S. CT. 738. 160 L. Ed. 2d 621. N 12 HAVING SEVERED § 3742 (E), THE PROVISION OF THE SRA GOVERNING APPELLATE REVIEW OF SENTENCES UNDER THE MANDATORY GUIDELINES SCHEME, SEE SUPRA, AT 13, AND N. 11, THE COURT INSTALLED, AS CONSISTENT WITH THE ACT AND THE SOUND ADMINISTRATION OF JUSTICE, A "REASONABLENESS" STANDARD OF REVIEW. 543 U.S., AT 261, 125 S. CT. 738, 160 L. Ed. 2d 621. WITHOUT ATTEMPTING AN ELABORATE DISCUSSION OF THAT STANDARD, JUSTICE BREYER'S REMEDIAL OPINION FOR THE COURT OBSERVED: "SECTION 3553 (A) REMAINS IN EFFECT, AND SETS FORTH NUMEROUS FACTORS THAT GUIDE SENTENCING. THOSE FACTORS IN TURN WILL GUIDE APPELLATE COURTS, AS THEY HAVE IN THE PAST, IN DETERMINING WHETHER A SENTENCE IS REASONABLE." IBID. N13 THE COURT EMPHASIZED THE PROVISIONAL CHARACTER OF THE BOOKER REMEDY. RECOGNIZING THAT AUTHORITY TO SPEAK "THE LAST WORD" RESIDE IN CONGRESS, THE [*33] COURT SAID:

"THE BALL NOW LIES IN CONGRESS'S COURT. THE NATIONAL LEGISLATURE IS EQUIPPED TO DEVISE AND INSTALL, LONG TERM, THE SENTENCING SYSTEM, COMPATIBLE WITH THE CONSTITUTION, THAT CONGRESS JUDGES BEST FOR THE FEDERAL SYSTEM OF JUSTICE." Id., AT 265, 125 S. CT. 738, 160 L. Ed. 2d 621.

N 12 SECTION 3553 (A) INSTRUCTS SENTENCING JUDGES TO CONSIDER "THE NATURE AND CIRCUMSTANCES OF THE OFFENSE AND THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT," "THE KINDS OF SENTENCES AVAILABLE," AND THE GUIDELINES AND POLICY STATEMENTS ISSUED BY THE UNITED STATES SENTENCING COMMISSION. § 3553 (A) (1), (3) - (5). AVOIDANCE OF UNWARRANTED SENTENCING DISPARITIES, AND THE NEED TO PROVIDE RESTITUTION, ARE ALSO LISTED AS CONCERNS TO WHICH THE JUDGE SHOULD RESPOND. § 3553 (A) (6) - (7)

EX POST FACTO CLAIMS: WEAVER V. GRAHAM (1981) 450 U.S. 24, 28; MILLER V. FLORIDA (1987) — U.S. —; 107 S. CT. 2446; U.S. V. ALBERTINI (9TH CIR. 198) 830 F. 2d 985, CHATMAN V. MARQUEZ, SUPRA, [SEE: SECTION 7, SENTENCING, FOR CITE]; KNAPP V. CARDWELL (9TH) CIR. 1982), 667 F. 2d 1253.

"Prosecution misstated evidence and other case factors to cause the indictment and selective prosecution on Rodriguez. Which violated the truth-in-evidence doctrine and violated his constitutional rights.

22. *Walters v. Superior Court*, (2000) 80 Cal. 4th 1074, 1079, 95 Cr 2d 880; see §§ 11.13 - 11.18.; Pen C § 1054.(c); See *In re Brown*, (1998) 17 Cal. 4th 873, 72 Cr. 2d 698; *In re Littlefield*, (1993) 5 Cal 4th 122, 135, 19 Cr 2d 248; *Gray v. Klauser*, 282 F.3d 633 (9th cir. 2002); *Hayes v. Woodford*, 301 F.3d 769 (9th cir. 2001).

23. California Criminal Law § 11.6 pg. 262, Real Evidence; The prosecution must disclose to the defense all relevant real evidence seized or obtained as a part of the investigation of the offenses charged. If it is in the possession of the prosecution or if the prosecution knows it is in the possession of the investigating agencies. Pen C § 1054.1 (c); see *In re Brown* (1998) 17 Cal 4th 873, 72 Cr 2d 698; *In re Littlefield* (1993) 5 C 4th 122, 135, 19 Cr 2d 248. The defense must seek access to any real evidence in the possession of the prosecution that was not disclosed following an informal request, through the statutory motion procedure. *Walters v. Superior Court*, (2000) 80 Cal. 4th 1074, 1079, 95 Cr 2d 880; see §§ 11.3-11.18. The defense should examine real evidence, such as bullets and bodily fluids, early in the case to decide whether independent forensic testing of that evidence is needed.

24. *Gary v. Klauser*, 282 F.3d 633 (9th cir. 2002), A state may not arbitrarily prevent defendant from presenting evidence that is material, trustworthy, and important to his or her defense. *Hayes v. Woodford*, 301 F.3d 1054 (9th cir. 2002). Prosecutor has constitutional duty to correct evidence he or she knows is false. *Garceau v. Woodford*, 275 F.3d 769 (9th cir. 2001). Instruction allowing inference of propensity from other crimes evidence violated due process.

# "CONCLUSION"

IN SUM, BECAUSE JUROR NO. 10 WAS IMPROPERLY DISCHARGED FROM DELIBERATING APPELLANT RODRIGUEZ WAS DENIED HIS RIGHT TO A FAIR AND IMPARTIAL VERDICT BY THE JURY EMPANELLED TO DECIDE HIS CASE AND THE ERROR WAS PREJUDICIAL COMPELLING REVERSAL OF PETITIONER'S CONVICTIONS.

FURTHER, PETITIONER'S CONVICTIONS FOR ATTEMPTED MURDER WERE BASED ON IMPROPER OPINION EVIDENCE AND INSUFFICIENT EVIDENCE OF HIS MENTAL STATE, BY CRIMINALIST "LANCE MARTINI" AND MUST BE REVERSED.

FURTHERMORE PETITIONER FEELS HE SHOULD ONLY BE CHARGED FOR "ONE" COUNT OF ASSAULT ON A PEACE OFFICER AND TO HAVE THAT TIME RUN CONCURRENT TO THE ENHANCEMENT TIME AS WELL AS WITH THE TIME FROM COUNTS "4" THROUGH "7."

CONTENTIONS.

A.

The discharge of Juror No. 10. was removed without good cause, And it was an Abuse of discretion And denied petitioner, Right under the Sixth Amendment to A Jury trial.

B.

There was insufficient evidence as a matter of law to support the attempted murder convictions of counts I, II, AND III - because there is insufficient evidence to establish specific intent to kill.

C.

When considering whether there was sufficient evidence of petitioner's specific intent to kill the officer's, This court cannot consider the testimony of criminalist LANCE MARTINI as to petitioner's intent, because it is inadmissible Ultimate Fact opinion Evidence.

D.

Eighth Amendment, Forbids Extreme sentences that are grossly disproportionate to the crime. This Violates constitutional Rights to due process.

E.

The ex post facto clause in ART I, 10. of the UNITED STATES CONSTITUTION prohibits any New statute which deprives one charged with a crime of any defense Available According to law at the time the act was committed. Violates Constitutional Rights.

F.

Prosecution misstated evidence and other case factors to cause the indictment and selective prosecution of RODRIGUEZ. which violated the truth-in-Evidence doctrine and violated his constitutional rights.

REQUEST FOR RELIEF.

Petitioner is without remedy save for Habeas corpus, according petitioner request that the court:

1. Issue a writ of Habeas corpus;

2. Issue an order to show cause;

3. Declare the rights of parties;

4. Appoint counsel or award reasonable Attorney's Fee's; and

5. Grant any and all other relief found necessary or appropriate.

DATED: JAN-17-08

FRANK L. RODRIGUEZ,

x Frank L. Rodriguez.

IN Pro Se.

CONCLUSION.

For the reasons stated, petitioner is entitled to reversal of his conviction and new trial, which this court should grant.

DATED: JAN-17-08

FRANK L. RODRIGUEZ.

x: Frank L. Rodriguez.

VERIFICATION.

I am the petitioner in this action, I have read the foregoing petition for writ of habeas corpus and the facts stated there-in are true of my own knowledge, except as to the matters that are there-in stated on my own information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on JAN-17-08, at H D S P. Susanville California.

FRANK L. RODRIGUEZ.

x: Frank L. Rodriguez

1. For any and all circuit court cases cited Herein below in his points and Authorities plaintiff cites: WILSON V. LAYNE, 526 U.S. 603 (1999) "(holding that court's should consider" cases of controlling authority in their jurisdiction", as well as the, consensus of cases of persuasive authority in other jurisdictions." Id at 617.

JUSTICE requires Fairness AND FINALity, we Are NOT OMNISCENT; We MUST MAKE OUR decisions ON the BASIS OF the record OF the parties, iNCLuding the government present to US. IN this CASE the government FAiLed iN its responsibiLity to those it represents AND to the courts. NevertheLess the interest OF Justice ALSO require, iN A CASE such AS this that the court NOT shield itseLF FROM the KNOWLedge OF WhAT transpired beLOW. UNITED STATES V. AULET, 618 F.2d 182, 187 (2d cir. 1980)... FROM the record beFore the reviewiNg court(s) it MUST be held that such FiNdiNgs Are cLearLy erroNeous; AND AFter MAKiNg such A FiNdiNg AFter reviewiNg the eNtire evidence, the result is deFiNite AND FirM CONViction that A MistAke(s) hAS beeN committed. UNITED STATES V. GYPSON, 333 U.S. 364, 395, 68 S.CT. 525, 542 (1948).

CONCLUSION.

FOR The, Foregoing, reASONS Above. A petition FOR Writ OF HAbeAS corpus should be granted.

RESPECTFULLY submitted.
FRANK L. RODRIGUEZ.
x Frank L. Rodriguez

DATED: JAN-17-08.

IN PRO PERSONIA.

(1)

IN RE, FRANK L. RODRIGUEZ,
ON HABEAS CORPUS

PETITIONER'S REPLY TO APPELLATE COURTS DENIAL OF PETITION,

PETITIONER RESPECTFULLY DISAGREES WITH APPELLATE COURTS FINDINGS THAT, THE ISSUE OF INSTRUCTIONAL ERROR COULD HAVE BEEN RAISED ON DIRECT APPEAL, PETITIONER CONTENDS HE HAS MADE A SUBSTANTIVE EFFORT TO RAISE NUMEROUS CLAIMS ON DIRECT APPEAL. IN INSUFFICIENT EVIDENCE TO SUPPORT ANY ATTEMPTED MURDER ON ANY ONE OF THE THREE OFFICERS. PETITIONER CONTENDS THERE IS NO SIGNIFICANT EVIDENCE ABOUT PLANNING ACTIVITY, MOTIVE, OR THE MANNER OF ANY ATTEMPTED MURDER ON ANY OF THE THREE OFFICERS, TO SUGGEST PRE-MEDITATION OR DELIBERATION. PETITIONER CONTENDS THE INTENTIONS WERE TO SCARE AND TRY TO GET AWAY FROM THE PURSUING OFFICER'S.

"IN RE, HARRIS, CITE AS 21 CAL. RPTR. 2d 373 (CAL. 1993); ON HABEAS CORPUS"

"FUNDAMENTAL CONSTITUTIONAL ERROR", (IN RE, HARRIS)

IN YEARS PAST, WE HAVE RECOGNIZED AN EXCEPTION TO THE "WALTREUS RULE" WHEN THE HABEAS CORPUS PETITIONER CLAIMS A VIOLATION OF HIS OR HER CONSTITUTIONAL RIGHTS, THUS, IN RE, WINCHESTER, SUPRA, 53 CAL. 2d 528, 2 CAL. RPTR. 296, 348 P.2d 904, WE OPINED THAT "HABEAS CORPUS HAS BECOME A PROPER REMEDY IN THIS STATE TO COLLATERALLY ATTACK A JUDGMENT OF CONVICTION WHICH HAS BEEN OBTAINED IN VIOLATION OF FUNDAMENTAL CONSTITUTIONAL RIGHTS!" (ID, AT P. 531, 2 CAL. RPTR. 296, 348 P.2d 904, CF. CUYLER V. SULLIVAN (1980) 446 U.S. 335, 343, 100 S. CT. 1708, 1715, 64 L. Ed. 2d 333 [FEDERAL RULE PERMITS STATE PRISONER TO SEEK HABEAS RELIEF IN FEDERAL COURT IF HE ALLEGES HE IS IN CUSTODY IN VIOLATION OF FEDERAL CONSTITUTION]; 28 U.S.C § 2254 (A) [SAME].) PAST CASES HAVE THUS PERMITTED A HABEAS CORPUS PETITIONER TO RENEW A CLAIM OF FUNDAMENTAL CONSTITUTIONAL ERROR THAT HAS PREVIOUSLY BEEN REJECTED ON APPEAL. WE EMPHASIZE, HOWEVER, THAT NO STATUTORY REQUIREMENT DIRECTS US TO PERMIT RELITIGATION OF CERTAIN ISSUES IN A POSTCONVICTION PETITION FOR A WRIT OF HABEAS CORPUS WHERE THE MATTER HAS BEEN DULY CONSIDERED ON APPEAL. RATHER, THE JUDICIALLY CREATED WALTREUS RULE, AND THE SIMILARLY CREATED EXCEPTIONS TO THE RULE, ARE SIMPLY MANIFESTATIONS OF THIS COURTS RESOLVE TO BALANCE THE STATE'S WEIGHTY INTEREST IN FINALITY OF JUDGMENTS IN CRIMINAL CASES WITH THE INDIVIDUAL'S

RIGHT- ALSO SIGNIFICANT- TO A FAIR TRIAL UNDER BOTH THE STATE AND FEDERAL CONSTITUTIONS.

WE THUS AGREE WHOLEHEARTEDLY WITH JUSTICE HARLAN'S TRENCHANT COMMENT THAT "'NO ONE, NOT CRIMINAL DEFENDANTS, NOT THE JUDICIAL SYSTEM, NOT SOCIETY AS A WHOLE IS BENEFITED BY A JUDGMENT PROVIDING A MAN SHALL TENTATIVELY GO TO JAIL TODAY, BUT TOMORROW AND EVERY DAY THEREAFTER HIS CONTINUED INCARCERATION SHALL BE SUBJECT TO FRESH LITIGATION'!" (MACKEY V. UNITED STATES, (1971) 401 U.S. 667, 691, 91 S.CT. 1160, 1179, 28 L.Ed.2d 404 (HARLAN, J.; CONC. IN PART AND DIS. IN PART), QUOTED IN TEAGUE V. LANE, SUPRA, 489 U.S. AT p. 309, 109 S.CT. AT p. 1075.) CLEARLY, THE STATE AND SOCIETY HAVE AN INTEREST IN HAVING THE MATTER SETTLED ONCE AND FOR ALL.

BALANCED AGAINST THIS STRONG INTEREST IS THE INTEREST AN INDIVIDUAL HAS IN VINDICATING HIS OR HER CONSTITUTIONAL RIGHTS. IN THE PAST, WE BALANCED THE TWO INTERESTS BY DECLARING THAT THE OPPORTUNITY FOR A THIRD JUDICIAL REVIEW (TRIAL APPEAL, POSTAPPEAL HABEAS CORPUS) OF A CLAIM WAS APPROPRIATE ONLY WHERE THE LITIGANT MADE A COLORABLE SHOWING THAT A "FUNDAMENTAL" CONSTITUTIONAL RIGHT WAS VIOLATED. THUS. WE EXPLAINED THAT A CONSTITUTIONAL ISSUE WOULD NOT BE COGNIZABLE ON A POSTAPPEAL PETITION FOR A WRIT OF HABEAS CORPUS UNLESS THE PETITION COULD SHOW "THE DEFECT SO FATALLY INFECTED THE REGULARITY OF THE TRIAL AND CONVICTION AS TO VIOLATE THE FUNDAMENTAL ASPECTS OF FAIRNESS AND RESULT IN A MISCARRIAGE OF JUSTICE." (IN RE, WINCHESTER, SUPRA, 53 CAL.2d AT p. 532, 2 CAL.RPTR. 296, 348 p.2d 904.)

THIS FORMULATION PERMITTED CRIMINAL DEFENDANTS TO GAIN A DEGREE OF POST CONVICTION, POST APPEAL REVIEW FOR IMPORTANT CONSTITUTIONAL VIOLATIONS THAT, FOR ONE REASON OR ANOTHER, HAD GONE UNREMEDIED. THE INABILITY OF CRIMINAL DEFENDANTS TO GAIN VINDICATION OF THEIR CONSTITUTIONAL CLAIMS IN THE APPELLATE COURTS, ESPECIALLY THOSE CLAIMS AFFECTING THE ULTIMATE FAIRNESS OF THEIR TRIALS, JUSTIFIED AND EXCEPTION TO THE WALTREUS RULE FOR CLAIMS OF "FUNDAMENTAL" CONSTITUTIONAL ERROR. IMPLICITLY, THIS COURT FOUND THAT IN BALANCING THE NEED FOR SUCH

REVIEW WITH THE STATE NEED FOR FINALITY OF JUDGMENTS, THE INDIVIDUALS NEED WAS THE GREATER ONE.

"IN RE, WILLIAM JOHN CLARK ON HABEAS CORPUS."

"EXCEPTIONS"

STATE COURT LIMITATIONS.

THE PROBLEM OF ENSURING THE AVAILABILITY OF HABEAS CORPUS AND EQUIVALENT POSTCONVICTION REMEDIES TO CORRECT FUNDAMENTAL ERROR WHICH HAS RESULTED IN IMPRISONMENT OF A CRIMAL DEFENDANT, WHILE CONTROLLING ABUSE OF THE WRIT, IS NOT NEW. (SEE ROBSON & MELLO, ARIADNES PROVISIONS: A "CLUE OF THREAD" TO THE INTRICACIES OF THE PROCEDURAL DEFAULT, ADEQUATE AND INDEPENDANT STATE GROUNDS AND FLORIDAS DEATH PENALTY (1988) 76 CAL. L. REV. 87; GOLDSTEIN, APPLICATION OF RES JUDICATA PRINCIPLES TO SUCCESSIVE FEDERAL HABEAS CORPUS PETITIONS IN CAPITAL CASES: THE SEARCH FOR AN EQUITABLE APPROACH (1987) 21 U.C. DAVIS L. REV. 45; FEDERAL HABES CORPUS AND THE DEATH PENALTY; NEED FOR A PRECLUSION DOCTRINE EXCEPTION (1985) 18 U.C. DAVIS L. REV. 1177; COMMENT REPETITIVE POST-CONVICTION PETITIONS ALLEGING INEFFECTIVE ASSISTANCE OF COUNSEL: CAN THE PENNSYLVANIA SUPREME COURT TAME THE 'MONSTER?" (1982) 20 DUQ. L. REV. 237.)

LIKE CALIFORNIA, MOST STATES HAVE STATUTORY AND OR JUDICIALLY CREATED LIMITATIONS ON SUCCESSIVE PETITIONS. SOME OF THESE STATES HAVE ALSO ATTEMPTED TO ARTICULATE RULES AND TO ACHIEVE CONSISTENT APPLICATION OF RULES, GOVERNING EXCEPTIONS TO THE LIMITATIONS IMPOSED ON SUCCESSIVE PETITIONS. OTHERS HAVE NO EXPRESS STANDARDS.

THE PENNSYLVANIA EXPERIENCE IS INSTRUCTIVE. IN 1980, THE PENNSYLVANIA POST CONVICTION HEARING ACT (PCHA), 42 PENNSYLVANIA CONSOLIDATED STATUTES SECTION 9541 ET SEQ. (NOW THE POST CONVICTION RELIEF ACT), INCLUDED AN EXCEPTION TO ITS RULES WICH DEEMED AN ISSUE "FINALLY LITIGATED" OR 'WAIVED" ON BASES SIMILAR TO THOSE APPLIED BY THIS COURT. THAT EXCEPTION PERMITTED THE COURT TO CONSIDER THE MENTS OF A (PCHA) PETITION NOTWITHSTANDING THOS BARS IF THE PETITIONER WAS ABLE "TO PROVE THE EXISTENCE OF EXTRAORDINARY CIRCUMSTANCES TO JUSTIFY HIS FAILURE TO RAISE

THE ISSUE". (ACT OF JAN. 25, 1966, PA. LAWS 1580 (1965) § 4, 19 PA STATS, § 1180-4 (SUPP, 1979-1980).) CONSTRUING THE "EXTRAORDINARY CIRCUMSTANCES" EXCEPTION IN COM. V. WATLINGTON, (1980) 491 PA. 241, 420 A. 2d 431, THE PENNSYLVANIA SUPREME COURT HELD THAT SERIAL INEFFECTIVENESS OF APPELLATE AND SUCCEEDING COUNSEL IN FAILING TO ALLEGE THE CONSTITUTED AND EXTRAORDINARY CIRCUMSTANCE.

BY 1988 THE WATLINGTON RULE HAD PROVED ITSELF INADEQUATE TO STEM THE TIDE OF SUCCESSIVE PETITIONS AND WAS ABANDONED. IN COM. V. LAWSON, (1988) 519 PA. 504, 549 A. 2d 107, THE PENNSYLVANIA SUPREME COURT ADDRESSED THE "VEXING PROBLEM OF REPETITIVE PETITIONS!" (Id., 549 A. 2d AT p. 108.) "THIS APPEAL EVIDENCES THE PROBLEMS THAT CAN ARISE IF WE PERMIT POST-CONVICTION RELIEF TO DESTROY ANY CONCEPT OF FINALITY IN OUR DECISIONAL PROCESS IN THE AREA OF CRIMINAL LAW.... [I]TS IMPORTANCE TO THE INTEGRITY OF OUR SYSTEM OF JURISPRUDENCE REQUIRES OUR ATTENTION...." (Id., AT p. 110.) THE COURT CONCLUDED THAT THE INTENT OF THE LEGISLATURE, AS REFLECTED IN THE (PCHA), TO CURTAIL CONTINUING ASSAULTS ON JUDGMENTS, HAD BEEN UNDERMINED BY "OVERLY GENEROUS JUDICIAL DECISIONS [WHICH] HAVE IN FACT PERMITTED THE MAGIC WORDS "INEFFECTIVE ASSISTANCE OF PRIOR COUNSEL", REGARDLESS OF THE NUMBER OF PRIOR COUNSEL, TO BE EQUATED WITH THE CONCEPT OF "EXTRAORDINARY CIRCUMSTANCES....." (Id., AT p. 111.)

THE SOLUTION WAS TO DISMISS WITHOUT HEARING A SECOND OR SUBSEQUENT APPLICATION FOR POSTCONVICTION RELIEF "UNLESS A STRONG PRIMA FACIE SHOWING IS OFFERED TO DEMONSTRATE THAT A MISCARRIAGE OF JUSTICE MAY HAVE OCCURRED. [I]...[W] WE HOLD TODAY THAT THE MERE ASSERTION OF INEFFECTIVE ASSISTANCE OF COUNSEL IS NOT SUFFICIENT TO OVERRIDE THE WAIVER AND "FINALLY LITIGATED" PROVISIONS IN THE P.C.H.A.. AS TO PERMIT THE FILING OF REPETITIVE OR SERIAL PETITIONS UNDER THE BANNER OF THAT STATUTE. A REPETITIVE OR SERIAL PETITION MAY BE ENTERTAINED ONLY FOR THE PURPOSE OF AVOIDING A DEMONSTRATED MISCARRIAGE OF JUSTIC, WHICH NO CIVILIZED SOCIETY CAN TOLERATE," (549 A.2d AT p. 112, FN OMITTED.)

IN RE FRANK L. RODRIGUEZ, ON HABEAS CORPUS

PETITIONER'S REPLY TO SERGEANT CARR & DEPUTY JIM BENNETT'S ANALYSIS TO EVALUATE THAT PETITIONER WAS UNDER THE INFLUENCE, JUST BY RECOGNITION.

PETITIONER CONTENDS THAT ON JUNE 12, 2003, ALTHOUGH A CRIME WAS COMMITTED IT WAS NOT WITH CONSCIOUS DISREGARD FOR THE LAW. PETITIONER ADMITS HE WAS UNDER THE INFLUENCE OF (METH AMPHETAMINS) PARAPHANALIA WAS COLLECTED AS EVIDENCE, "TWO GLASS SMOKING (METH) PIPES" AS ITEM 16; SEE EXHIBIT (B) FOR LABORATORY RESULTS ALSO FOR LIST OF ITEMS COLLECTED AS EVIDENCE. PETITIONER CONTENDS THE INTENTIONS WERE TO FLEA/ESCAPE APPREHENSION. THERE WAS NEVER A TOXICOLOGY TEST/DRUG TEST EVER SUBMITTED, NO BLOOD TEST WHAT-SO-EVER. WHICH WOULD HAVE CLEARLY SHOWED A POSITIVE RESULT OF DRUG USAGE. PETITIONER DID NOT POSSESS THE MENTAL STATE.

DISTRICT ATTORNEY WITHHELD EVIDENCE, PETITIONER FELLES THAT WAS VITAL TO HIS CASE IT WILL CLEALY SHOW IN EXHIBIT (B) THAT IN ARRESTING REPORT THE EVIDENCE COLLECTED IS DIFFERNT FROM THE EVIDENCE SUBMITTED AT TRIAL.

#1

ON "OCT" 07-2004, I Frank L. Rodriguez was convicted of (3) counts of attempted murder on a officer and (3) counts of assaulting a officer, and on (Dec) 15-2004, I Frank L. Rodriguez was sentence to (3) consecutive life terms plus an additional (60) years

The reason why I was convicted and sentenced to these charges is because on June 12, 2003, I was in a stolen vehicle and ended up in a high speed chase with the cops and during the chase, there were shots fired, at random there was no intent what so ever to kill or hurt any one of the officers, there was no premeditation or planning activity or motive to kill or hurt any of the officers. All I was trying to do was get away from the officers or at leas have them give up there chase, and as all this was going on there were some points where if my intentions were to realy kill or hurt the officers I could of, even the officer Strom and officer Kwiatkowski and officer Vannickblesworth testify that I could of shot at them both (3) or (4) times if I wanted to or if I was realy trying to kill or hurt them.

But just like they both said in there testimony I didn't. I was at point blank range at the times I realy could of done them harm, and like they said I didn't shoot at them, and during this whole incident no one was hurt or killed. I am not saying that I'm totally innocent of any of this I know that I was wrong in my decision makeing. And I thank god every day and night that no-one was hurt or killed. But I just want to be sentenced for the right crime because I feel there is insufficient evidence to support any attempted murder on any one of the (3) officers, I also feel there is no significant evidence about premeditation planning activity, motive or malice or the manner of any attempted murder on any of the officers, to suggest any of these would be an error. Because all I was trying to do was get away from the officer's and also hope they would just give up the chase.

I would like to have a secound chance in life, and to show society that I do belong out there and that I just made some very dumb decisions well I was on druges. I just want to show society I can do good out there, and make sure my kids do good and see them finish school and to one day see them get married someday. So all I am asking is to be sentence for the right charges (CONT'd)

#2

BECAUSE THERE WAS NO-ONE HURT AND THERE IS NO SIGNIFICANT EVIDENCE ABOUT PREMEDITATION PLANNING ACTIVITY, MOTIVE OR MALICE TO THE ATTEMPTED MURDER ON ANY OF THE OFFICER'S AND AGAIN TO SUGGEST ANY OF THESE WOULD BE AN ERROR. SO WITH THAT I THANK YOU VERY MUCH FOR YOUR TIME.

SINCERELY,

FRANK L. RODRIGUEZ
Frank L. Rodriguez
V-63368
JAN-17-08

EXHIBIT A

000145

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SAN DIEGO
NORTH COUNTY DIVISION

DEPARTMENT 22 HON. YURI HOFMANN, JUDGE

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, PLAINTIFF, VS. FRANK LLOYD RODRIGUEZ, DEFENDANT. | NO. SCN163391 |

**REPORTER'S PARTIAL TRANSCRIPT**

OCTOBER 4, 2004
OCTOBER 5, 2004

APPEARANCES:

FOR THE PLAINTIFF: BONNIE DUMANIS
DISTRICT ATTORNEY
BY: PAUL MYERS
DEPUTY DISTRICT ATTORNEY
325 SOUTH MELROSE
SUITE 5000
VISTA, CALIFORNIA 92083

FOR THE DEFENDANT: ELLIOTT & ELLIOTT
BY: KENNETH ELLIOTT
ATTORNEY AT LAW
400 SOUTH MELROSE
SUITE 103
VISTA, CALIFORNIA 92083

JANET F. GIANNANTONIO, CSR 12717
OFFICIAL COURT REPORTER
VISTA, CALIFORNIA

COPY

VISTA, CALIFORNIA, MONDAY, OCTOBER 4, 2004, 1:40 PM 000146

-- JURY VOIR DIRE OF PROSPECTIVE JUROR NO. 10 --

(PROCEEDINGS PRIOR TO WHAT IS HEREIN TRANSCRIBED WERE STENOGRAPHICALLY REPORTED; NOT TRANSCRIBED.)

(PER CCP 237, THE NAME OF ANY SEATED JUROR IS REDACTED TO REFLECT THEIR JUROR SEAT NUMBER.)

**THE COURT:** THANK YOU. [PROSPECTIVE JUROR NO. 10].

**PROSPECTIVE JUROR NO. 10:** MY NAME IS [PROSPECTIVE JUROR NO. 10]. I LIVE IN CARLSBAD. I AM SINGLE. I WORK AS AN OPERATION'S MANAGER IN A RESEARCH AND DEVELOPEMENT DEPARTMENT FOR A FOOTWEAR MANUFACTURING COMPANY.

I HAVE NO CHILDREN. I HAVE NO PRIOR JURY EXPERIENCE. I'VE NEVER BEEN INVOLVED WITH ANYBODY CONVICTED OF A CRIME. MY NEIGHBOR OF TWO YEARS IS CARLSBAD PD AND UNCLE IS ALSO PD IN SAN BERNARDINO COUNTY. NO TO NUMBER 11, 12 AND 13.

(PROCEEDINGS AFTER WHAT HAS BEEN HEREIN TRANSCRIBED WERE STENOGRAPHICALLY REPORTED; NOT TRANSCRIBED.)

VISTA, CALIFORNIA, TUESDAY, OCTOBER 5, 2004, 10:15 AM

(PROCEEDINGS PRIOR TO WHAT IS HEREIN TRANSCRIBED WERE STENOGRAPHICALLY REPORTED; NOT TRANSCRIBED.)

**THE COURT:** THE RECORD WILL REFLECT THAT WE'RE MEETING WITHOUT THE PRESENCE OF THE JURORS WITH THE EXCEPTION OF [JUROR NO. 10] FROM WHOM THE COURT HAS RECEIVED A NOTE THAT READS AS FOLLOWS:

> I'M OBLIGATED TO INFORM YOU THAT I AM BECOMING UNCOMFORTABLE WITH MY ABILITY TO DETERMINE THE FATE OF ONE MAN'S LIFE. I WOULD HOPE TO BE OBJECTIVE, BUT I'M NOT SURE THAT I COULD BE AT THIS POINT.

[JUROR NO. 10], YOU'VE BEEN NOW SWORN AS A JUROR, WHICH MEANS THAT IT'S -- BECOMES SOMEWHAT MORE DIFFICULT TO EXCUSE YOU.

**JUROR NO. 10:** OKAY.

**THE COURT:** CAN YOU TELL US MORE ABOUT WHAT YOU MEAN BY THE NOTE?

**JUROR NO. 10:** IN HAVING THOUGHT ABOUT IT LAST NIGHT, I MEAN, I'M NOT WELL-VERSED IN -- I GUESS I'VE NEVER BEEN A JUROR BEFORE THE BURDEN IS THE WEIGHING THE EVENT TO DETERMINE, LIKE I SAID, THE FATE OF, YOU KNOW, THE NEXT 20 YEARS OF ONE PERSON'S LIFE SAY. I DON'T KNOW THAT I HAVE ABILITY TO -- I'M NOT CONFIDENT WITH MY ABILITY TO -- TO DO THAT. SO --

**THE COURT:** OKAY. DO YOU UNDERSTAND THAT YOUR JUROR -- YOUR DUTY AS A JUROR IS LIMITED. YOU HAVE CERTAIN -- CERTAIN OBLIGATIONS AND SO DOES THE COURT. ONE OF THE THINGS THAT YOU ARE NOT TO CONSIDER AND THAT I WOULD BE INSTRUCTING YOU NOT TO CONSIDER IS PUNISHMENT AND THOSE KINDS OF THINGS BECAUSE THE JURY

IS NOT GOING TO BE DECIDING THAT.

**JUROR NO. 10:** OKAY.

**THE COURT:** THE JURY'S OBLIGATION IS TO LISTEN TO WITNESSES, TO TRY TO DETERMINE WHAT THE FACTS ARE FROM THE EVIDENCE THAT IS PRESENTED DURING THIS TRIAL, AND MAKE JUDGMENTS ABOUT THOSE FACTS.

I CAN TELL YOU THAT I WOULD EXPECT THAT MOST OF YOUR FELLOW JURORS WOULD ALSO NOT BE COMPLETELY COMFORTABLE WITH THIS PROCESS BECAUSE IT'S A VERY SERIOUS SITUATION AND IT'S A VERY DAUNTING TASK --

**JUROR NO. 10:** RIGHT.

**THE COURT:** -- FOR JURORS.

IS YOUR FEELING DIFFERENT FROM THOSE? I MEAN, IS IT SOMETHING THAT YOU'RE TELLING US YOU'RE -- YOU'RE INCAPABLE OF DOING?

**JUROR NO. 10:** I DON'T KNOW THAT I'M INCAPABLE. I JUST FELT THE NEED TO EXPRESS THAT TO YOU.

**THE COURT:** OKAY.

**JUROR NO. 10:** THEY MAY VERY WELL BE FEELING THE SAME, WHETHER THEY FELT THE NEED TO EXPRESS THAT TO YOU, I DON'T KNOW.

**THE COURT:** OKAY. I'M GLAD THAT YOU EXPRESSED THAT TO ME. DO YOU BELIEVE THAT YOU WILL -- CAN YOU DO YOUR BEST AS A JUROR IN THE TASKS THAT YOU ARE GOING TO BE ASSIGNED TO DO?

**JUROR NO. 10:** I WILL DO MY BEST.

**THE COURT:** ALL RIGHT. DID EITHER COUNSEL WISH TO INQUIRE? MR. ELLIOTT?

MR. ELLIOTT: YES, YOUR HONOR. COUPLE QUESTIONS. 000149

BY MR. ELLIOTT:

Q MA'AM, OBVIOUSLY YOU THOUGHT ABOUT THIS A LOT LAST NIGHT. IS IT THE DECIDING SOMEONE'S FATE OR IS IT THE DECIDING THE FACTS OF WHAT'S OCCURRED THAT'S GOT YOU CONCERNED?

A FATE.

Q OKAY. DO YOU THINK THE FACT THAT YOU FEEL THAT WAY WOULD AFFECT YOUR ABILITY TO, LET'S SAY, LISTEN TO ALL THE EVIDENCE?

A NO.

Q OR THE DETERMINE WHAT REALLY WENT ON IN A CERTAIN SITUATION?

A NO.

Q OKAY. JUST SEEMS LIKE A LOT OF RESPONSIBILITY?

A YES.

Q WOULD IT MAKE YOU MORE OR LESS LIKELY TO BE SWAYED BY ONE SIDE OR THE OTHER?

A NO. I'M A VERY FAIR PERSON. I GUESS, IT WAS A HUGE BURDEN.

Q AN UNCOMFORTABLY HUGE BURDEN?

A ENOUGH FOR ME TO WRITE A NOTE TO THE JUDGE.

THE COURT: THANK YOU, MR. ELLIOTT. MR. MYERS?

BY MR. MYERS:

Q MORNING. YOU MENTIONED A NUMBER OF YEARS FOR SOMETHING LIKE THAT. YOU UNDERSTAND THE JUDGE THAT YOU'RE NOT THINK ABOUT THE NUMBER OF YEARS?

A HYPOTHETICAL. THAT WAS HYPOTHETICAL REFERENCE ON

000150

MY PART TO TIME.

Q BUT IS THE PENALTY THAT THE PERSON MIGHT BE FACING ONE OF THE THINGS THAT GIVES YOU A HARD TIME WITH REGARD TO DETERMINING AS PERSON'S FATE?

A POTENTIALLY. I CAN'T SAY FOR SURE. IT WOULD DEPEND, YOU KNOW, WHAT WOULD BE IN FRONT OF ME WHEN DETERMINING UNTIL I GOT THERE.

Q IS THIS GIVING YOU A HARD TIME TO SIT AS A JUROR RIGHT NOW? DOES IT MAKE YOU FEEL UNCOMFORTABLE?

A A LITTLE BIT.

Q WHAT IS IT THAT GIVES YOU THE DISCOMFORT THAT YOU'RE FEELING?

A I'M NOT -- I'M NOT REALLY SURE. IT'S JUST -- IT'S A HEAVY WEIGHT TO -- TO SIT IN JUDGMENT ON SOMEONE, I BELIEVE. I DIDN'T THINK THAT I WOULD FEEL THAT WAY, BUT IN BEING HERE TODAY AND THE SERIOUSNESS OF THE MATTER CHANGED MY MIND.

Q OKAY. IF IT WERE UP TO YOU RIGHT NOW, IF YOU HAD THE CHOICE, WOULD YOU RATHER SIT OR RATHER NOT SIT?

A HONESTLY, I WOULD RATHER NOT SIT. I WOULD RATHER SIT FOR THE EXPERIENCE, BUT I DON'T THINK THAT IT'S ENOUGH AND --

Q AND IT'S BECAUSE OF THE GRAVITY OF THE OFFENSE AND THE GRAVITY OF THE POTENTIAL CONSEQUENCES THAT YOU'RE TROUBLED THIS WAY?

A YES.

Q AND AS YOU SIT HERE, DO YOU THINK THAT THAT GRAVITY MIGHT AFFECT YOU IN THE NEXT COUPLE OF DAYS AS YOU

000151

SIT THROUGH THE CASE AND AS YOU DELIBERATE?

**A** I COULDN'T SAY. RIGHT NOW I FEEL THAT IT WOULD. AFTER SITTING THROUGH A COUPLE OF DAYS, I MAY BECOME COMFORTABLE, BUT AS OF RIGHT NOW SITTING I AM NOT.

**Q** OKAY. AND SO AS OF RIGHT NOW YOU BELIEVE THAT THE GRAVITY OF THIS PROBLEM AND THE GRAVITY OF THE OFFENSE AND THE GRAVITY OF THE FATE THAT THE DEFENDANT MIGHT BE FACING COULD INFLUENCE THE WAY YOU LOOK AT THE EVIDENCE AND THE WAY YOU VIEW THIS CASE?

**A** I WOULD HOPE TO BE OBJECTIVE, AS I SAID. I WOULD -- YOU KNOW, I'M A VERY FAIR AND HONEST PERSON. SO IN LISTENING I WOULD -- I WOULD HOPE THAT WOULDN'T INFLUENCE ME, BUT -- AND BASED ON THE FACT THAT FOLLOWING JURY INSTRUCTIONS, I WOULD HAVE TO FOLLOW THOSE. BUT I WOULD STILL FEEL WEIGHTED. SO YES, TO ANSWER -- ANSWER YOUR QUESTION.

**Q** YOU FEEL IT WOULD INFLUENCE THE WAY YOU VIEW THE CASE BY THE GRAVITY OF THE THING?

**A** POSSIBLY. LIKE I SAID, I DON'T KNOW. I HAVEN'T HEARD ANYTHING TO -- I HAVEN'T HEARD ANY EVIDENCE. I DON'T KNOW, BUT IT'S CONFUSING.

**Q** SO YOU COULDN'T RULE THAT CHANCE OUT?

**A** I CAN'T RULE IT OUT RIGHT AT THIS POINT.

**MR. MYERS:** THANK YOU. I HAVE NOTHING ELSE, YOUR HONOR.

**THE COURT:** ALL RIGHT. MAY I SEE COUNSEL? ONE MOMENT, [JUROR NO. 10].

**(SIDE BAR OUT OF THE PRESENCE OF THE JURY;**

NOT REPORTED.)

**THE COURT:** MR. MYERS, DID YOU WISH TO STATE YOUR MOTION?

**MR. MYERS:** YES, YOUR HONOR. WE'LL WISH TO EXCUSE FOR CAUSE BASED ON THE INDICATIONS THAT THE JUROR HAS SAID.

**THE COURT:** MR. ELLIOTT.

**MR. ELLIOTT:** YOUR HONOR, FOR THE RECORD, I'LL BE OBJECTING. I BELIEVE SHE'S INDICATED A KNOWLEDGE OF THE GRAVITY OF THE CASE BEFORE, BUT HAS NOT INDICATED IN ANY FASHION THAT SHE CAN'T FOLLOW THE LAW. IN FACT, I THINK SHE STATED QUITE PLAINLY THAT SHE STILL CAN.

GIVEN ALL OF HER ANSWERS YESTERDAY AND THE ANSWERS TODAY, I THINK ALL SHE'S DONE IS EXPRESSED A CONCERN FOR THE GRAVITY OF THE CASE RATHER THAN AN INABILITY TO FOLLOW THE LAW. SO I WILL OBJECT TO HER BEING EXCUSED.

**THE COURT:** FINAL, MR. MYERS?

**MR. MYERS:** SUBMITTED ON WHAT YOU SAID IN CHAMBERS.

**THE COURT:** THE COURT WILL EXCUSE [JUROR NO. 10] FOR CAUSE. HER RESPONSES TODAY SEEM TO BE AFTER OBVIOUS RECONSIDERATION BY HER, ARE DIFFERENT THAN THE RESPONSES YESTERDAY, SOME OF THE RESPONSES YESTERDAY. AND THE COURT IS TROUBLED BY HER ABILITY TO BE ENTIRELY FAIR AND IMPARTIAL BASED ON THAT. SHE IS ACCEPTED AS A JUROR IN THIS CASE BASED ON HER RESPONSES YESTERDAY AND THIS NEW INFORMATION WOULD SUGGEST THAT SHE WOULD NOT BE ENTIRELY ABLE TO BE AS FAIR AND IMPARTIAL AS SHE HAD

INDICATED YESTERDAY.

SO THEREFORE THE COURT IS GOING TO EXCUSE [JUROR NO. 10]. THANK YOU.

**JUROR NO. 10:** THANK YOU.

/ / /

**(PROCEEDINGS AFTER WHAT HAS BEEN HEREIN TRANSCRIBED WERE STENOGRAPHICALLY REPORTED; NOT TRANSCRIBED.)**

"EXHIBIT"

"B"

"REPORTER'S APPEAL TRANSCRIPT"

VOLUME #"2"

Q OKAY. AND EAST ON THIS DIAGRAM IS ...
A WOULD BE --
Q EVERYONE'S RIGHT. OKAY. SO MORE PERHAPS EVEN CLOSER TO PARALLEL WITH YOU?
A CORRECT.
Q ALL RIGHT. WAS YOUR VEHICLE AT A COMPLETE STOP AT THIS POINT?
A NO.
Q OKAY. WAS THE RODRIGUEZ/REED VEHICLE AT A COMPLETE STOP AT THIS POINT?
A NO, IT WAS NOT.
Q OKAY. WHAT WAS THE PERIOD OF TIME THAT YOU WERE FACE-TO-FACE WITH MR. RODRIGUEZ AND THE GUN WAS POINTED AS AT YOU'VE DESCRIBED?
A I'D SAY TWO TO THREE SECONDS.
Q TWO TO THREE SECONDS. AND DURING THAT TWO TO THREE SECONDS, HOW MANY TIMES WERE YOU SHOT AT?
A NO TIMES.
Q NO TIMES. AND YOU'VE BEEN SHOOTING GUNS FOR HOW LONG?
A FOURTEEN YEARS.
Q AND HOW LONG DOES IT TAKE TO PULL A TRIGGER?
A REALLY FAST.
Q IN TWO OR THREE SECONDS, YOU COULD PROBABLY --
A PULL IT A COUPLE TIMES.
Q PULL IT A FEW TIMES, RIGHT?
A YES.
Q OKAY. YOU TOLD US THAT SHORTLY AFTER THE PURSUIT

"TESTIMONY FROM OFFICER STROM"

ACCELERATION?

**A** YES.

**Q** SO IF A PERSON IN THE POSITION OF THE BUICK DRIVER, MR. RODRIGUEZ, IS LOOKING AT YOU, HE'S ALSO SEEING THE SHERIFF'S UNIT COMING TO RAM HIM AT THE SAME TIME?

**MR. ELLIOTT:** CALLS FOR SPECULATION.

**THE COURT:** SUSTAINED AS PHRASED.

**BY MR. MEYERS:**

**Q** FROM -- AT THE POINT YOU ACCELERATED, FROM WHAT YOU SAW AND HEARD, THE SHERIFF'S UNIT IS ALSO, AT THE TIME YOU ACCELERATED, GOING TOWARDS THE RODRIGUEZ VEHICLE, IS THAT TRUE?

**A** I -- I DON'T REMEMBER SEEING THAT, NO.

**Q** BUT IMMEDIATE -- SOMETIME AFTER THE ACCELERATION THERE IS THE RAMMING; IS THAT CORRECT?

**A** YES, I DO REMEMBER SEEING THE VEHICLES BEING HIT.

**MR. MYERS:** THANK YOU. NO FURTHER QUESTIONS, YOUR HONOR.

**THE COURT:** THANK YOU, MR. MYERS. MR. ELLIOTT.

**RECROSS-EXAMINATION**

**BY MR. ELLIOTT:**

**Q** THERE WERE STILL DESPITE THIS DISCUSSION THE TWO OR THREE SECONDS WHERE THE GUN WAS POINTED AT YOU AND NOT FIRED; CORRECT?

**A** CORRECT.

**MR. ELLIOTT:** NOTHING FURTHER.

"TESTIMONY FROM OFFICER STROM"

**BY MR. ELLIOTT:**

**Q** ALL RIGHT. AND IS IT AFTER THE SECOND SHOT THAT YOU SEE OFFICER STROM BEGIN TO MOVE TO THE RIGHT OR WHERE IN THAT SEQUENCE OF EVENTS DID HE BEGIN TO MOVE TO THE RIGHT?

**A** I -- I BELIEVE IT WAS JUST PRIOR TO THE SHOTS BEING FIRED. AS SOON AS THE GUN CAME UP IN THE WINDOW, I BELIEVE HE STARTED TO MOVE OVER TO THE RIGHT. THAT'S ABOUT THE SAME TIME I HEARD THE SOUND.

**Q** OKAY. SO THE SEQUENCE OF EVENTS IS YOU SEE THE GUN, OFFICER STROM MOVES TO THE RIGHT THEN YOU HEARD THE TWO POPS; CORRECT?

**A** YES.

**Q** ALL RIGHT. HOW LONG AFTER THAT DID HE BEGIN THE U-TURN THAT YOU'RE TALKING ABOUT?

**A** MATTER OF SECONDS, FIVE TO 10 SECONDS.

**Q** OKAY. AND THIS IS NEAR ADAMS ROAD, AS I UNDERSTAND IT?

**A** YES.

**Q** OKAY. DOES THE BUICK GO RIGHT TO MAKE THE U-TURN TO THE LEFT OR DOES IT JUST SLOW DOWN AND TURN LEFT? HOW DOES THAT HAPPEN?

**A** SLOWS DOWN AND TURNS LEFT.

**Q** OKAY. AT SOME POINT THOUGH THE BUICK TURNING LEFT NOW -- IS NOW TURNED LEFT FAR ENOUGH THAT THE DRIVER SIDE OF THE BUICK IS ESSENTIALLY FACING THE DRIVER'S SIDE OF OFFICER STROM'S CAR; CORRECT?

**A** PRETTY MUCH.

**Q** OKAY. AND I THINK FOR THE RECORD, THAT IS --

THAT'S A 3. PEOPLE'S 3.

AS IN THIS DIAGRAM HERE, IS THIS -- IS THIS ACCURATE IN TERMS WHERE THE VEHICLES WERE AT THE POINT THAT YOU SAW THE GUN POINTED AND I THINK YOU TOLD US AT OFFICER STROM?

**A** REASONABLY. YES, REASONABLY CLOSE.

**Q** OKAY. YOU WERE BEHIND OFFICER STROM IT LOOKS TO BE HALF A CAR LENGTH OR SO?

**A** YES.

**Q** ALL RIGHT. AND WAS THE RODRIGUEZ VEHICLE TRULY PERPENDICULAR LIKE THIS OR WAS IT STARTING TO FACE BACK DOWN HIGHWAY 76?

**A** WELL, AT SOME POINT IT WAS PERPENDICULAR, BUT IT'S VERY SHORT PERIOD OF TIME HE'S MAKING THAT TURN.

**Q** NEVER CAME TO A COMPLETE STOP, THE RODRIGUEZ VEHICLE?

**A** NO.

**Q** PRIOR TO BEING HIT ANYWAY?

**A** NO.

**Q** OKAY. HOW FAR INTO THIS TURN WAS THIS VEHICLE WHEN YOU SAW THE GUN POINTED AT OFFICER STROM?

**A** PROBABLY THE APEX OF THE TURN RIGHT WHEN HE'S ABOUT AT THAT -- AT THAT POINT.

**Q** OKAY.

**A** YES.

**Q** AND YOU SEE THAT AND THEN YOU ACCELERATE ESSENTIALLY INTO THE RODRIGUEZ VEHICLE; CORRECT?

**A** WE'RE ALL DECELERATING AT THIS POINT BECAUSE HE'S

SLOWING DOWN TO MAKE THAT TURN.

Q OKAY.

A AND I'M JUST KIND OF NEGOTIATING MY SPEED NOT -- I DON'T WANT TO GO TOO FAST INTO HIM.

Q SO YOU HAD BEEN GOING MORE THAN 20 MILES AN HOUR AT THAT POINT THAT YOU SEE THIS GUN COMING OUT?

A AT THAT POINT WE WERE PROBABLY DOING ABOUT 20.

Q OKAY. WELL, I GUESS MAYBE LET ME PUT --

A DECELERATING.

Q YOU WERE DECELERATING BECAUSE YOU DIDN'T WANT TO BE GOING MORE THAN 20 WHEN YOU HIT HIM, RIGHT?

A YES.

Q BECAUSE YOU DIDN'T WANT YOUR AIR BAG TO DEPLOY, RIGHT?

A YEAH.

Q OKAY. BE THAT ALL AS IT MAY, IT WAS SOME PERIOD OF TIME SEVERAL SECONDS WHILE STROM WAS MOVING, RODRIGUEZ WAS MOVING AND THE GUN WAS POINTED BY RODRIGUEZ AT STROM; CORRECT?

A YES.

Q TWO SECONDS, FOUR SECONDS, SOMEWHERE IN THERE?

A ONE SECOND.

Q ALL RIGHT. AND YOU'VE ALREADY SHOWED US BY DEMONSTRATION THAT PROBABLY WITH A HALF SECOND DELAY HE COULD HAVE GOTTEN OFF FOUR SHOTS OR SO, RIGHT?

A IN THAT PERIOD OF TIME?

Q SURE. POP, POP, POP.

A WITH A FULL AUTO, YEAH.

TESTIMONY FROM DEPUTY KWIATKOWSKI

Q CERTAINLY IT DOESN'T TAKE MORE THAN A SECOND TO PULL A TRIGGER ONCE, RIGHT?
A RIGHT.
Q AND NO SHOTS WERE FIRED BY MR. RODRIGUEZ AT THIS POINT; CORRECT?
A CORRECT.
Q NOW YOU DECIDED TO USE YOUR VEHICLE TO RAM HIS VEHICLE; CORRECT?
A YES.
Q AND ESSENTIALLY THREW YOURSELF IN THE LINE OF FIRE, AT LEAST YOUR VEHICLE AND YOURSELF IN THE LINE OF FIRE SHOULD HE CHOOSE TO SHOOT; CORRECT?
A YES.
Q AT SOME POINT YOUR CAR, FOR LACK OF A BETTER TERM, ECLIPSES STROM'S VEHICLE; CORRECT? YOU ARE NOW BETWEEN STROM AND RODRIGUEZ, RIGHT?
A NO.
Q YOU WERE NEVER BETWEEN THEM?
A NO.
Q ALL RIGHT. WELL, AT SOME POINT, I GUESS I'LL PUT IT THIS -- WELL, YOU HIT HIM?
A YES.
Q SO THAT MADE YOU THE -- THE DISTANCE OF YOUR HOOD BETWEEN RODRIGUEZ AND YOURSELF, YOUR -- YOUR BODY, RIGHT?
A THE -- THE FOCUS OF HIS ATTENTION DEFINITELY WAS ME AFTER I WAS APPROACHING HIS DRIVER'S SIDE DOOR, YES.
Q OKAY. I GUESS WHAT I'M GETTING TO IS AT THE POINT YOUR CAR HIT HIS CAR, THE DISTANCE BETWEEN YOU AND RODRIGUEZ

IS JUST HOWEVER BIG YOUR HOOD IS, RIGHT?

A YES.

Q ALL RIGHT. AND AT ANY TIME BEFORE YOU HIT HIM OR UP UNTIL THE GUN WENT OUT OF SIGHT, HE DID NOT SHOOT AT YOU EITHER, DID HE?

A NO.

Q WHEN -- WITHDRAW.

YOU'VE ALREADY SHOWN US ON DIRECT EXAMINATION HOW MR. RODRIGUEZ WAS HOLDING THE GUN BEFORE THE U-TURN WHEN YOU SAW THE FIRST SET OF SHOT (SIC), SORT OF BACKWARDS OVER YOUR SHOULDER, LIKE THAT; CORRECT?

A YES.

Q DRIVING WITH YOUR LEFT HAND, POINTING GUN BACKWARDS OVER YOUR RIGHT SHOULDER?

A YES.

Q IS THAT CORRECT?

A I DIDN'T SEE HIS LEFT HAND. I CAN ONLY ASSUME IT WAS STEERING THE WHEEL.

Q WELL, OKAY. LET ME ASK YOU THIS: IF THE LEFT HAND HAD BEEN OUT ON THE FRONT OF THE STOCK, DO YOU THINK YOU WOULD HAVE SEEN THAT AS HE WAS -- UNDERSTAND WHAT I'M ASKING OR DID I NOT ASK THAT VERY WELL?

A WHAT IS IT THAT YOU'RE ASKING, THAT I WOULD HAVE SEEN HIS LEFT HAND?

Q CORRECT. IF HIS -- HIS LEFT HAND HAD BEEN HERE, AS HE LOOKED OVER HIS LEFT SHOULDER, YOU THINK YOU WOULD HAVE SEEN THAT?

A HIS -- AGAIN, YOU ASKING ME IF I WOULD HAVE SEEN

OF THE SHERIFF'S VEHICLE, VANMIDDLESWORTH'S SHERIFF'S VEHICLE CAME TO THE DRIVER'S SIDE OF RODRIGUEZ'S VEHICLE AS THEY PASSED?

A FOUR FEET.

Q ALL RIGHT. SO AT THAT POINT MR. RODRIGUEZ AND DEPUTY VANMIDDLESWORTH WOULD HAVE BEEN SEPARATED BY THE FOUR FEET BETWEEN THEIR VEHICLES AND THE DISTANCE BETWEEN THE PASSENGER SIDE AND THE DRIVER SIDE OF VANMIDDLESWORTH'S CAR?

A YES.

Q EIGHT, 10 FEET. MAYBE?

A THAT'S SOUNDS ABOUT RIGHT.

Q AND YOUR EXPEDITION, AS YOU'VE ALREADY TOLD US, IT'S GOT ALL-TERRAIN STUFF AND IT'S RAISED UPRIGHT?

A YES.

Q SO, FOR EXAMPLE, IF YOU WERE NEXT TO THE RODRIGUEZ VEHICLE, YOU -- HE MIGHT NOT NECESSARILY BE ABLE TO SEE INTO THE CAB OF YOUR CAR OR VEHICLE, RIGHT?

A RIGHT.

Q BUT DEPUTY VANMIDDLESWORTH WAS DRIVING A REGULAR PATROL-TYPE UNIT, RIGHT?

A HE HAD AN EXPEDITION.

Q HE HAD AN EXPEDITION AS WELL?

A OKAY.

Q WERE ANY SHOTS FIRED WHEN THE TWO CARS WERE SIDE BY SIDE?

A NO.

Q THEN THE VANMIDDLESWORTH CAR IS NOW IN FRONT AND

YOU TALKED ABOUT THE POINTING THAT YOU SAW AT THAT POINT?

A YES.

Q WHICH WAS INITIALLY OUT THE DRIVER'S WINDOW?

A YES.

Q TO THE FRONT; CORRECT?

A YES.

Q AND NO SHOTS WERE FIRED THEN?

A NO.

Q AND THEN YOU TOLD US THAT YOU TOLD DEPUTY VANMIDDLESWORTH THE GUN WAS ACTUALLY POINTED TOWARDS HIM THROUGH THE -- THE DRIVER -- THE WINDSHIELD OF THE RODRIGUEZ VEHICLE; CORRECT?

A I WARNED HIM THAT THE GUN WAS POINTED AT HIM.

Q ALL RIGHT. ONCE AGAIN, NO SHOTS FIRED AT THAT POINT; CORRECT?

A NO.

Q OKAY. NO, NOT CORRECT OR NO, NO SHOTS FIRED?

A NO SHOTS FIRED.

Q OKAY. AND HOW FAST WAS EVERYONE GOING DURING THIS POINT, THE POINT WHERE YOU'RE -- HE, VANMIDDLESWORTH, PASSES THE RODRIGUEZ VEHICLE?

A FORTY-FIVE OR 50.

Q ALL RIGHT. THE POINT THAT THE VEHICLES CAME TO REST AT THE END OF THE DRIVEWAY YOU'VE DISCUSSED, WAS YOUR SIREN STILL ON?

A I SHUT IT OFF AT SOME POINT WHEN -- AFTER I WAS STOPPED.

Q AFTER YOU WERE STOPPED. AND WHAT ABOUT DEPUTY

**Q** SO IS IT FAIR TO SAY THAT JUST WITH REGARD TO WHAT YOU OBSERVED, THERE WAS TWO TASKS GOING ON, THE SHOOTING AND THE DRIVING ALSO?

**A** YES.

**Q** WERE THERE TIMES WHERE HE WAS COMPLETELY FOCUSED ON DRIVING AS OPPOSED TO THE SHOOTING?

**A** YES.

**Q** NOW WE'VE TALKED ABOUT HOW MANY SHOTS COULD BE FIRED IN SAY A ONE-SECOND INTERVAL AND THAT LARGELY DEPENDS ON THE TYPE OF WEAPON THAT YOU'RE USING; IS THAT FAIR?

**A** YES.

**Q** IF A FIREARM IS JAMMED, THEN HOW MANY SHOTS CAN YOU FIRE PER SECOND?

**A** NONE.

**Q** UNTIL YOU DO SOMETHING TO UNJAM THE WEAPON; IS THAT CORRECT?

**A** YOU CLEAR IT, YES.

**Q** OKAY. THANK YOU.

**MR. MYERS:** CAN I HAVE A SECOND, PLEASE, YOUR HONOR?

**THE COURT:** YES.

**MR. MYERS:** NO FURTHER QUESTIONS.

**THE COURT:** MR. ELLIOTT. CROSS.

**RECROSS-EXAMINATION**

**BY MR. ELLIOTT:**

**Q** DEPUTY, IT APPEARED TO YOU THAT MR. RODRIGUEZ WAS

TRYING TO GET AWAY FROM YOU, CORRECT, AND OFFICER STROM AND DEPUTY VANMIDDLESWORTH?

A HE WAS TRYING TO GET AWAY FROM US, YES.

Q HE WAS TRYING VERY HARD TO GET AWAY FROM YOU; CORRECT?

A YES.

Q HE WAS SPEEDING AND ALL THE OTHER THINGS MR. MYERS SPENT SOME TIME ON, RIGHT?

A YES.

Q ALL RIGHT. AT THAT POINT WHERE YOUR VEHICLE MADE CONTACT WITH HIS VEHICLE DURING THE U-TURN, DOES IT BEGIN TO DRIVE AWAY, WAS THERE ANYTHING PREVENTING HIM THAT YOU COULD SEE FROM FIRING THE GUN AT THAT POINT?

A OTHER THAN TRYING TO MANEUVER THE VEHICLE AND EVADING, NO.

Q WELL, HE HAD BEEN EVADING YOU AND SHOOTING AT YOU PREVIOUSLY; CORRECT?

A YES.

Q YOU DON'T KNOW WHEN, IF EVER, THE GUN BECAME JAMMED DURING THIS PURSUIT, DO YOU?

A NO.

Q DO YOU KNOW WHAT WOULD BE NECESSARY TO UNJAM A GUN LIKE THIS, IF IT BECAME JAMMED? WHAT ACTIONS WOULD BE NECESSARY?

A YES.

Q WHAT WOULD THAT INCLUDE?

A THE ACTION WOULD HAVE TO BE WORKED TO CLEAR THE JAM.

TESTIMONY FROM VANMICK/ELLSWORTH

FIREARMS INSTRUCTORS, WOULD YOU SAY THAT THOSE TYPES OF SHOTS ON THE CIRCUMSTANCES YOU HAD THAT DAY WERE IMPOSSIBLE TO MAKE IN TERMS OF HITTING PEOPLE?

**A** NO.

**Q** ANOTHER THING WITH REGARD TO THE TIME PERIOD WHERE YOU WERE GOING ALONG SIDE OF MR. RODRIGUEZ JUST PRIOR TO THE TERMINATION OF THE PURSUIT, HIS DRIVER'S SIDE WAS HOW FAR AWAY FROM THE PASSENGER'S SIDE OF YOUR VEHICLE, PASSENGER'S SIDE DOOR?

**A** MAYBE ONLY TWO OR THREE FEET.

**Q** OKAY. SO ESSENTIALLY IF HE STUCK HIS ARM OUT, IT WOULD HAVE BEEN CLOSE ENOUGH FOR HIM TO TOUCH --

**A** PROBABLY.

**Q** -- THE PASSENGER SIDE?

**A** YES. AT SOME POINT, YES, IT WOULD HAVE.

**Q** NOW THE ACTUAL WINDOW OF THE -- THE WINDOWSILL, YOU KNOW WHAT I MEAN BY THE WINDOWSILL OF THE PASSENGER SIDE DOOR?

**A** YES.

**Q** THAT WOULD BE SOME DISTANCE ABOVE HIS HEAD; IS THAT CORRECT?

**A** CORRECT.

**Q** SO ESSENTIALLY, DURING THE TIME PERIOD WHEN YOU'RE PASSING, WHAT HE HAD WAS A VIEW OF THE PASSENGER SIDE DOOR OF YOUR FORD EXPLORER?

**A** CORRECT.

**Q** AND ESSENTIALLY THE MARKINGS, THE STAR, WHATEVER IT IS THAT'S ON THAT; CORRECT?

**A** CORRECT.

**Q** OKAY. AND HE WOULD NOT HAVE BEEN ESSENTIALLY STARING FACE-TO-FACE WITH YOU AS YOU WERE PASSING HIM DURING THAT THE PERIOD, WOULD HE?

**A** NO.

**Q** THANK YOU.

**MR. MYERS:** I HAVE NOTHING ELSE.

**THE COURT:** THANK YOU, MR. MYERS. MR. ELLIOTT.

**RECROSS-EXAMINATION**

**BY MR. ELLIOTT:**

**Q** SO -- SO IT'S POSSIBLE HE COULD HIT YOU? THAT'S BASICALLY YOUR TESTIMONY?

**A** YES.

**Q** AND IF THERE WERE EVEN A ONE PERCENT CHANCE HE COULD HAVE HIT YOU, YOU WOULD HAVE MOVED, WOULDN'T YOU?

**A** OF COURSE.

**Q** YOU DIDN'T SIT THERE AND CALCULATE THE PROBABILITY. I MEAN, THAT'S NOT -- THAT'S NOT HOW PEOPLE THINK?

**A** NO.

**Q** ANYONE SHOOTING ESSENTIALLY IN YOUR DIRECTION AT ALL YOU'D HAVE MOVED, RIGHT?

**A** THAT'S CORRECT.

**Q** IF YOU WERE TEACHING SOMEONE TO SHOOT AND YOU WERE LOOKING FOR SOME OPTIMAL CHANCE OF HITTING YOUR TARGET, WOULD YOU TEACH HIM TO DO IT DRIVING ONE DIRECTION SHOOTING

THE OTHER BACKWARDS OVER THEIR SHOULDER?

**MR. MYERS:** ASKED AND ANSWERED, YOUR HONOR.

**MR. ELLIOTT:** RECROSS.

**THE COURT:** I'LL PERMIT IT. OVERRULED.

**THE WITNESS:** COULD YOU SAY THAT -- COULD YOU ASK ME THAT AGAIN?

**BY MR. ELLIOTT:**

**Q** IF YOU WERE TEACHING SOMEONE TO SHOOT AND GIVING THEM THE OPTIMAL POSSIBILITY OF HITTING THEIR TARGET, WOULD IT BE DRIVING 45 MILES PER HOUR IN ONE DIRECTION, SHOOTING BACKWARDS OVER THEIR SHOULDER INTO THE OTHER DIRECTION?

**A** NO.

**MR. ELLIOTT:** NOTHING FURTHER.

**THE COURT:** ALL RIGHT.

**MR. MYERS:** MAY I, YOUR HONOR?

**THE COURT:** YES, MR. MYERS.

**REDIRECT EXAMINATION CONTINUED**

**BY MR. MYERS:**

**Q** NOW DID MR. RODRIGUEZ HAVE A CHANCE, IN THAT PARTICULAR CONTEXT, TO STAND AT 15 FEET AWAY, PLANT HIS TWO FEET AND FACE HIS TARGET? WAS THAT OPPORTUNITY EVER PRESENTED TO HIM?

**A** NO.

**Q** WOULD YOU ASCRIBE TO GIVING THE POSSIBILITY OF YOU BEING SHOT AT A ONE PERCENT CHANCE BASED ON THE WAY THAT THE AIM WAS TAKEN?

# "EXHIBIT"

# "C"

## "REPORTER'S APPEAL TRANSCRIPT"

## "VOLUME #13"

CERTAINLY NOT IMPOSSIBLE, CERTAINLY CAN BE DONE WITH A REASONABLE AMOUNT OF ACCURACY. SO THE ABILITY OF THE SHOOTER IN THE LEAD VEHICLE TO FIRE TWO SHOTS, STRIKE THE TARGET VEHICLE TWICE IS VERY REPRESENTATIVE OF SOME -- SOME GOOD SHOOTING, NUMBER ONE, AS WELL AS AN INTENT TO STRIKE THAT TARGET VEHICLE OR AT LEAST THE TARGET VEHICLE/DRIVER COMBINATION.

**MR. MYERS:** THANK YOU. I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

**THE COURT:** MR. ELLIOTT, DID YOU WISH TO CROSS-EXAMINE.

**MR. ELLIOTT:** JUST A SECOND. ONE SECOND, YOUR HONOR.

**CROSS-EXAMINATION**

**BY MR. ELLIOTT**

**Q** YOU ASSUME FOR THE PURPOSE OF THAT HYPOTHETICAL THOUGH, DIDN'T YOU, SIR, THAT HE WAS TRYING TO HIT THAT VEHICLE RATHER THAN THE VEHICLE IN FRONT, RIGHT?

**A** WELL, IF THE DIAGRAM IS EVEN REASONABLY CORRECT, THE -- THE VEHICLE IMMEDIATELY BEHIND WOULD BE OUT OF REACH OR OUT OF THE ABILITY OF THE SHOOTER TO TARGET IN ON THAT VEHICLE.

**Q** SO IF THAT LEAD VEHICLE ACTUALLY THE MIDDLE VEHICLE HAD BEEN IN BETWEEN THE TWO VEHICLES OR FARTHER UP ON THE DIAGRAM TO BE MORE IN BETWEEN THEM JUST A SECOND EARLIER, WOULD THAT AFFECT YOUR OPINION AT ALL?

**A** IF THE VEHICLE WAS WITHIN THE LINE OF -- LINE OF SIGHT THEN THE INTENDED TARGET COULD HAVE BEEN THAT

"EXHIBIT"

"D"

"REPORTER'S APPEAL TRANSCRIPT"

VOLUME #6

AFTERNOON A LETTER TO YOUR HONOR HANDWRITTEN BY MR. RODRIGUEZ AND ULTIMATELY I WILL ASK THE COURT TO TAKE THAT INTO CONSIDERATION. DO YOU WISH ME TO WAIT WHILE YOU READ THAT?

THE COURT: YEAH, JUST GIVE ME A FEW MINUTES.

MR. ELLIOTT: FOR THE RECORD, A COPY OF THAT LETTER WAS PROVIDED TO COUNSEL AS WELL.

THE COURT: THANK YOU.

THE COURT HAS HAD AN OPPORTUNITY TO REVIEW MR. RODRIGUEZ' LETTER TO THE COURT.

MR. ELLIOTT: YOUR HONOR, MY COMMENTS COME UNDER THREE GENERAL HEADINGS THIS AFTERNOON. FIRST IS MY OBJECTION TO COUNTS ONE, TWO AND THREE BEING RUN CONSECUTIVE TO EACH OTHER. YOUR HONOR, IN THAT REGARD, I WOULD CITE THE COURT TO BLAKELY VS. WASHINGTON, THE CASE WHICH CONCERNS THE USE OF FACTS TO ESSENTIALLY INCREASE A SENTENCE IN A SITUATION WHERE A SENTENCE IS STATUTORILY SET OUT.

THE BLAKELY CASE HOLDS IN GENERAL THAT A JURY MUST FIND ANY RELEVANT FACT WHICH BUMPS UP A SENTENCE. AND MY POSITION HERE IS THAT THE PROBATION OFFICER'S REPORT ON PAGE 7, IN CITING RULE OF COURT 4.424(A)(2), HAS ANALYZED CERTAIN FACTS AND COME TO THE CONCLUSION BASED ON THOSE FACTS THAT CONSECUTIVE RATHER THAN CONCURRENT SENTENCES ARE APPROPRIATE.

MY POSITION, YOUR HONOR, WOULD BE THAT BLAKELY REQUIRES THAT THOSE FACTS BE FOUND NOT BY THE PROBATION OFFICER OR EVEN BY YOURSELF BUT BY THE

JURY. AND INASMUCH AS THERE IS NO FINDING REGARDING THAT RULE OF COURT AND ANY OF ITS SUB-ITEMS BY THIS JURY, I'M ASKING THE COURT TO RUN COUNTS ONE, TWO AND THREE CONCURRENT TO BLAKELY.

ALSO WITHIN THAT HEADING IS ONE THROUGH THREE BEING CONCURRENT RATHER THAN CONSECUTIVE. I WOULD NOTE 12022.53 SAYS THAT THE ENHANCEMENT FOR THE PERSONAL USE OF A FIREARM OR DISCHARGE OF A FIREARM MUST BE CONSECUTIVE TO THE UNDERLYING SENTENCE. BUT THERE IS NOTHING IN 22.53 WHICH REQUIRES THAT THOSE ENHANCEMENTS BE CONSECUTIVE TO EACH OTHER SO THERE IS NOTHING IN THE STATUTE 12022.53 WHICH REQUIRES THEY BE CONSECUTIVE TO EACH OTHER.

I'M AWARE OF THE CASE PEOPLE VS. SIKES FROM JULY OF THIS YEAR, WHICH INDICATES THAT MY ANALYSIS DOES NOT APPLY IN CONCURRENT VERSUS CONSECUTIVE ISSUES. THAT'S THE COURT OF APPEAL FROM THIS STATE. HOWEVER, UNTIL THE CALIFORNIA SUPREME COURT TELLS ME DIFFERENTLY, I WILL BE MAKING THIS ARGUMENT.

THE SECOND ISSUE, COUNT FOUR, THE RESEARCH -- ACTUALLY MOST OF THIS WE HAVE ALREADY ADDRESSED IN CHAMBERS. I'M ASKING THE COURT TO IMPOSE AND STAY SENTENCE ON EACH OF THOSE COUNTS. THAT THOSE SENTENCES BE NO MORE THAN THE MID-TERM AGAIN FOR THE BLAKELY REASONS. AND THAT THEY BE CONCURRENT WITH EACH OTHER AS WELL AS WITH COUNTS ONE, TWO AND THREE.

FINALLY, YOUR HONOR, MY THIRD HEADING, IF YOU WILL, WILL BE THE PROBATION REVOCATIONS. INASMUCH AS

HE IS RECEIVING THE SENTENCE THAT THE COURT INDICATES IS LIKELY ON COUNTS ONE, TWO AND THREE, I WOULD ASK THE COURT TO CONSIDER, INASMUCH AS THEY ARE NOT STRIKE CASES, THEY BEING THE PROBATION REVOCATIONS, THAT THE COURT CONSIDER RUNNING THOSE CONCURRENT AS WELL.

YOUR HONOR, ON THOSE OBSERVATIONS, AND ON MR. RODRIGUEZ' LETTER, I WILL SUBMIT.

THE COURT: THANK YOU. MR. MYERS.

MR. MYERS: WELL, YOUR HONOR, BEFORE I GIVE MY REMARKS IN RESPONSE, I WOULD ASK IF DEPUTY JIM VAN MIDDLESWORTH COULD ADDRESS THE COURT WITH REGARD TO HIS VIEW OF SENTENCING TODAY.

THE COURT: YES.

DEPUTY VAN MIDDLESWORTH: MY FIRST NAME IS JIMMY, J-I-M-M-Y, VAN MIDDLESWORTH. V-A-N-M-I-D-D-L-E-S-W-O-R-T-H.

YOUR HONOR, I HAVE BEEN IN LAW ENFORCEMENT FOR JUST UNDER 20 YEARS. IN THAT AMOUNT OF TIME, WITH 17 YEARS IN PATROL, IT'S THE FIRST TIME ANYONE HAS TRIED TO SHOOT ME. MR. RODRIGUEZ HAS A LENGTHY CRIMINAL PAST. IT DOESN'T SEEM TO ME THAT WHEN SOMEONE GOES TO THE EXTENT OF TRYING TO SHOOT SOMEONE WHO WALKS THE POINT FOR SOCIETY, WHEN THEIR ACTIONS RISE TO THAT LEVEL, IT DOESN'T SEEM TO ME THAT LENIENCY IS GOING TO DO THEM MUCH GOOD.

A PERSON'S CRIMINAL HISTORY LIKE HIS, SEEMS TO -- OVER THE 20 YEARS THAT I'VE SEEN, RARELY TURNS FROM

# EXHIBIT

# (A)

TO SUPPLEMENTAL GROUND'S.
5 AND 6.

**MR. ELLIOTT:** YES.

**THE COURT:** YOU MAY BE EXCUSED AGAIN. YOU MAY CALL YOUR NEXT WITNESS.

**MR. MYERS:** YES. WE'D LIKE TO CALL MR. ANTHONY DEMARIA, PLEASE. YOUR HONOR.

**ANTHONY DEMARIA,**

**CALLED AS THE PEOPLE'S WITNESS, HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:**

**THE CLERK:** THANK YOU. PLEASE STATE YOUR NAME AND SPELL IT FOR THE RECORD.

**THE WITNESS:** ANTHONY DEMARIA. CAPITAL D-E, CAPITAL, M-A-R-I-A.

**THE CLERK:** THANK YOU.

**DIRECT EXAMINATION**

**BY MR. MYERS:**

**Q** MR. DEMARIA, CAN YOU TELL THE JURY WHAT YOUR OCCUPATION IS?

**A** I'M A CRIMINALIST ASSIGNED TO THE FIREARMS SECTION OF THE SHERIFF'S CRIME LAB.

**Q** COULD YOU TELL THE JURY WHAT IT IS THAT YOU DO WITH REGARD TO THAT TYPE OF JOB; WHAT ARE YOUR DAILY DUTIES?

**A** WORKING IN THE FIREARMS SECTION OF THE CRIME LAB, WE EXAMINE FIREARMS. WE COMPARE BULLETS AND CASINGS TO

GUNS. AND WE ALSO RESPOND TO CRIME SCENES WHERE THERE'S BEEN A SHOOTING AND WE LOOK AT TRAJECTORIES AND RECONSTRUCT CRIME SCENES INVOLVING SHOOTINGS.

**Q** NOW WITH REGARD TO THIS PARTICULAR JOB, WHAT TYPE OF EDUCATION AND ALSO WHAT TYPE OF EXPERIENCE DO HAVE YOU TO QUALIFY FOR THAT POSITION?

**A** THE -- TO BE A CRIMINALIST AT THAT LAB, I'VE A BACHELOR'S DEGREE FROM SAN DIEGO STATE, AND A MASTER'S DEGREE IN FORENSIC SCIENCE.

ONCE EMPLOYED AT THE SHERIFF'S LAB, THE FIREARMS SECTION REQUIRES A THREE-YEAR TRAINING PROGRAM TO BE QUALIFIED AS A FIREARMS CRIMINALIST, OR YOU ATTEND A VARIETY OF CLASSES ON FIREARMS OFFERED BY THE DEPARTMENT OF JUSTICE, CALIFORNIA CRIMINALIST'S INSTITUTE AND FBI AND OTHER TYPES OF AGENCIES OFFERING FIREARMS CLASSES.

**Q** AND WITH REGARD TO THAT, HAVE YOU PREVIOUSLY QUALIFIED IN THE CALIFORNIA COURTS AS AN EXPERT IN THE AREA OF ANALYSIS OF FIREARMS AND ANALYSIS OF CRIME SCENES AS IT PERTAINS TO FIREARMS?

**A** YES, I HAVE.

**Q** AND OVER THE COURSE OF THE LAST 10 YEARS OR SO, COULD YOU APPROXIMATE FOR THE JURY HOW MANY SHOOTING SCENES YOU'VE ACTUALLY RESPONDED TO FOR THE PURPOSE OF INTERPRETING EVIDENCE?

**A** IN THE 10 YEARS BEEN EMPLOYED BY THE SHERIFF'S LAB, I HAVE RESPONDED TO CLOSE TO 300 MAJOR CRIME SCENE INVESTIGATIONS. APPROXIMATELY, IF I HAD TO SAY, MAYBE I'VE BEEN TO 60 SHOOTINGS SCENE INCIDENTS. MANY OF THOSE ARE

OFFICER-INVOLVED SHOOTINGS.

Q HAVE YOU ALSO QUALIFIED IN COURTS IN THE AREA OF INTERPRETATION OF DEFECTS IN SERVICES FOR THE PURPOSES OF POSSIBLE MECHANICAL MARKS LEFT BY BULLETS IN FIREARMS?

A YES. ALSO RESPONDING TO CRIME SCENES IN THE PAST 10 YEARS, EXAMINE NUMEROUS DEFECTS, DIFFERENT SURFACES TO DETERMINE IF THEY WERE CAUSED BY A BULLET.

Q NOW WITH REGARD TO THIS PARTICULAR CASE, DID THERE COME A POINT WHERE YOU WERE SUMMONED TO VALLEY CENTER TO TAKE A LOOK AT A FORD EXPEDITION THAT WAS ASSOCIATED WITH A DEPUTY SHERIFF JOHN KWIATKOWSKI?

A YES. I WAS CONTACTED BY MY SUPERVISOR TO RESPOND TO THE VALLEY CENTER SHERIFF'S STATION TO EXAMINE A FORD EXPEDITION THAT HAD BEEN INVOLVED IN A SHOOTING INCIDENT.

Q AND WHEN YOU WENT UP TO VALLEY CENTER, DID YOU MEET WITH ONE OF THE DETECTIVES ON THE CASE?

A YES, I DID.

Q AND WOULD THAT BE DETECTIVE BLACKMON?

A YES, IT IS.

Q GENTLEMAN WHO IS SEATED TO MY RIGHT?

A YES. THAT'S CORRECT.

Q OKAY. AND DID YOU ACTUALLY TAKE A LOOK AT THE FRONT AREA OF THIS PARTICULAR VEHICLE TO SEE IF THERE WAS ANY TYPES OF IMPRESSIONS OR DEFECTS THAT WERE POSSIBLY ASSOCIATED WITH BULLET HOLES?

A YES, I DID. DEPUTY BLACKMON POINTED OUT AN AREA ON THE PASSENGER'S SIDE NEAR THE BUMPER THAT THERE WAS TWO DEFECTS. ONE WAS ON THE METAL PORTION OF THE BUMPER AND THE

OTHER WAS ON THE PLASTIC OR RUBBER PART OF THE BUMPER JUST BELOW IT.

**MR. MYERS:** IF I MAY HAVE JUST A SECOND PLEASE, YOUR HONOR?

**THE COURT:** YES.

**BY MR. MYERS:**

**Q** I WOULD LIKE TO SHOW YOU WHAT'S BEEN MARKED FOR IDENTIFICATION AS PEOPLE'S EXHIBIT NUMBER 6. AND I WOULD ASK, IF YOU WOULD, TAKE A LOOK AT THAT.

DOES THAT BRING BACK -- DOES THAT REFRESH YOUR RECOLLECTION WITH REGARD TO WHAT YOU SAW ON THE PASSENGER'S SIDE?

**A** YES. THESE ARE -- WERE TWO DEFECTS I WAS ASKED TO EXAMINE AND DETERMINE IF THESE WERE CAUSED BY BULLETS.

**Q** OKAY. AND TO SUFFICE IT TO SAY THAT SOME OF THE DEPUTY SHERIFFS AT VALLEY CENTER THOUGHT THAT THOSE WERE POSSIBLE BULLET DEFECTS?

**A** THAT IS CORRECT.

**Q** AND DID YOU AGREE WITH THAT OR AGREE IN PART OR WHAT WAS YOUR FINAL DETERMINATION BASED ON YOUR INSPECTION OF THAT PASSENGER PART OF THE BUMPER?

**A** FROM LOOKING AT THIS PHOTO HERE, THE --

**Q** EXCUSE ME.

**MR. MYERS:** YOUR HONOR, MAY THE WITNESS COME DOWN PERHAPS AND HOLD THAT PHOTOGRAPH CLOSER TO THE JURY WHILE HE WAS GIVING HIS ANSWERS?

**THE COURT:** OBJECTIONS? YES, YOU MAY STEP DOWN.

/ / /

**BY MR. MYERS**

**Q** IF YOU COULD COME DOWN INTO THE WELL. AND JUST PERHAPS IT'S A SMALL PHOTOGRAPH HOLD IT AS CLOSE TO THE JURY AS YOU CAN.

**A** THERE WAS TWO AREAS ON THE PASSENGER SIDE BUMPER THAT IT'S LOOKING AT. ONE ON THE TOP HERE IS ON THE METAL PORTION OF IT, AND THE OTHER ONE WAS DOWN BELOW. THE HOLE ON THE BOTTOM PERFORATED THE RUBBER OR PLASTIC PORTION OF THE BUMPER, MEANING IT PASSED ALL THE WAY. THE ONE ABOVE DIDN'T PERFORATE; IT JUST IMPACTED. AND WHATEVER THIS WAS MY DETERMINATION, THE ONE ON THE METAL, WASN'T CAUSED BY A BULLET, MAYBE SOME OTHER DAMAGE, THE VEHICLE HIT SOMETHING OR SOMETHING DENTED IT. THIS MARK ON THE METAL IS ALSO RUSTED OUT. SO MAYBE IT WASN'T -- HADN'T OCCURRED RECENTLY.

THE HOLE ON THE BOTTOM WAS ACTUALLY HAD GONE ALL THE WAY THROUGH THE BUMPER, AND IT PUSHED THE PLASTIC INWARD, WHICH IS CHARACTERISTIC OF A BULLET PERFORATING AN OBJECT.

SO MY DETERMINATION WAS THAT BOTTOM HOLE, WHICH I'D LABELED AS "B," WAS CAUSED BY A BULLET. THE UPPER IMPACT WAS CAUSED BY SOME OTHER TYPE OF INCIDENT.

**Q** OKAY. NOW ON THAT PARTICULAR DAY WHEN YOU WENT OUT THERE, DID YOU INSPECT THE ENTIRE SURFACE OF THE CAR INCH BY INCH OR WAS IT JUST SIMPLY YOU LOOK AT THOSE PARTICULAR DEFECTS?

**A** AT -- YEAH. ON THIS OCCURRENCE I JUST WAS EXAMINING THESE TWO AREAS HERE TO SEE WHAT I SHOULD DETERMINE THEY WERE CAUSED BY.

**Q** WAS IT AT A SUBSEQUENT POINT IN TIME POINTED OUT TO YOU OR WERE YOU NOTIFIED THAT THERE WAS ALSO ANOTHER SPOT ON THE BUMPER THAT THE SHERIFFS THOUGHT MAY BE ASSOCIATED WITH A BULLET?

**A** YES. I RECEIVED A PHONE CALL APPROXIMATELY A WEEK AFTER THIS WHERE THE DETECTIVES HAD SAID THEY FOUND EITHER ANOTHER HOLE ON THE DRIVER'S SIDE OF THE VEHICLE ON A PLASTIC PIECE OF MOLDING REALLY LOW, PRETTY CLOSE TO THE GROUND. THEY WANTED ME TO COME BACK OUT AND TAKE A LOOK AT THAT AND SEE IF THAT WAS CAUSED BY A BULLET. AND ALSO -- SO I RESPONDED AND THAT TIME I FIGURED, LET ME TAKE A LOOK AT THE ENTIRE VEHICLE, MAKE SURE THERE'S NOTHING ELSE. AND THAT WAS -- THAT WAS IT.

**Q** AND ON THAT SECOND OCCASION -- CAN YOU PUT THAT ONE, BUT THAT'S ANOTHER SET OF PHOTOGRAPHS I'D LIKE YOU TO LOOK AT. I'D LIKE TO YOU JUST RIGHT HERE IF YOU COULD GO THROUGH PHOTOGRAPHS 21 THROUGH 25. JUST SIMPLY TAKE A LOOK AT THEM AND THEN WHEN YOU'RE FINISHED LOOKING AT THEM, TELL ME IF YOU RECOGNIZE THEM.

**A** YES. THESE WERE -- THIS WAS THE HOLE THAT I WAS ASKED TO TAKE A LOOK AT A WEEK LATER.

**MR. MYERS:** AND FOR THE RECORD WE'RE KEEPING, YOUR HONOR, THE WITNESS IS NOW SHOWING THE JURORS PHOTOGRAPH NUMBER 25.

**BY MR. MYERS**

**Q** PERHAPS YOU COULD APPROACH THE JURORS AND EXPLAIN THOSE PHOTOGRAPHS, WHAT YOU SAW.

**A** ON THIS PHOTOGRAPH HERE, YOU COULD SEE THIS IS ON

THE DRIVER'S SIDE OF THE VEHICLE. AND THE AREA WE'RE LOOKING AT I LABELED IT "C-1," WHICH IS THE LAST PIECE OF PLASTIC MOLDING BEFORE YOU THEN -- YOU HAVE BOTTOM OF THE BUMPER. THERE WAS A HOLE THAT ACTUALLY PERFORATED MEANING IT PASSED ALL THE WAY THROUGH. ONCE AGAIN, SOME OF THESE OTHER PICTURES SHOW A MORE CLOSE-UP VIEW. I'LL GO TO THE MOST ZOOMED IN, WHICH WAS --

**Q** CAN YOU PLEASE READ THE LABEL ON THE BACK OF IT FOR THE RECORD?

**A** THIS IS 24.

**Q** FOR THE RECORD, 24. COULD YOU PLEASE, WITH THE COURT'S PERMISSION, SHOW THAT TO THE JURY AND EXPLAIN WHAT YOU SAW?

**THE COURT:** YES.

**THE WITNESS:** THIS IS A CLOSE-UP VIEW OF THAT HOLE THAT WENT THROUGH. AND LIKE THE OTHER ONE WE LOOKED AT, COMPLETELY PASSED THROUGH THE BUMPER AND IT PUSHED THE RUBBER OR PLASTIC INWARD. SO BOTH OF THESE WERE TRAVELING IN A DIRECT -- FROM A DIRECTION IN FRONT OF THE VEHICLE WHEN THEY STRUCK AND PUSHED THROUGH THE BUMPER, WHICH IS CHARACTERISTIC OF A BULLET HOLE.

**BY MR. MYERS**

**Q** AND BASED ON YOUR OPINION AND EXPERIENCE THAT'S WHAT THOSE TWO DEFECTS YOU'VE OUTLINED CONSTITUTED?

**A** YES. BOTH B-1 AND C-1 WERE CAUSED BY A BULLET TRAVELING THROUGH THE BUMPER. AND A-1 WAS CAUSED BY SOME OTHER EVENT. NOT SURE.

**Q** THANK YOU. YOU MAY RESUME YOUR PLACE ON THE

STAND.

**MR. MYERS:** MAY I HAVE A SECOND, PLEASE, YOUR HONOR?

**THE COURT:** YES.

**MR. MYERS:** NO FURTHER QUESTIONS, YOUR HONOR.

**THE COURT:** THANK YOU, MR. MYERS. MR. ELLIOTT, DID YOU WISH TO CROSS-EXAMINE?

**MR. ELLIOTT:** YES, PLEASE, YOUR HONOR. A FEW QUESTION, IF I MIGHT.

**CROSS-EXAMINATION**

**BY MR. ELLIOTT:**

**Q** SO THAT I'M CLEAR, MR. DEMARIA, WHAT WAS THE DATE YOU WERE FIRST CALLED OUT TO GO LOOK AT THE BUMPER OF THIS VEHICLE?

**A** IF I COULD LOOK AT MY REPORT HERE AND REFER TO THAT?

**Q** WELL, LET ME ASK YOU A COUPLE QUESTIONS BEFORE YOU DO THAT.

DID YOU WRITE A REPORT IN THIS MATTER?

**A** YES.

**Q** AND WHEN IN TIME DID YOU WRITE THAT REPORT?

**A** I'D HAVE TO LOOK AT THE REPORT TO SEE EXACT DATE IT WAS WRITTEN.

**Q** I MEANT, WAS IT CLOSE IN TIME TO WHEN THESE EVENTS OCCURRED OR WAS IT LAST WEEK?

**A** THE -- I WAS ASKED TO RESPOND TO THE VALLEY CENTER STATION, I BELIEVE IT WAS APPROXIMATELY FOUR WEEKS AFTER THE

SHOOTING HAD OCCURRED.

Q THE FIRST TIME?

A THAT'S CORRECT.

Q ALL RIGHT. AND WHEN YOU WROTE THIS REPORT, WAS IT CLOSE IN TIME TO WHEN YOU HAD -- HAD BEEN TO VALLEY CENTER?

A THE FIRST TIME I WENT TO VALLEY CENTER WAS APPROXIMATELY FOUR WEEKS AFTER THE ORIGINAL SCENE. THE SECOND TIME THEY CALLED ME BACK TO TAKE A LOOK AT THE HOLE ON THE DRIVER'S SIDE, WAS, I BELIEVE, APPROXIMATELY A WEEK LATER.

Q OKAY. I'M -- I'M HAVING SOME PROBLEMS THIS MORNING, I'M SORRY.

DID YOU WRITE YOUR REPORT CLOSE IN TIME TO WHEN YOU HAD BEEN TO VALLEY CENTER?

A YES.

Q OKAY. AND AT THE TIME THAT YOU WROTE IT, WAS EVERYTHING IN IT ACCURATE?

A YES.

Q AND DID YOU REVIEW IT PRIOR TO TESTIFYING TODAY?

A YES. REVIEWED ALL MY REPORTS.

Q ALL RIGHT. EVERYTHING SEEMED TO BE ACCURATE TO THE BEST OF YOUR RECOLLECTION?

A YES.

Q OKAY. IF YOU WOULD REVIEW YOUR REPORT AND TELL US THE FIRST DATE YOU RECALL YOU WERE CALLED OUT TO VALLEY CENTER?

A OKAY. IF I COULD LOOK AT MY REPORT?

Q PLEASE.

A OKAY. SEE I FIRST RESPONDED TO VALLEY CENTER ON THE 6TH OF AUGUST OF 2003.
Q OKAY. AND WHEN YOU WENT OUT THERE ON THE 6TH OF AUGUST, WERE YOU DIRECTED TO A PARTICULAR VEHICLE?
A YES, I WAS. I WAS DIRECTED BY DETECTIVE BLACKMON TO A SPECIFIC EXPEDITION.
Q THIS IS MIGHT SEEM STUPID, I'M SORRY, BUT THE BUMPER WAS STILL ATTACHED TO THE VEHICLE AT THIS POINT?
A YES, IT WAS.
Q ALL RIGHT. AND WHERE WAS THE VEHICLE WHEN YOU SAW IT ON AUGUST THE 6TH?
A IT WAS IN THE CORNER OF THE PARKING LOT, KIND OF OFF TO THE SIDE, AWAY FROM ALL THE OTHER PATROL UNITS, PARKED. IT WAS BACKED INTO A -- INTO A PARKING SPACE.
Q ALL RIGHT. AND WHEN YOU APPROACHED THAT VEHICLE THEN SINCE IT WAS BACKED IN, THIS IS THE FENCED-IN PARKING LOT BEHIND THE VALLEY CENTER STATION?
A YES, THAT'S CORRECT.
Q ALL RIGHT. WHEN YOU APPROACHED THAT VEHICLE SINCE IT WAS BACKED IN, YOU APPROACHED IT FROM THE FRONT; IS THAT TRUE?
A THAT IS CORRECT.
Q AND WERE YOU TOLD THAT YOU COULD ONLY LOOK IN A SPECIFIC PLACE FOR DEFECTS? WERE YOU DIRECTED TO DEFECTS OR HOW DID THAT OCCUR?
A I WAS DIRECTED TO THE -- TO EXAMINE THE PASSENGER SIDE BUMPER WHERE THERE WERE TWO DEFECTS THAT THEY WANTED ME TO INTERPRET AND TO DETERMINE IF A BULLET HAD STRUCK THE

PASSENGER'S SIDE BUMPER.

Q WOULD IT BE FAIR TO SAY THEN SINCE YOU WERE APPROACHING FROM THE FRONT THAT NO OTHER DEFECTS WERE IMMEDIATELY OBVIOUS ON YOU?

A AT FIRST GLANCE, JUST LOOKING AT THE CAR THAT WAS THE AREA THAT WAS POINTED OUT. THE -- THOSE DEFECTS WERE PRETTY OBVIOUS. I DIDN'T EXAMINE ANY OTHER AREAS OTHER THAN THAT.

Q WERE YOU FORBIDDEN TO LOOK IN ANY OTHER AREAS?

A NO.

Q OKAY. BUT YOU -- AS YOU APPROACHED THE VEHICLE FROM THE FRONT, THOSE TWO DEFECTS STOOD OUT AND THOSE TWO ALONE; IS THAT TRUE?

A THOSE TWO -- THOSE TWO DEFECTS AS WELL AS THERE WAS SOME DAMAGE I NOTICED. LOOKED LIKE DRIVER'S SIDE MIRROR WAS HANGING, AND SOME DAMAGE TO THE BUMPER AND THINGS LIKE THAT. BUT OTHER THAN THAT, I WAS JUST CONCENTRATING ON THE TWO AREAS ON THE BUMPER.

Q WHAT ABOUT -- I'M SHOWING YOU NOW PICTURE 25. THERE'S A WHITE -- THERE'S A REGULAR HEADLIGHT; YOU SEE THAT?

A YES.

Q AND TO THE LEFT OF THAT, AS WE LOOK AT THIS PICTURE, THERE'S A HEADLIGHT. DO YOU SEE THAT?

A I SEE IT.

Q AND THEN THERE'S A -- SOME SORT OF A WHITE OR AMBER FORWARD-FACING LIGHT BELOW THAT. YOU SEE THAT?

A YES.

Q IN THIS PICTURE DOES THAT -- DOES THERE APPEAR TO BE ANY DAMAGE OR BE ANYTHING UNUSUAL ABOUT THAT LIGHT?
A ABOUT THE YELLOW LIGHT?
Q YEAH.
A IT LOOKS LIKE MAYBE, LIKE, THE BRACKET'S BENT A LITTLE BIT.
Q OKAY. ALL RIGHT. SO AS YOU APPROACH THIS VEHICLE FROM THE FRONT, YOU CAN SEE THAT THERE'S NOTHING OBSTRUCTING YOUR VIEW OF THE FRONT OF THE VEHICLE; CORRECT?
A CORRECT.
Q AND THE SHORT OF IT IS YOU DIDN'T SEE THIS THIRD DEFECT; CORRECT?
A THAT'S CORRECT.
Q ALL RIGHT. SO WHEN DID YOU GO BACK OUT THE SECOND TIME?
A IT WAS -- TO BE EXACT IT WAS AUGUST 18TH, WHICH WAS 12 DAYS AFTER.
Q OKAY. WERE YOU INFORMED AS TO WHETHER OR NOT THIS VEHICLE HAD BEEN MOVED BETWEEN JUNE 12TH, AND YOUR FIRST INSPECTION ON AUGUST THE 6TH?
A NOBODY INFORMED ME IF THE VEHICLE HAD BEEN MOVED. IT APPEARED IT WAS STILL BACKED INTO THE SAME SPOT, IN THE SAME LOCATION AS BEFORE.
Q OKAY. HAD YOU SEEN THE VEHICLE EVER IN YOUR LIFE BEFORE AUGUST 6TH?
A NO.
Q OKAY. AND DID YOU SEE IT BETWEEN AUGUST 6TH AND AUGUST 18TH?

A NO, I DID NOT.

Q YOU CAME BACK OUT; IT SEEMED TO BE PARKED IN ABOUT THE SAME SPACE?

A YES.

Q THIS SECOND DEFECT WAS BROUGHT TO YOUR ATTENTION AT THAT POINT; CORRECT?

A THAT IS CORRECT.

Q DID YOU PERFORM ANY, FOR LACK OF A BETTER TERM, CHEMICAL TESTS ON ANY OF THESE DEFECTS? AND IF SO, WHICH ONES?

A YES. I PERFORMED A TEST WE CALL SODIUM RHODIZONATE, WHICH REACTS WITH LEAD. SO IT'S A -- I TESTED ALL THREE AREAS, A-1, B-1 AND C-1.

Q LET ME STOP YOU THERE, IF I MIGHT.

A OKAY.

Q WHY WOULD YOU PERFORM SUCH A TEST?

A IT'S -- IT'S A GOOD WAY TO SEE MOST -- A LOT OF BULLETS THAT ARE LEAD, YOU KNOW. BULLETS ARE MADE OF LEAD AND WHEN THEY GO THROUGH SOMETHING, THEY'LL ACTUALLY WIPE SOME OF THAT LEAD AROUND THE BULLET HOLE. AND IF YOU GET A POSITIVE REACTION, IT COULD SUPPORT YOUR CONCLUSION BY SAYING NOT ONLY IS THERE A HOLE THERE, BUT I DETECTED LEAD AROUND THE HOLE.

Q WHAT INFORMATION WERE YOU GIVEN ABOUT THIS EVENT PRIOR TO GOING OUT THERE AND PERFORMING THESE TESTS? IN OTHER WORDS, DID YOU HAVE ANY INFORMATION CONCERNING, LET'S SAY, WHAT KIND OF WEAPON WAS INVOLVED?

A NO, I DID NOT. JUST THAT THERE WAS A SHOOTING

INVOLVED SOME OFFICERS IN PURSUIT OF A VEHICLE, AND THEY THOUGHT THAT THE VEHICLE HAD BEEN STRUCK.

**Q** ALL RIGHT. DID THESE TWO BULLET HOLES APPEAR TO BE THE SAME SIZE TO YOU?

**A** NO. THEY WERE DIFFERENT SIZES.

**Q** AND THE RESULT -- I'M SORRY. THE RESULT OF YOUR CHEMICAL TEST WAS THAT IN NONE OF THE THREE DEFECTS DID YOU FIND LEAD RESIDUE; IS THAT CORRECT?

**A** THAT IS CORRECT. ALL THREE OF THE AREAS, A, B AND C WERE NEGATIVE FOR LEAD. SOMETIMES IF BULLETS HAVE JACKETING, COPPER JACKETED, DIFFERENT TYPES, WHICH IS A COPPER COATING THAT COATS THE LEAD PART -- PORTION OF THE BULLET, YOU MIGHT NOT GET A REACTION FROM THE LEAD PASSING THROUGH. OR BEING THAT THE VEHICLE HAD SAT FOR A MONTH WITH THE WEATHER AND CONDITIONS MAY HAVE DETERIORATED, IF THERE WAS LEAD THERE.

**Q** CAN YOU TEST FOR COPPER?

**A** YES. THERE'S A TEST FOR COPPER ALSO THAT CAN BE USED. IN THIS CASE IT WASN'T USED.

**Q** I'M SORRY. SO THAT TEST WAS NOT PERFORMED?

**A** THAT'S CORRECT.

**MR. ELLIOTT:** NOTHING FURTHER.

**THE COURT:** THANK YOU, MR. ELLIOTT. MR. MYERS, REDIRECT.

**REDIRECT EXAMINATION**

**BY MR. MYERS**

**Q** WILL BULLETS THAT GO THROUGH A SURFACE INVARIABLY

LEAVE A POSITIVE FOR LEAD AND DOES THAT HAPPEN EVERY TIME A BULLET GOES THROUGH A SURFACE?

**A** NO. WE DON'T ALWAYS GET POSITIVE RESULTS FROM BULLETS PASSING THROUGH DIFFERENT OBJECTS OR SURFACES.

**Q** WITH THAT BEING SAID AND THE RESULTS OF THE TESTS, IS THERE ANY DOUBT IN YOUR MIND THAT THE DEFECTS THAT YOU SAW CAME FROM BULLETS GOING THROUGH AT A HIGH VELOCITY?

**A** THERE'S NO DOUBT THAT BOTH B AND C ARE CAUSED BY A BULLET PASSING THROUGH THE BUMPER.

**MR. MYERS:** THANK YOU. NO FURTHER QUESTIONS, YOUR HONOR.

**THE COURT:** THANK YOU, MR. MYERS. MR. ELLIOTT.

**RECROSS-EXAMINATION**

**BY MR. ELLIOTT**

**Q** HOW -- GIVEN THE ABSENCE OF LEAD AND NO COPPER TESTING, WHAT DISTINGUISHES THESE HOLES FROM HOLES CAUSED BY SOME OTHER OBJECT OTHER THAN A BULLET?

**A** BULLET HOLES USUALLY PUSH THROUGH THINGS OR PUNCTURE THROUGH WHICH CAUSES THE METAL OR RUBBER TO ACTUALLY PUSH THROUGH AND THEN YOU HAVE A HOLE.

IF YOU WERE TO, SAY, DRILL A HOLE THROUGH THE BUMPER, WHEN YOU DRILL SOMETHING, YOU TAKE AWAY ALL THE METAL OR TAKE AWAY ALL THE RUBBER OR PLASTIC AND YOU HAVE A NICE PERFECT HOLE.

WHEN YOU HAVE A BULLET HOLE, IT ACTUALLY

**San Diego Sheriff's Department**
**CRIME LABORATORY**
5255 Mt. Etna Dr. San Diego, CA 92117 (858) 467-4600

# LABORATORY SERVICE REPORT
## FIREARMS ANALYSIS UNIT

| | | | |
|---|---|---|---|
| **REQUESTED BY:** | Detective J. Blackmon | **SDSO #:** | **03046455** |
| **AGENCY / DIVISION:** | SDSD/Valley Center | **AGENCY #:** | N/A |
| **SUSPECT (S):** | Rodriguez, Frank<br>Reed, Autumn | **CRIME:** | PC 245(a)(1) |
| **VICTIM (S):** | Deputy J. Kwiatkowski<br>Deputy J. Van Middlesworth | **CRIME DATE:** | 06/12/03 |

**SERVICE REQUESTED**

Determine if defects on vehicle are bullet impacts.
Determine directionality of bullet impacts.

**EVIDENCE SUBMITTED**

| | |
|---|---|
| Vehicle Processing Report dated 08/06/03 | Criminalist A. DeMaria |
| Vehicle Processing Report dated 08/18/03 | Criminalist A. DeMaria |
| Vehicle Processing Photos | FET M. Durina |

**EXAMINATION**

Three (3) defects were observed and documented during the processing of a San Diego Sheriff's Patrol Unit #23603, processed at the Valley Center Sheriff's Station (refer to reports dated 08/06/03 and 08/18/03).

Observation A1: Oval shaped defect on passengers side front bumper (gray painted metal surface). The characteristics of "A1" were examined and documented. A chemical test for lead was performed on the defect location.

Observation B1: Oval shaped defect on passengers side front bumper (lower black plastic surface). The characteristics of "B1" were examined and documented. A chemical test for lead was performed on the impact location.

Observation C1: Circular shaped defect on driver's side front bumper (lower black plastic surface). The characteristics of "B1" were examined and documented. A chemical test for lead was performed on the impact location.

**CONCLUSIONS**

(Observation "A1" is not characteristic of a bullet impact. The impact tested negative for lead residue.)

A.D.

**SAN DIEGO COUNTY SHERIFF'S DEPARTMENT CRIME LABORATORY**
**FIREARMS ANALYSIS UNIT**
**CASE NUMBER 03046455**
**(continued)**

Observation "B1" is characteristic of a unstabilized bullet impact that perforated the front bumper at a slightly downward angle. The impact is consistent with a bullet originating from a location in front of the vehicle. The impact tested negative for lead residue.

Observation "C1" is characteristic of a stabilized bullet impact that perforated the front bumper at a slightly downward angle. The impact is consistent with a bullet originating from a location in front of the vehicle. The impact tested negative for lead residue.

**DISPOSITION OF EVIDENCE**

No evidence was obtained from the SDSD Property and Evidence Unit. Detailed notes of the examination are maintained at the Sheriff's Crime Laboratory and are available upon request.

8/19/03
*ANTHONY S. DEMARIA* — *Date*
*CRIMINALIST II # 9791*

8/20/03
*TECHNICAL REVIEW* — *Date*

8/25/03
*ADMINISTRATIVE REVIEW* — *Date*

EXHIBIT

(B)

| CODE SECTION: | PC 664/187 Attempt Murder X3 / CVC 10851 Auto Theft | CASE NUMBER: | 03046455C |
|---|---|---|---|
| | | INCIDENT DATE: | 6/23/2003 |

Deputy Van Middlesworth, Sheriff's Department Firearms Instructor checked the weapon recovered from the suspects vehicle. He said that someone had tampered with the weapon and it may be fully automatic.

Sergeant Carr had Deputy Jim Bennett's (Drug Recognition Expert) evaluate Rodriguez for being under the influence of drugs. Deputy Bennett's said Rodriguez was not under the influence.

On June 12, 2003, Sergeant Carr asked Detectives Persichilli and Bullard to check the roadway, Hwy 76, in the vicinity of and west of Adams Drive for any spent casing. Detective Persicilli and Bullard collected two spent casing matching the spent casing and two live rounds we had collected from the suspect's vehicle earlier. These casing were placed in evidence at the Valley Center Sheriff's Station.

Detective Persicilli and Bullard also interviewed Walter James Boerner resident of the Rancho Corrido Campground. Boerner is also employed as a security guard at the campground. Boerner heard four shots and saw the suspect vehicle. A male Hispanic or Indian was driving and the female passenger was either Hispanic of Indian (See Detective Persichilli's Supplemental Report regarding his actions and Mr. Boerner's statement).

I talked to Richard Staples at approximately 1120 hours on June 13, 2003 and obtained the following statement.

**Witness Richard Staples Statements:**

Staples said he drives a water truck to and from Palomar Mountain daily using Hwy 76. He came down the hill earlier that morning (6/12/2003) and saw the Highway Patrol officer off the road. When he was heading back to Palomar Mountain for another load of water the Highway Patrol had closed Hwy 76. He was walking around trying to find a signal for his cell phone when he saw a spent casing along the curb. He didn't know if it had anything to do with what happened with the officer however he told one of the Highway Patrol officer about the casing and where it was located.

All evidence collected at the scene was placed in evidence at the Valley Center Sheriff's Station including the taped interview of suspect, Frank Lloyd Rodriguez.

**Evidence:**

Item 3- ITM Arms Co Model 99 7.62 Rifle Serial # 0001212
Item 4- Rifle Magazine
Item 5- Two Live 7.62 rounds (taken from vehicle)
Item 6- One empty casing
Item 7- One Smashed casing (found on Hwy 76)
Item 8- One Empty Casing (found on Hwy 76)
Item 9- Social Security Card #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, Frank Lloyd Rodriguez

| REPORTING DETECTIVE | ID # | DIVISION | DATE OF FOLLOW-UP | REVIEWED BY | DATE REVIEWED |
|---|---|---|---|---|---|
| BLACKMON, J. | 0964 | VCO/SH92 | 6/12/2003 | D. CARR SGT 0081 | JUN 16 2003 |

## FOLLOW-UP INVESTIGATION



| CODE SECTION: | PC 664/187 Attempt Murder X3 / CVC 10851 Auto Theft | CASE NUMBER: | 03046455C |
|---|---|---|---|
| | | INCIDENT DATE: | 6/23/2003 |

Item 10- One CD with photos
Item 11- 35mm roll of film (12 exp)
Item 12- 35mm roll of film (12 exp)
Item 13- Nokia Cell Phone Mod 51851 # 25308692191
Item 14- Nokia Cell Phone Mod 5180iP # 072/05874767
Item 15- Motorola Cell Phone Mod 120C # 06608184692
Item 16- Two Glass Smoking (Meth) Pipes
Item 17- One Media Gear Bag with tools
Item 18- One Maestro Black Backpack with flashlight
Item 19- One Large Nylon Bag
Item 20- Kodak Camera
Item 21- One cassette tape of suspect Rodriguez's interview

**Case Disposition:**

**Closed by arrest, sent to the District Attorney for Prosecution.**

| REPORTING DETECTIVE | ID # | DIVISION | DATE OF FOLLOW-UP | REVIEWED BY | DATE REVIEWED |
|---|---|---|---|---|---|
| BLACKMON, J. | 0964 | VCO/SH92 | 6/12/2003 | D. CARR SGT 0081 | JUN 1 6 2003 |

**Statements:** None

**Evidence:**
1) ~~glass pipe (Wt 6.2 Gms.)~~
2) set of keys
Additional evidence to be submitted by detectives.

**Injuries:** None.

**Property Damage:**

**Follow-up:** Detective follow-up

**Related Reports:** See California Highway Patrol officer reports; W. Strom #15750 / J.R. Garcia #14724. Arjis 11 reports. Escondido Police case # 0310347.

# San Diego Sheriff's Department
## *CRIME LABORATORY*

5255 Mt. Etna Drive, San Diego, CA 92117
(858) 467-4600

## LABORATORY SERVICE REPORT

| | | | |
|---|---|---|---|
| REQUESTED BY: | **DIBENE** | CASE #: | **03046455** |
| AGENCY/DIVISION: | **SDSO / VALLEY CENTER** | AGENCY #: | |
| SUSPECT: | **RODRIGUEZ, FRANK** | CRIME: | **245A1 PC** |
| SUSPECT 2: | **REED, AUTUMN** | CRIME DATE: | **06/12/2003** |

**SERVICE REQUESTED:** **CONTROLLED SUBSTANCE ANALYSIS**

**RESULTS:**

| ITEM NUMBER: | 1 | | | | | | |
|---|---|---|---|---|---|---|---|
| COCAINE | | | | | | | |
| HEROIN | | | | | | | |
| LYSERGIC ACID DIETHYLAMIDE (LSD) | | | | | | | |
| MARIJUANA | | | | | | | |
| METHAMPHETAMINE | JBS | | | | | | |
| | | | | | | | |
| | | | | | | | |
| NO CONTROLLED SUBSTANCES DETECTED | | | | | | | |
| NOT EXAMINED | | | | | | | |
| | | | | | | | |
| APPROXIMATE NET WEIGHT (GRAMS) | RESIDUE | | | | | | |

DISPOSITION: ALL ITEMS IN THIS CASE WERE RETURNED TO THE PROPERTY AND EVIDENCE UNIT.

| | | |
|---|---|---|
| JEFF SALAMAT | 6-24-03 | [signature] 6-26-03 |
| ANALYST | DATE | ADMIN / TECH REVIEWER / DATE |

Page 1 of 1

PEOPLE OF THE STATE OF CALIFORNIA
VERSUS
FRANK LLOYD RODRIGUEZ

CASE NO. SCN163391-02

MASTER INDEX 0

CHRONOLOGICAL EXHIBIT INDEX

VOLUME 2-OCTOBER 5, 2004


| EXHIBITS MARKED | PAGE:LINE |
|---|---|
| PEOPLE'S EXHIBIT 1 (RIFLE) | 39:4 |
| PEOPLE'S EXHIBIT 3 (DIAGRAM) | 42:16 |
| PEOPLE'S EXHIBIT 2 (DIAGRAM) | 64:1 |
| PEOPLE'S EXHIBIT 4 (DIAGRAM) | 78:18 |
| PEOPLE'S EXHIBIT 5 (DIAGRAM) | 82:12 |
| PEOPLE'S EXHIBIT 12 (PHOTOGRAPH) | 84:1 |
| PEOPLE'S EXHIBITS 10, 11 (PHOTOGRAPHS) | 85:20 |
| PEOPLE'S EXHIBIT 6 (PHOTOGRAPH) | 88:18 |
| PEOPLE'S EXHIBIT 9 (PHOTOGRAPH) | 136:5 |

PEOPLE OF THE STATE OF CALIFORNIA
VERSUS
FRANK LLOYD RODRIGUEZ

CASE NO. SCN163391-02

MASTER INDEX 0

CHRONOLOGICAL EXHIBIT INDEX

VOLUME 3-OCTOBER 6, 2004


| EXHIBITS MARKED | PAGE:LINE |
|---|---|
| PEOPLE'S EXHIBITS 21-25 (PHOTOGRAPHS).......... | 225:7 |
| PEOPLE'S EXHIBIT 14 (PHOTOGRAPH)............... | 282:10 |
| PEOPLE'S EXHIBIT 13 (SOCIAL SECURITY CARD)..... | 282:27 |
| PEOPLE'S EXHIBIT 15 (TWO LIVE ROUNDS).......... | 284:6 |
| PEOPLE'S EXHIBIT 16 (ONE EXPENDED CASING)...... | 284:24 |
| PEOPLE'S EXHIBIT 17 (ONE EXPENDED CASING)...... | 285:2 |
| PEOPLE'S EXHIBIT 18 (ONE EXPENDED CASING....... | 285:11 |
| PEOPLE'S EXHIBIT 19 (SOCIAL SECURITY CARD)..... | 285:19 |
| PEOPLE'S EXHIBIT 20 (RIFLE MAGAZINE)........... | 285:25 |

| EXHIBITS RECEIVED | PAGE:LINE |
|---|---|
| PEOPLE'S EXHIBITS 1-25 RECEIVED................ | 296:3 |

JS44

(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

2254 1983

FILING FEE PAID Yes___ No ✓

IFP MOTION FILED Yes___ No___

COPIES SENT TO Court ✓ ProSe

FILED

FEB - 1 2008

CLERK, U.S. DISTRICT COURT SOUTHERN DISTRICT OF CALIFORNIA BY DEPUTY

**I (a) PLAINTIFFS**

**Frank L. Rodriguez**

**DEFENDANTS**

**Tilton, et al**

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** Lassen

**(EXCEPT IN U.S. PLAINTIFF CASES)**

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT

(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

**Frank L. Rodriguez**
**PO Box 3030**
**Susanville, CA 96127**
**V-63358**

ATTORNEYS (IF KNOWN)

'08 CV 0205 IEG PCL

**II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)**

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX (For Diversity Cases Only) FOR PLAINTIFF AND ONE BOX FOR DEFENDANT**

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐1 | ☐1 | Incorporated or Principal Place of Business in This State | ☐4 | ☐4 |
| Citizen of Another State | ☐2 | ☐2 | Incorporated and Principal Place of Business in Another State | ☐5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

**IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY).**

**28 U.S.C. 2254**

**V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)**

**CONTRACT:** ☐ 110 Insurance; ☐ Marine; ☐ Miller Act; ☐ Negotiable Instrument; ☐ 150 Recovery of Overpayment &Enforcement of Judgment; ☐ 151 Medicare Act; ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans); ☐ 153Recovery of Overpayment of Veterans Benefits; ☐ 160 Stockholders Suits; ☐ Other Contract; ☐ 195 Contract Product Liability

**TORTS — PERSONAL INJURY:** ☐ 310 Airplane; ☐ 315 Airplane Product Liability; ☐ 320 Assault, Libel & Slander; ☐ 330 Federal Employers' Liability; ☐ 340 Marine; ☐ 345 Marine Product Liability; ☐ 350 Motor Vehicle; ☐ 355 Motor Vehicle Product Liability; ☐ 360 Other Personal Injury

**TORTS — PERSONAL INJURY:** ☐ 362 Personal Injury- Medical Malpractice; ☐ 365 Personal Injury - Product Liability; ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY:** ☐ 370 Other Fraud; ☐ 371 Truth in Lending; ☐ 380 Other Personal Property Damage; ☐ 385 Property Damage Product Liability

**FORFEITURE/PENALTY:** ☐ 610 Agriculture; ☐ 620 Other Food & Drug; ☐ 625 Drug Related Seizure of Property 21 USC881; ☐ 630 Liquor Laws; ☐ 640 RR & Truck; ☐ 650 Airline Regs; ☐ 660 Occupational Safety/Health; ☐ 690 Other

**LABOR:** ☐ 710Fair Labor Standards Act; 720 Labor/Mgmt. Relations; ☐ 730 Labor/Mgmt. Reporting & Disclosure Act; ☐ 740 Railway Labor Act; ☐ 790 Other Labor Litigation; ☐ 791 Empl. Ret. Inc.; ☐ Security Act

**BANKRUPTCY:** ☐ 422 Appeal 28 USC 158; ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS:** ☐ 820 Copyrights; ☐ 830 Patent; ☐ 840 Trademark

**SOCIAL SECURITY:** ☐ 861 HIA (13958); ☐ 862 Black Lung (923); ☐ 863 DIWC/DIWW (405(g)); ☐ 864 SSID Title XVI; ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS:** ☐ 870 Taxes (U.S. Plaintiff or Defendant); ☐ 871 IRS - Third Party 26 USC 7609

**OTHER STATUTES:** ☐ 400 State Reappointment; ☐ 410 Antitrust; ☐ 430 Banks and Banking; ☐ 450 Commerce/ICC Rates/etc.; ☐ 460 Deportation; ☐ 470 Racketeer Influenced and Corrupt Organizations; ☐ 810 Selective Service; ☐ 850 Securities/Commodities Exchange; ☐ 875 Customer Challenge 12 USC; ☐ 891 Agricultural Acts; ☐ 892 Economic Stabilization Act; ☐ 893 Environmental Matters; ☐ 894 Energy Allocation Act; ☐ 895 Freedom of Information Act; ☐ 900 Appeal of Fee Determination Under Equal Access to Justice; ☐ 950 Constitutionality of State; ☐ 890 Other Statutory Actions

**REAL PROPERTY:** ☐ 210 Land Condemnation; ☐ 220 Foreclosure; ☐ 230 Rent Lease & Ejectmant; ☐ 240 Tort to Land; ☐ 245 Tort Product Liability; ☐ 290 All Other Real Property

**CIVIL RIGHTS:** ☐ 441 Voting; ☐ 442 Employment; ☐ 443 Housing/Accommodations; ☐ 444 Welfare; ☐ 440 Other Civil Rights

**PRISONER PETITIONS:** ☐ 510 Motions to Vacate Sentence Habeas Corpus; ☒ 530 General; ☐ 535 Death Penalty; ☐ 540 Mandamus & Other; ☐ 550 Civil Rights

**VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)**

☒ 1 Original Proceeding ☐ 2 Removal from State Court ☐ 3 Remanded from Appelate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ 6 Multidistrict Litigation ☐ 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:** ☐ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23 **DEMAND $** Check YES only if demanded in complaint: **JURY DEMAND:** ☐ YES ☐ NO

**VIII. RELATED CASE(S) IF ANY (See Instructions):** JUDGE Docket Number

DATE 2/1/2008 ~~SIGNATURE OF ATTORNEY OF RECORD~~

[signature]

CR